1
2
3
4
5
6
7
8            UNITED  STATES  DISTRICT  COURT

9         FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

10

11   **STRIKEPOINT TRADING, LLC, a**          **CASE NO. SACV 07-1073 DOC**
     **California limited liability company;**     **(MLGx)**
12   **and OPTIONEER, LLC, a Nevada**
     **limited liability company,**
13                                              **O R D E R** GRANTING IN PART
                  **Plaintiff(s),**             AND DENYING IN PART
14                                              DEFENDANTS' MOTION FOR
           **v.**                               SUMMARY JUDGMENT
15
     **AIMEE ELIZABETH SABOLYK, an**
16   **individual dba INNOVATIVE**
     **OPTION STRATEGIES, and**
17   **GLOBAL ASSET ADVISORS, LLC,**
     **an Illinois limited liability company;**
18   **and JOHN MATTHEW**
     **MONDRAGON, an individual,**
19
                  **Defendant(s).**
20

21

22

23

24   _____

25         Before the Court is Defendants Aimee Elizabeth Sabolyk, John Mondragon, and Global

26   Assets Advisors, LLC's (collectively "Defendants") Motion for Summary Judgment or, in the

27   alternative, Partial Summary Judgment.  After considering the moving, opposing, and replying

28   papers thereon, as well as the parties' oral argument, the Court hereby GRANTS IN PART and

1  DENIES IN PART Defendants' Motion.

2  **I.      BACKGROUND**

3          Plaintiff StrikePoint, LLC ("StrikePoint") is a commodity futures and options brokerage

4  firm located in Mission Viejo, California.  StrikePoint was formed in 2004 by its members,

5  Plaintiff Optioneer, LLC ("Optioneer") (Optioneer and StrikePoint are, collectively, "Plaintiffs")

6  and Altavest Worldwide Trading, Inc ("Altavest").  Optioneer is a fifty percent owner of

7  StrikePoint.  StrikePoint's primary business is acting as the introducing broker for customers of

8  Optioneer.  Optioneer's clients are subscribers to a program of trading strategy for trading in the

9  options and futures markets ("the Optioneer strategy") developed by Optioneer across twenty-

10  five years and tested for seven years.

11          More specifically, Optioneer and StrikePoint service investors who trade in index options,

12  a small subset of options based on the future price of indexes such as the S&P 500 and

13  NASDAQ 100.  Due to this specific type of trading, Plaintiffs contend that index option

14  investors comprise a small niche clientele and are costly to target and retain as clients.

15  Optioneer engages in extensive marketing campaigns to attract such clientele.  StrikePoint

16  contends that it aids Optioneer in these efforts by, for example, sending its brokers to various

17  seminars to promote the Optioneer strategy and by reimbursing Optioneer for its costs in various

18  years.

19          StrikePoint has no direct contracts between itself and subscribers to the Optioneer

20  strategy.  However, when Optioneer enters into agreements with clients, those agreements

21  require that the client subscribers execute all trades using the Optioneer strategy through

22  Strikepoint.  Further, StrikePoint ultimately executes the clients' trades exclusively through R.J.

23  O'Brien & Associates, Inc. ("RJO"), a Futures Commissions Merchant registered with the

24  Commodities Futures Trading Commission.  The relationship between StrikePoint and RJO is

25  memorialized in a written Clearing Agreement.

26          StrikePoint contends that it engages in a number of precautions to protect its allegedly

27  proprietary customer information.  For example, it states that it has all employees sign

28  confidentiality/non-disclosure agreements that identify customer information as confidential.  It

indicates that StrikePoint's Policy and Procedures Manual identifies customer information as protected. It also claims that brokers are told not to contact clients outside of the StrikePoint setting, are admonished not to download client information for personal use, and are given limited internet access.

Aimee Sabolyk ("Sabolyk") and John Mondragon ("Mondragon") were brokers for StrikePoint. Both signed confidentiality/nondisclosure agreements as part of their employment with StrikePoint that identify customer information as confidential. Plaintiffs allege that Sabolyk and Mondragon left StrikePoint to work for Global Asset Advisors, LLC ("GAA"), a commodities and futures brokerage company in Chicago, Illinois, and that in doing so, Sabolyk and Mondragon are using client information they misappropriated from StrikePoint.

Aimee Sabolyk left StrikePoint on June 1, 2007, and started working for GAA shortly thereafter, relocating from California to Illinois. Sabolyk had worked for StrikePoint since its inception as she was originally an employee of Altavest (Altavest was the sole introducing broker for Optioneer prior to the formation of StrikePoint). StrikePoint alleges that as of May 2008, eleven of Sabolyk's fourteen GAA clients are former StrikePoint clients. As evidence of misappropriation, StrikePoint contends that Sabolyk's personal email and phone records demonstrate that she engaged in inappropriate contact with StrikePoint clients both before and after her resignation. Further, StrikePoint points out that Sabolyk downloaded protected client information into an Excel spreadsheet days before her departure, for no apparent work purpose, and likely emailed the spreadsheet using her personal email account. StrikePoint also accuses Sabolyk of making a libelous statement regarding StrikePoint to a former StrikePoint client.

Mondragon joined StrikePoint as a commodities broker on or about July 11, 2005 and ultimately quit his position on January 7, 2008, after being demoted by StrikePoint. Shortly thereafter, Mondragon, who is originally from Chicago, moved back to the city and started working for GAA. StrikePoint's evidence against Mondragon consists of a boastful statement he allegedly made to another StrikePoint client regarding taking clients with him to GAA. Further, StrikePoint indicates that once Mondragon began working for GAA, GAA assigned Mondragon "leads," i.e. prospective GAA clients, who were all current StrikePoint clients. Further, a

1  majority of Mondragon's GAA current clients are former StrikePoint clients.

2        StrikePoint further contends that GAA facilitated and encouraged Sabolyk and

3  Mondragon's misappropriation of client information.  StrikePoint identifies that four of the

4  fifteen brokers that left StrikePoint within a two year period all went to work for GAA,

5  relocating almost two-thousand miles.  Further, Strikepoint points out that GAA has its

6  employees sign agreements identifying customer lists as confidential information and prohibiting

7  GAA employees from soliciting GAA clients.  Thus, GAA likely knew Mondragon and Sabolyk

8  were subject to such restrictions by StrikePoint regarding clients serviced by Mondragon and

9  Sabolyk while they worked at StrikePoint.

10        GAA contends that it engages in more than index option trading, the sole investment of

11  StrikePoint, thus GAA has no need to target StrikePoint clientele using StrikePoint's former

12  employees.  Further, all Defendants contend that StrikePoint clients merely followed Sabolyk

13  and Mondragon to GAA and were not improperly identified or solicited by Defendants.  They

14  point out that all StrikePoint clients who are now GAA clients signed forms indicating that they

15  had not been solicited by Defendants.

16        On September 24, 2007, Plaintiffs filed a complaint against Sabolyk and GAA for: (1)

17  Violation of the Computer Fraud and Abuse Act (against Sabolyk only); (2) Breach of contract

18  (against Sabolyk only); (3) Unfair Competition; (4) Unfair Business Practices; (5)

19  Misappropriation of Trade Secrets; and (6) Tortious Interference with Contractual Relationship

20  (against GAA only).

21        On July 21, 2008, this Court granted Plaintiffs' Motion for a Preliminary Injunction,

22  enjoining Defendants from "(1) soliciting or accepting any further business from Plaintiffs'

23  customers whose records Defendants used in violation of the non-disclosure and non-compete

24  agreements and (2) using or disclosing any StrikePoint records."  Defendants were also "ordered

25  to return all of Plaintiffs' customer records to StrikePoint."

26        Further, on September 10, 2008, Plaintiffs filed a First Amended Complaint, adding John

27  Mondragon as a defendant and adding a trade libel claim against Sabolyk..

28        Defendants brought the instant motion for summary judgment on November 24, 2008, as

1  to all Plaintiffs' causes of action.

2  **II.    LEGAL STANDARD**

3      Summary judgment is proper if "the pleadings, depositions, answers to interrogatories,

4  and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

5  to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.

6  R. Civ. P. 56(c).

7      The Court must view the facts and draw inferences in the manner most favorable to the

8  non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993 (1962);

9  *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears

10  the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it

11  need not disprove the other party's case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256,

12  106 S. Ct. 2505 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S. Ct. 2548 (1986).

13  When the non-moving party bears the burden of proving the claim or defense, the moving party

14  can meet its burden by pointing out that the non-moving party has failed to present any genuine

15  issue of material fact. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

16      Once the moving party meets its burden, the "adverse party may not rest upon the mere

17  allegations or denials of the adverse party's pleading, but the adverse party's response, by

18  affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is

19  a genuine issue for trial. If the adverse party does not so respond, summary judgment, if

20  appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e); *see also*

21  *Anderson,* 477 U.S. at 248-49. Furthermore, a party cannot create a genuine issue of material

22  fact simply by making assertions in its legal papers. There must be specific, admissible evidence

23  identifying the basis for the dispute. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter*

24  *Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1980). The Supreme Court has held that "[t]he

25  mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on

26  which the jury could reasonably find for [the opposing party]." *Anderson*, 477 U.S. at 252.

27  **III.    DISCUSSION**

28

### A. Plaintiff's[1] Second and Third Causes of Action

Defendants first argue that judgment as a matter of law should be entered in their favor as to Plaintiff Strikepoint's Second and Third Causes of Action. By its second and third causes of action, Strikepoint seeks contract damages for Sabolyk and Mondragon's alleged breach of Strikepoint's Confidentiality/Non-Disclosure Agreements ("CNDAs") signed by both defendants on March 16, 2006, due to their alleged use and disclosure of protected client information.

The only argument advanced by Defendants regarding why Strikepoint's claims must fail as a matter of law is that the CNDAs are unenforceable restraints on trade under California Business and Professions Code § 16600.

California Business and Professions Code section 16600 ("section 16600") states that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

The portions of the CNDAs at issue according to Defendants are paragraphs three (3), six (6), and seven (7). Paragraph three reads as follows:

> During the term of Employee's employment by Employer, Employee shall not, directly or indirectly, invest or engage in any business that is competitive with Employer. For three years following his/her termination of employment for any reason, Employee agrees not to undertake any employment or activity competitive with Employer's business wherein the loyal and complete fulfillment of the duties of the competitive employment or activity would call upon Employee to reveal, to make judgment on or otherwise to use, any confidential information or trade secrets of Employer.

Paragraph six states:

---

[1]The Court uses the singular "Plaintiff" here as these two causes of action are only brought by StrikePoint and do not include Optioneer.

1                In consideration of the Employer's employing Employee in a

2                position wherein he/she has and will establish personal relationships

3                with the Employer's clients and accounts, Employee covenants and

4                agrees that he/she shall not, either directly or indirectly, for

5                himself/herself or for any other person or entity, call upon, solicit,

6                divert, or take away, or attempt to do so, any of the clients or

7                accounts of Employer, with which he/she has become acquainted, or

8                acquired the names of, during the course of his/her employment with

9                Employer.

10  Paragraph seven reads:

11               Employee acknowledges that during the term of his/her employment,

12               he/she will be working closely with and/or supervising other

13               employees of Employer.  Employee acknowledges that such co-

14               workers are employees of Employer, and are a valuable resource of

15               the Employer.  Employee agrees, during the term of this Agreement

16               and for a period of two (2) years following its termination or

17               expiration, not to directly or indirectly solicit, encourage, entice, or

18               cause any employee of Employer, including those employees

19               supervised by Employee or whose activities Employee may have

20               directed, to terminate his/her employment.  Employee further agrees

21               not to employ, directly or indirectly, any person who was employed

22               by Employer at any time during the twelve (12) month period

23               preceding the termination or expiration of this Agreement.

24      In making their argument that these provisions render the CNDAs invalid under section

25  16600, Defendants rely on recent California Supreme Court case *Edwards II v. Arthur Andersen*

26  *LLP*, 44 Cal. 4th 937 (2008).  However, while the *Edwards* Court reiterated the strong California

27  policy against covenants not to compete, as Plaintiffs point out, the *Edwards* Court expressly

28  states that it is not addressing the trade secret exception to covenants not to compete.  *Edwards*,

44 Cal. 4th at 946, n. 4 ("We do not here address the applicability of the so-called trade secret exception to section 16600, as Edwards does not dispute that portion of his agreement or contend that the provision of the noncompetition agreement prohibiting him from recruiting Andersen's employees violated section 16600").

Thus, while California strongly disfavors covenants not to compete, the competition must remain fair.  As a result and notwithstanding *Edwards*, covenants not to compete may be enforceable if "necessary to protect the employer's trade secrets" or other protected, confidential proprietary information.  *Metro Traffic Control, Inc. v. Shadow Traffic Network*, 22 Cal. App. 4th 853, 859-61 (1994) (*citing Muggil v. Reuben H. Donnelley Corp.*, 62 Cal. 2d 239, 242 (1965)).

The Court proceeds to examine whether this limitation on the reach of section 16600 applies to the contractual provisions at issue in the instant case.  To begin, the first sentence of paragraph 3, preventing *current* employees from competing with StrikePoint is enforceable under California Labor Code § 2863 and does not implicate section 16600.  Cal. Lab. Code § 2863 ("An employee who has any business to transact on his own account, similar to that instrusted to him by his employer, shall always give the preference to the business employer").

Further, the second sentence of paragraph three that limits a post-termination employee from working for a competitor only limits such work if the new employment "would call upon Employee to reveal, to make judgments on or otherwise to use, any confidential information or trade secrets of Employer."  The language of this provision alone does not violate section 16600. The wording clearly indicates that future competitive employment is only problematic if StrikePoint's confidential information or trade secrets will be compromised by the employment, thus preventing the departing employee only from engaging in *unfair* competition.

Paragraph six also directly implicates protected information as it requires the departing employee not to solicit StrikePoint's clients.  StrikePoint claims that such clients and client information in fact constitute the trade secret and confidential information at issue in this case. Indeed, paragraph four of the CNDA identifies "client/account lists," "client/account information" and "other records owned by or associated with the Employer and/or its clients" as

1   "trade secrets and other confidential commercial and personal information."  While the Court

2   recognizes that labeling something a trade secret does not necessarily make it so, *Thompson v.*

3   *Impaxx, Inc.*, 113 Cal. App. 4th 1425, 1430 (2003), Defendants have essentially asked the Court

4   to determine if the terms of the agreement alone render it void under section 16600.  Just looking

5   at the language of the CNDA suggests that paragraph six also only limits competition that is

6   unfair i.e. competition that reaches the previous employer's confidential, proprietary

7   information.  *See Gordon v. Landau*, 49 Cal. 2d 690, 694 (holding covenant not to solicit former

8   clients enforceable where information about those clients was protected as a trade secret).

9        The remaining paragraph seven prohibits departing employees from soliciting or hiring

10  StrikePoint employees.  There is no limiting language in this paragraph suggesting that the

11  departing employee cannot solicit or hire a current StrikePoint employee only if that current

12  employee may exploit protected information.  As to solicitation, there is case law suggesting that

13  such provisions do not violation section 16600.  *See Loral Corp. v. Moyes*, 174 Cal. App. 3d

14  268, 280 (1985), a point which Defendants do not contest.  Instead, the force of Defendants

15  argument rests on the "no-hire"provision.  Admittedly, "no-hire" provisions that reach beyond

16  solicitation are problematic under section 16600 as they clearly limit the mobility of current

17  employees.  *Loral Corp.*, 174 Cal. App. 3d at 279-80; *VL Systems, Inc. v. Unisen, Inc.*, 152 Cal.

18  App. 4th 708, 718 (2007).

19       Thus, the remaining issue here is whether the suspect no-hire provision, a portion of

20  paragraph seven, renders the entire CNDA invalid even when that provision is not part of the

21  underlying breach of contract claim.  The Court declines to reach such a result and does not find

22  that Defendants' case law compels a different outcome.  For example, in *Kolani*, the court

23  indicated that it would not rewrite a too broad covenant not to compete in order to save it from

24  invalidation under section 16600 at the point of litigation.  *Kolani v. Gluska*, 64 Cal. App. 4th

25  402, 407 (1998).  However, the instant case does not call upon the Court to rewrite or narrowly

26  construe any illegitimate contract provisions as the only possibly suspect provision of the

27  contract does not form the basis of Plaintiff's causes of action.  With only one small portion of

28  the contract likely suspect on its face under section 16600, the Court disagrees with Defendants'

1  citation to *Armendariz* and does not feel that this is a situation in which the problematic

2  provisions permeate the entire agreement, requiring that the entire contract be voided.

3  *Armendariz v. Foundation Health Psychcare Servs.*, 24 Cal. 4th 83, 124 (2000).

4      As a result, the merits of StrikePoint's breach of contract claims actually turn on whether

5  there was a legitimate trade secret being protected by the covenants not to compete (rather than

6  Defendants' too broad reading of section 16600 that suggests all covenants not to compete are

7  automatically void), an issue to which the Court now turns.

8      **B.**     **Unfair Competition, Unfair Business Practices, and Trade Secret Claims**

9      Defendants proceed to argue that Plaintiffs' fourth cause of action for common law unfair

10 competition, fifth cause of action for unfair business practices under California Business and

11 Professions Code § 17200, and sixth cause of action for misappropriation of trade secrets under

12 California's Uniform Trade Secrets Act ("UTSA") fail as a matter of law. Defendants make the

13 same arguments regarding why these three causes of action fail as a matter of law, indicating that

14 these claims all involve the same allegedly bad acts by Defendants (i.e. the misappropriation of

15 Plaintiffs' client lists and improper solicitation of Plaintiffs' clients).

16     First, Defendants argue that Plaintiff StrikePoint is not an actual owner of the customer

17 list and therefore has no standing to assert a protectable interest in the client identities. Second,

18 Defendants argue that the customer list at issue fails to meet the definition of a trade secret under

19 the UTSA. Third, Defendants argue that Plaintiffs have no evidence of misappropriation by

20 Sabolyk or Mondragon.

21     **1.**     **StrikePoint as Owner of the Client Lists**

22     Defendants first argue that StrikePoint is not an owner of the customer lists and therefore

23 cannot assert any claims against Defendants regarding misuse or misappropriation of the

24 customer lists.[2] Defendants support their argument by alleging that Optioneer "puts forth all the

25

26     [2]The Court observes that Defendants' argument regarding ownership is premised

27 on their claim that Plaintiff Optioneer, the true owner of the customer lists, has withdrawn
   from the lawsuit. However, neither side cites to any documentary evidence

28 demonstrating that Optioneer has effectively withdrawn from the action. Plaintiffs' First

1   effort in establishing a clientele, prepares all the paperwork and obtains the customer's [sic]

2   signatures, and only then refers them to StrikePoint solely to facilitate the *Optioneer customer's*

3   *trades.*" Def. Mot. Summ. J. 11 (emphasis in original). Defendants cite to no legal authority in

4   making their argument regarding ownership.

5        However, the Court notes that Defendants, especially in their Reply, seem to utilize the

6   legal standard for determining if a customer list is a trade secret (as discussed below in Section

7   II.B.2. of this Order) as the basis for their argument that StrikePoint cannot claim to have a

8   protected interest in the clients. In other word, because StrikePoint did not expend a lot of time

9   or money recruiting the clients, StrikePoint cannot claim any ownership interest in the customer

10   lists, regardless of any other facts.

11        As a starting point, Plaintiff StrikePoint rightly points out that trade secrets can be jointly

12   owned and, in fact, a joint owner can bring a claim for trade secret misappropriation against the

13   other owner. *Morton v. Rank America, Inc.*, 812 F. Supp. 1062, 1074 (C.D. Cal. 1993).

14        Further, the Court does not think the present record makes it definitively clear that

15   StrikePoint has engaged in no efforts to recruit clients.

16        As Defendants correctly point out, Michael Ambruster, the Chief Financial Officer of

17   StrikePoint, did indicate in deposition testimony that StrikePoint did not reimburse Optioneer for

18   Optioneer's marketing efforts in 2004, 2005, and 2006. Instead, StrikePoint engaged in

19   reimbursement in 2007 for $700,000 and in 2008 for $800,000 in connection with Optioneer's

20   marketing. Hilton Dec. Exh. C at 60. Defendants then allege that the clients at issue in this case

21   were Optioneer customers prior to 2007 and StrikePoint's reimbursement. Thus, Defendants

22   contend, StrikePoint cannot argue that it has any ownership interest in the clients at issue here

23   even if StrikePoint could make such an argument as to customers acquired after 2007.

24        However, in that same deposition, Ambruster indicates that StrikePoint actually paid

25

26   Amended Complaint filed with this Court on September 10, 2008, includes both

27   StrikePoint and Optioneer as Plaintiffs. Further, the Court has no evidence on its docket
   of a withdrawal by Optioneer. Nonetheless, the Court proceeds to address Defendants'

28   arguments regarding StrikePoint's ownership of the customer list.

$50,000 in the years previous to 2007 regarding marketing expenses.  Hilton Dec. Exh. C. at 76.
Further Ambruster alleges that StrikePoint always participated in client development by
"sending [StrikePoint] brokers to trading and investing seminars where they can meet
prospective clients, discuss the Optioneer program and promote their specialized program and
trading services."  Ambruster Dec. ¶ 4; *see also* Hilton Dec. Exh. C at 81.  Finally, StrikePoint
contends that it pays all the costs of servicing and maintaining the clients.

Thus, these facts regarding client development at least raise a factual issue as to whether
StrikePoint's involvement gives StrikePoint an ownership interest in the client list.

Further, the absence of direct written agreements between StrikePoint and the customers
does not change the result here, especially because StrikePoint is identified as the sole broker of
Optioneer in the Optioneer agreements and the customers are expressly required to execute any
trades through StrikePoint.  Defendants cite to no authority indicating that direct written
agreements are necessary for a party to assert a protected interest in client lists, especially when
the party provides services to the clients in question.

At a minimum, there is a genuine dispute as to material fact regarding whether
StrikePoint is an owner of the client list, in conjunction with Optioneer.  Especially considering
Optioneer owns fifty percent of StrikePoint, the parties' close relationship raises the possibility
of joint ownership.  Thus, summary judgment cannot be granted in favor of Defendants based on
the ownership issue.

### 2.    The Client List as a Trade Secret

The UTSA defines a trade secret as "information, including a formula, pattern,
compilation, program, devise, method, technique, or process, that: (1) Derives independent
economic value, actual or potential, from not being generally known to the public or to other
persons who can obtain economic value from its disclosure or use; and (2) Is the subject of
efforts that are reasonable under the circumstances to maintain its secrecy."  Cal. Civ. Code §
3426.1.

Defendants first argue that as a general rule, "a client's identity and contact information is
not a trade secret or otherwise protectable as proprietary information."  Def. Mot. Summ. J. 12.

However, California law does not have a blanket bar against treating customer lists as trade secrets.  Instead, "where the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market....As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer, the more likely a court will find such information constitutes a trade secret."  *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522 (1997).  Further, "[w]hether information is a trade secret is ordinarily a question of fact."  *San Jose Const., In.c v. S.B.C.C., Inc.,* 155 Cal. App. 4th 1528, 1537 (2007).

### A.      Independent Economic Value

Plaintiff StrikePoint has presented evidence that its clients are a small niche market of investors that trade in index options.  Further, as discussed previously, there is evidence suggesting that StrikePoint (at least in conjunction with Optioneer) engages in costly and time consuming marketing campaigns to seek out its clientele.  Thus, StrikePoint has presented evidence that a reasonable juror could rely on to find that StrikePoint's client list has independent economic value, notwithstanding Defendants' arguments to the contrary.

In arguing that the client list here is not a trade secret, Defendants initial arguments appear to be directed at prong one of the UTSA definition.  Besides arguing (as previously discussed in the ownership section) that StrikePoint has not actually expended the effort in creating the list,[3] Defendants further argue that the list should not qualify as a trade secret because StrikePoint's clients are not in an exclusive relationship with StrikePoint (i.e. the clients can engage in index option trading with other brokers) and StrikePoint's clients are not its main asset.

In making these two arguments, Defendants primarily rely on *American Paper Packaging Prods.v. Kirgan*, 183 Cal. App. 3d 1318 (1986) and *Smith Barney v. Burrow*, 558 F. Supp. 2d 1066 (E.D. Cal. 2008).  However, the Court finds that both cases are readily distinguishable

---

[3]The Court reiterates that the first point regarding whether StrikePoint expended efforts to develop the clients remains a jury issue based on the facts as discussed in the ownership section.  The Court will not restate those arguments here.

1   from the present action and do not warrant a finding *as a matter of law* that the client list at issue

2   here is not a protectable trade secret.

3       *Smith Barney* is not as persuasive as the Defendants suggest.  In that case, the court found

4   that clients whom departing financial advisors serviced did not constitute Smith Barney's

5   protectable trade secret.  *Smith Barney*, 558 F. Supp. at1081.  In that case, the advisors at issue

6   signed non-solicitation and confidentiality agreements similar to the agreements in the instant

7   matter.  *Id*. at 1069-70.  However, the Court found that the departing advisors had developed the

8   clients through their own efforts and without the aid of Smith Barney.  *Id*. at 1081.  Defendants

9   in the instant matter do not present facts suggesting that  Sabolyk and Mondragon, without any

10   involvement by StrikePoint, developed particular clients at StrikePoint.  Further and particularly

11   dispositive for the *Smith Barney* Court, Smith Barney also followed a procedure in which it

12   allowed departing financial advisors to take client information with them when the advisors

13   moved to another financial institution.  As a result, the court reasoned that Smith Barney could

14   not claim the information was confidential in a contract while at the same time allowing

15   departing advisors to take the client information with them.  *Id*. at 1080-1.  In the instant case,

16   there is no evidence that StrikePoint follows a protocol by which it allows departing brokers to

17   take client information with them.  Thus, *Smith Barney* does not demonstrate that the client list is

18   not a trade secret as a matter of law.

19       Relying on *American Paper & Packaging Products*, Defendant's point out that

20   StrikePoint's clients are not required to be in an exclusive relationship with StrikePoint.

21   *American Paper & Packaging Products, Inc.*, 183 Cal. App. 3d at 1326.  In other words, while

22   recognizing that StrikePoint's clients must exclusively deal with StrikePoint if they want to

23   engage in index option trading using the Optioneer strategy, Defendants contend that

24   StrikePoint's clients are also able to engage in index option trading with other brokerage houses.

25   Thus, Defendants contend, the clients' identities as index option traders are not known solely by

26   StrikePoint and the information, allegedly, is not secret.  As a result, the requirement that the

27   trade secret information not be generally known by those who can benefit from its use is not met.

28       Defendants are right that the value and alleged trade secret regarding these clients'

1    identities is the fact that they engage in index option investment.  However, they do not present

2    any factual evidence demonstrating that these clients are generally known within the brokerage

3    industry for being index option traders.  In *American Paper & Packaging Products, Inc.*, while

4    the plaintiff manufacturing company could not demonstrate that it was in any exclusive business

5    relationships with the clients at issue, there also was ample evidence on the record that the

6    clients in question were readily known in the particular industry at hand.  *American Paper &*

7    *Packaging Products., Inc*. at1326. Thus, this Court does not read a lack of an exclusivity

8    requirement as determinative in deciding whether a client list is a trade secret.  Instead, there still

9    remains a question of fact regarding whether other brokerage houses knew that the clients in

10   question were trading index options.

11          Further, the Court finds the *ABBA Rubber Company* Court's discussion of the "generally

12   known" requirement to be quite instructive to the present situation.  *See ABBA Rubber Company*

13   *v. Seaquist*, 235 Cal. App. 3d 1, 18-20 (1991).  In that case, the court pointed out that what must

14   not be generally known by competitors is that the clients at issue *actually* participate in the

15   market.  The *ABBA* court notes that the real value in client lists is that the holder of the list has

16   identified from a number of potential consumers, those consumers that actually will purchase its

17   product.  *Id*.  If other competitors have already figured out who actual purchasers are, the list

18   might not be subject to trade secret status.  However, if competitors do not actually know who,

19   out of the list of potential consumers, will actually engage in purchasing a given product, the list

20   is sufficiently secret.  *Id*.  By way of example in the instant case, if it is generally known in the

21   brokerage industry that these particular individuals actually engage in index option investment,

22   then StrikePoint's customer list might not be a trade secret.  However, if the knowledge is only

23   that these individuals make enough money such that they could invest in index options, trade

24   secret status is not necessarily defeated.  This is a factual question that has yet to be resolved and

25   precludes summary judgment.

26          Finally, Defendants' argument that StrikePoint's clients are not its main asset is

27   unconvincing to the Court.  Defendants cite to a number of cases in which they claim that

28   StrikePoint must demonstrate that its clients are its main asset to garner trade secret protection.

*See Morlife, Inc. V. Perry*, 56 Cal. App. 4th 1514 (1997) and *Courtesy Temp. Serv. v. Camacho*, 222 Cal. App. 3d 1278 (1990).  Defendants' assertion is that StrikePoint's main asset is not the clients themselves but StrikePoint's position as the sole introducing broker for clients trading the Optioneer strategy.  Finding this distinction somewhat perplexing, the Court notes that StrikePoint indicated that its sole clients are the clients that trade the Optioneer strategy.  Sklar Dec. Exc. C 79.  Thus, even conceding that StrikePoint must make such a showing, a reasonable juror could conclude the clients are a main asset to StrikePoint.

### B.    Reasonable Efforts to Maintain Secrecy

"Whether a party claiming a trade secret undertook reasonable efforts to maintain secrecy is a question of fact."  *In Re Providian Credit Card Cases*, 96 Cal. App. 4th 292, 306 (2002).

Without much discussion, the Ninth Circuit in *MAI Systems Corp.*, applying California law, found that the plaintiff, a computer systems manufacturer, had taken reasonable efforts to maintain the secrecy of information contained in its customer database by having its employees sign confidentiality agreements regarding its trade secrets.  *MAI Systems Corp. v. Peak Computer, Inc.*, 991F.2d 511, 521 (9th Cir. 1993).  Further, a California Court of Appeals made a similar decision in *ReadyLink Healthcare*:   "[Plaintiff] took reasonable steps to ensure the secrecy of its trade secret information by requesting employees to sign nondisclosure agreements."  *ReadyLink Healthcare v. Cotton*, 126 Cal. App. 4th 1006, 1018 (2005).

StrikePoint presents enough evidence demonstrating that it took reasonable precautions to at least withstand summary judgment.  For example, as discussed previously, its brokers are required to sign confidentiality/nondisclosure agreements that identify client information as proprietary information.  Further, StrikePoint's Policies and Procedures Manual identifies "client names/contact information" as confidential and informs employees that if they "improperly use or disclose trade secrets or confidential business information[, they] will be subject to disciplinary action."  Ambruster Dec. ¶ 26, Exh. I.  StrikePoint also provides evidence that its brokers were told not to download client information to any personal devices or otherwise use client information for personal reasons and were told not to contact clients outside the StrikePoint setting.  Further, StrikePoint limited its brokers' internet access to only authorized

16

1    sites through utilization of an internet "'firewall.'" Pitre Dec. ¶ 3.

2         Defendants argue that StrikePoint does not take reasonable precautions because in an

3    "employee guidelines" form required to be signed by the brokers, the definition of proprietary

4    company information does not include client lists/account information.  Sklar Dec. Ex. 48-50.

5    However, the definition of proprietary information indicates that it is not exhaustive.

6    Considering there is evidence that the brokers are otherwise informed that client lists are

7    proprietary, as discussed above, this particular omission does not demonstrate that StrikePoint

8    has not taken reasonable precautions as a matter of law.

9         Defendants further point out that StrikePoint executes its clients' trades through R.J.

10   O'Brien & Associates, Inc. ("RJO"), a Futures Commissions Merchant registered with the

11   Commodities Futures Trading Commission (CFTC).   The relationship between the parties is

12   memorialized in a written Clearing Agreement ("Agreement").  Defendants contend that

13   StrikePoint has not adequately protected its client information by the terms of that Agreement.

14        However, there are numerous provisions in the Agreement that suggest the issue of client

15   confidentiality was contemplated by the parties and provided for in the Agreement.  For

16   example, section 3.3 indicates that "all customers receiving services pursuant to this Agreement

17   shall remain Customers of Broker [i.e. StrikePoint]."  Further section 11.3, which refers back to

18   section 3.3, states that RJO will not solicit StrikePoint's clients during or upon termination of the

19   Agreement.  In addition, section 9.6 provides that RJO and StrikePoint "shall use all reasonable

20   efforts to preserve and protect the other's patent, *trade secret*, copyright and other proprietary

21   rights" (emphasis added).  Particularly relevant, section 17.10 indicates that "[n]either RJO nor

22   [StrikePoint] shall disclose the terms of this Agreement or information obtained as a result

23   thereof or *information regarding the identity of the other's Customers* to any outside or affiliated

24   party except to regulatory or self-regulatory organizations, pursuant to judicial process or as

25   otherwise required by law or to authorized employees of the other" (emphasis added).  Finally,

26   Ambruster, on behalf of StrikePoint, states in deposition testimony that the issue of safeguarding

27   client information was discussed by StrikePoint and RJO prior to entering the Agreement.

28   Hilton Dec. Exh. C at 53.

1    Defendants primary argument regarding why this Agreement does not adequately protect

2    StrikePoint's alleged trade secret is because the Agreement incorporates the requirements of 17

3    C.F.R. §160, *et seq.*, CFTC regulations regarding the privacy of consumer financial information.

4    These CFRs require that financial institutions provide their privacy policies to consumers, tell

5    consumers when the institutions will disclose consumer information to third parties, and get

6    consent from consumers prior to any disclosures.  17 C.F.R. § 160.1.  Primarily relying on 17

7    C.F.R. § 160.10, Defendants contend that RJO could disclose information about StrikePoint's

8    clients if RJO received consent from such clients.  *See* 17 C.F.R. § 160.10.  However, the Court

9    does not see how this C.F.R. demonstrates that StrikePoint has consented to the disclosure of its

10   client information to third parties, especially when section 17.0 of the Agreement indicates that

11   RJO promises not to disclose such information.

12   Considering the evidence, there is at least a genuine issue of material fact regarding

13   whether StrikePoint took reasonable efforts to maintain the secrecy of its client list.

14            **3.      Misappropriation**

15   After demonstrating that a client list constitutes a trade secret, the employer must present

16   evidence that the "employee misappropriated the information to attain an unfair competitive

17   advantage."  *Morlife, Inc.*, 56 Cal. App. 4th at 1523.

18   Under the UTSA, misappropriation means:

19   (1) Acquisition of a trade secret of another by a person who knows or has reason to know

20        that the trade secret was acquired by improper means; or

21   (2) Disclosure or use of a trade secret of another without express or implied consent by a

22        person who:

23              (A) Used improper means to acquire knowledge of the trade secret; or

24              (B) At the time of disclosure or use, knew or had reason to know that his or her

25                   knowledge of the trade secret was:

26                        (i) Derived from or through a person who had utilized

27                        improper means to acquire it;

28                        (ii) Acquired under circumstances giving rise to a duty to

18

1            maintain its secrecy or limit its use; or

2            (iii) Derived from or through a person owed a duty to

3            maintain its secrecy or limit its use.

4    Cal. Civ. Code § 3426.1(b).

5         Further, "'improper means' includes theft, bribery, misrepresentation, breach or

6    inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other

7    means."  Cal Civ. Code § 3426.1.

8         Thus, to withstand summary judgment, StrikePoint has to demonstrate that there is a

9    triable fact whether Defendants, without Plaintiff's consent and in breach of Plaintiff's CNDAs,

10   acquired Plaintiff's client list or used Plaintiff's client list to improperly solicit StrikePoint

11   clients.

12            a.       Sabolyk

13        Defendants point out that merely informing customers of a change in employment

14   without more is not improper under the Act.  *See Aetna Bldg. Maint. Co. v. West*, 39 Cal. 2d 198,

15   204 (1952).  They argue that any contact Sabolyk had with StrikePoint clients regarding her

16   decision to leave StrikePoint was limited to informing them of her departure and that if clients

17   followed her to GAA, it was not because she solicited them.  Further, they argue that her cell-

18   phone records and personal email records, while demonstrating that she had contact with

19   StrikePoint clients, do not show that she actively solicited any StrikePoint clients.  With regard

20   to the email records and phone calls, they point out that most of that contact was with

21   StrikePoint client Mike Kessler, who Defendants contend is also Sabolyk's boyfriend.

22   Defendants also point out that all former StrikePoint clients that followed Sabolyk to GAA

23   executed signed statements indicating that Sabolyk (and Mondragon as discussed below) did not

24   solicit the clients' departure from StrikePoint.  And Defendants state that StrikePoint has no

25   statements by StrikePoint clients, current or former, in which those clients affirmatively indicate

26   that Sabolyk (or Mondragon) solicited them.  Finally, while conceding that Sabolyk made an

27   Excel spreadsheet with client information shortly before her departure from StrikePoint,

28   Defendants contend that there is no evidence that Sabolyk actually "copied, downloaded,

1  printed, or took this document with her." Def.'s Reply 19.

2      While Defendants raise strong arguments, the Court finds that there is at least a triable

3  issue of fact that Sabolyk engaged in improper behavior.  For example, Defendant's strongly rely

4  on the fact that Kessler is Sabolyk's boyfriend to argue that any communications between them

5  do not demonstrate improper behavior on the part of Sabolyk.  However, as Plaintiff StrikePoint

6  contends, many of those emails suggest that Sabolyk was using Kessler to contact StrikePoint

7  clients and request that they follow her to GAA, in an effort to cover up her own improper

8  solicitation.

9      For example, in a May 17, 2007 email sent by Kessler to another StrikePoint client

10  before Sabolyk ultimately left Strikepoint, Kessler states, "I'm pretty confident our broker is

11  going to be making a change shortly which she can't talk about on the phone at this time.  Nor

12  can she solicit her clients.  So don't call or email her at work and ask about it, they monitor those

13  things....For obvious reasons she's interested in some of her clients following her."  Bruner Dec.

14  Exh. H.  Further, there are a series of emails that suggest Sabolyk and Kessler have discussed the

15  ways in which Kessler should pursue clients on behalf of Sabolyk.  Bruner Dec. Exh. M; Bruner

16  Dec. Exh. P.  For example, in a July 23, 2007 email, Sabolyk asks Kessler how they should go

17  about pursuing certain StrikePoint clients:

18      What do you think of sending Roger Mason an email suggesting the following points:

19      a.) since there are no fees here, he could start with a really small account

20      b.) I am providing managed accounts here

21      c.) you are pleased (may or may not be true?)

22      Also, thoughts on Steve Spencer? You could write to him about finding a new IB, not

23      necessarily me?  When do you think is a good time to approach Mark Guthrie?

24  Bruner Dec. Exh. P.  This email could certainly be interpreted by a juror as Sabolyk asking

25  Kessler to go after StrikePoint clients on her behalf.

26      Finally in other emails, Sabolyk thanks Kessler for getting her clients: "You are giving

27  me an opportunity I never could have had otherwise....And clearly your working efforts are

28  helping me to generate the business that I need."  Bruner Dec. Exh. X.  In a another email, a

former StrikePoint client who has decided to switch to GAA states, "Please be sure to thank your friend Mike Kessler.  He has been working me like a dog for the last six months to make the switch."  Bruner Dec. Exh. F.

These emails at least raise the inference that Sabolyk knew and encouraged Kessler to seek out StrikePoint clients on her behalf, thus suggesting that through Kessler she engaged in improper solicitation.

Further, Sabolyk's creation of an Excel spreadsheet only two days before she resigned in which she downloaded client names addresses, telephone numbers, email addresses and other personal information strongly suggest that she engaged in improper behavior.  Defendants contend that there is no evidence that Sabolyk actually took that spreadsheet with her.  However, all but one of StrikePoint's former clients that Sabolyk services at GAA were included in the spreadsheet.   Further, the former StrikePoint clients that Sabolyk asks Kessler to pursue in the July 23 email quoted above are listed on the Excel spreadsheet.  These facts at least raise the inference that Sabolyk indeed did print the spreadsheet and took it with her upon her departure from StrikePoint.

While the call regarding improper behavior by Sabolyk is close, the question should at least go to the jury.

### b.    Mondragon

Further, the Court finds that Plaintiffs have presented sufficient evidence of misappropriation on behalf of Mondragon to withstand summary judgment.

Plaintiffs present evidence that Mondragon, shortly after leaving StrikePoint, asked Nicholas Fazio (another StrikePoint broker) if Fazio had been assigned any of Mondragon's clients.  When Fazio indicated that one client had been assigned to him, Mondragon stated that the client would probably not be a StrikePoint client for long and would follow Mondragon to GAA.  Hilton Dec. Ech. H; Fazio Dec. ¶ 3.

Further, StrikePoint presents evidence that as soon as Mondragon began working at GAA, he was assigned "leads" for prospective new GAA clients.  All of these "leads" were current StrikePoint clients.  Further, all but one of these leads were Mondragons' clients when he was at

1  StrikePoint.  Bruner Dec. Exh. LL.  Ultimately, these "leads" all closed their accounts with

2  StrikePoint and moved to GAA.  Bruner Dec. Exh. NN.  StrikePoint contends that thirteen of

3  Mondragon's fifteen current GAA clients are former StrikePoint clients.  Bruner Dec. Exh. MM.

4

5  Defendants contend that the Fazio declaration and the fact that GAA assigned "leads" to

6  Mondragon do not present sufficient evidence that Mondragon engaged in any improper

7  behavior.  Instead, the only possible interpretation of the evidence, as they argue, is that

8  Mondragon's clients merely followed him to GAA without any solicitation by him.  However,

9  the assignment of leads at least raises the inference that Mondragon engaged in solicitation, as

10  one would assume that a broker would contact prospective clients to try and convince them to

11  become actual clients.  Further, the fact that all of Mondragon's leads were former StrikePoint

12  clients, and primarily *his* former clients, suggests that he may have improperly disclosed these

13  clients' identities to GAA (i.e. he might have identified the client's as leads to GAA in the first

14  place) in breach of his StrikePoint CNDA.

15  Again, while Defendants' counsel in oral argument rightly pointed out that the evidence is

16  close, Defendants have not shown that a reasonable juror could not find that Mondragon

17  engaged in misappropriation of StrikePoint's alleged trade secret.

18                          c.      GAA

19  Because Defendants contend that no reasonable juror could find that either Sabolyk or

20  Mondragon engaged in misappropriation, they do not present any additional arguments or

21  evidence regarding why GAA also cannot be held accountable for misappropriation.  However,

22  the Court has determined that there is a triable issue of fact regarding whether Sabolyk and

23  Mondragon engaged in misappropriation.  Because Defendants have not countered StrikePoint's

24  evidence that GAA, as Sabolyk and Mondragon's employer, also engaged in misappropriation,

25  the Court cannot proceed to grant summary judgment in favor of GAA.

26          **4.     Conclusion**

27  Thus, Defendants' motion for summary judgment is denied as to the fourth, fifth, and

28  sixth causes of action based on Defendants' substantive arguments regarding trade secret

1  misappropriation.  The Court notes that Defendants also argue that the fourth cause of action

2  should be preempted under the UTSA, another basis for summary judgment as to that claim.

3  The Court addresses that argument later in section E of this Order.

4       Further, because there is a triable issue of fact regarding whether the client lists constitute

5  a trade secret, Defendants' motion for summary judgment as to StrikePoint's second and third

6  cause of action for breach of the CNDAs is also denied.

7       **C.    Trade Libel**

8       Defendants also move for summary judgment as to Plaintiff StrikePoint's eighth cause of

9  action against Defendant Sabolyk for trade libel.  StrikePoint's claim for trade libel is based on

10  an email sent by Sabolyk to StrikePoint client Larry Meadows on September 5, 2007.

11       The September 5, 2007 email reads as follows:

12            Larry,

13            You never got back to me.  What commission rate are you looking

14            for?  Also, what happened with Tim?  I got an email from him but

15            haven't been able to speak with him...something about Strikepoint

16            and placing unauthorized trades?

17            Aimee

18  Bruner Dec. Exh. U.

19       The allegedly libelous portion of the email is the reference to StrikePoint placing

20  unauthorized trades.  Further, the comment by Sabolyk is allegedly the restatement of the

21  content of an August 24, 2007email sent by StrikePoint client Timothy Smith to Sabolyk in

22  which Smith asserts that StrikePoint placed "'unauthorized trades.'" FAC ¶ 64.

23       Defendants argue that the email does not constitute a false statement of fact because Tim

24  Smith did in fact send Sabolyk an email in which Smith accused StrikePoint of unauthorized

25  trading.  Defendants do not argue that Smith's underlying accusation of unauthorized trading is a

26  true statement.  Instead, Defendants seem to concede in their Reply that StrikePoint has

27  presented evidence that Smith's statement was false.  Defendants also argue that StrikePoint

28  cannot demonstrate any pecuniary harm that was caused by the allegedly libelous statement.

1    Plaintiff StrikePoint responds by arguing that the underlying statement by Smith is false.

2    Further, StrikePoint argues that it has shown damages because Meadows closed his StrikePoint

3    account shortly after receiving the email from Sabolyk.

4    At the outset, the Court notes that the parties do not make clear what legal standard they

5    apply to the cause of action "trade libel."  Defendants argue that the definition of trade libel as

6    the tort of injurious falsehood should apply, whereas Plaintiff StrikePoint relies on case law

7    suggesting that StrikePoint considers trade libel to be the same as defamation or, more

8    specifically, libel per se.  The difference affects the burden placement and what in fact Plaintiff

9    has to prove in order to prevail on this cause of action.

10   Trade libel requires more of the plaintiff.  The California Court of Appeals noted that

11   trade libel "has not been subjected to rigorous judicial analysis in California."  *Polygram*

12   *Records, Inc. v. The Superior Court of Napa County*, 170 Cal. App. 3d 543, 548 (1985).  Trade

13   libel has been defined as "an intentional disparagement of the quality of property, which results

14   in pecuniary damage to plaintiff."  *Id.* at 548 (*quoting Erlich v. Etner*, 224 Cal. App. 2d 69, 73

15   (1964).  In a trade libel suit, plaintiff must prove the statement is false, must show that the

16   defendant knew the statement was false or acted with reckless disregard as to the statements

17   truth, and must prove special damages to its business i.e. specifically identifiable pecuniary

18   harm.  *Id.* at 549.   Thus, the *Polygram* Court concluded that "[t]rade libel is not true libel and is

19   not actionable as defamation."  *Id.*

20   Defamation, particularly where defamation is based on libel per se, requires much less of

21   the plaintiff.  The tort of defamation "involves (a) a publication that is (b) false, (c) defamatory,

22   and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damages.

23   *Taus v. Loftus*, 40 Cal. 4th 683, 720 (2007).  Defamation is perpetrated either by libel or slander.

24   Cal. Civ. Code § 44.  Libel is " 'a false and unprivileged publication by writing...which exposes

25   any person to hatred, contempt, ridicule or obloquy, or which causes him to be shunned or

26   avoided, or which has a tendency to injure him in his occupation.' "  *Selleck v. Globe*

27   *International, Inc.*, 166 Cal. App. 3d 1123, 1130 (1985) (*quoting* Cal. Civ. Code § 45).  Where

28   the libel relates to plaintiff's trade or business occupation, plaintiff need not prove special

1    damages as they are presumed.  Cal. Civ. Code § 45a.  Further, as pointed out by the *Polygram*

2    Court, a defamatory statement typically is presumed to be false, and the defendant is strictly

3    liable as to the falsity of the statement.  *Polygram Records, Inc.*, 170 Cal. App. 3d at 549.

4         In any event, truth is a defense to a defamation claim.  *Campanelli v. Regents of Univ. of*

5    *Calif.*, 44 Cal. App. 4th 572, 581 (1996).  And Defendants rely on truth as a defense to Plaintiff's

6    Eighth Cause of Action without reference to which legal standard is applied.  With truth as a

7    defense to this claim, the real fight between the parties is whether Sabolyk's restatement of

8    Smith's seemingly undisputed false statement constitutes liability for libel as to her.  In other

9    words, while it is true that Sabolyk received an email from Smith including the allegedly false

10   statement, the parties fight over whether Sabolyk can be liable for repeating that false statement.

11        In fact, republication of an allegedly false statement can result in liability as to the person

12   who repeats the statement.  "At common law, one who republishes a defamatory statement is

13   deemed thereby to have adopted it and so may be held liable, together with the person who

14   originated the statement, for resulting injury to the reputation of the defamation victim.  (See

15   Rest.2d Torts, § 578.)  California has adopted the common law in this regard."  *Khawar v. Globe*

16   *Intern., Inc.*, 19 Cal. 4th 254, 268 (1998).  *See also Shively v. Bozanich*, 31 Cal. 4th 1230, 1242

17   (2003) ("The rule [that each publication of a defamatory statement gives rise to a new cause of

18   action for defamation] applies when a person who heard, read or saw the original defamatory

19   remark repeats the remark to others").

20        Under this republication rule and without contesting the falsity of the underlying

21   statement, Defendants cannot prevail on a truth defense just because it was true that Sabolyk

22   received an email that included an allegedly libelous statement.  Further, the Court agrees that

23   the original publication, by accusing StrikePoint of engaging in unauthorized trading disparages

24   Strikepoint in its business and therefore "is reasonably susceptible of a defamatory meaning[.

25   Thus,] a factual question for the jury exists."  *Kaelin v. Globe Communications Corp.*, 162 F.3d

26   1036, 1040 (9th Cir. 1998).

27        Defendants secondly argue that Plaintiff StrikePoint cannot show that any harm was

28   caused by Sabolyk's repetition of the statement to Meadows.  As the Court has previously noted,

1   it is unclear if Plaintiff need prove pecuniary harm due to the ambiguity regarding which legal

2   standard applies.  However, even assuming Plaintiff must prove pecuniary harm, StrikePoint

3   offers evidence that Meadows left StrikePoint shortly after receiving the email.  Ambruster Dec.

4   In Opp. To Mot. For Summ. J. ¶ 28.  Defendants argue that Plaintiff has not shown that

5   Meadows closed his account *because* of the information in the email.  While the Court agrees

6   that there may have been a number of reasons why Meadows closed his account, a reasonable

7   juror could conclude that Meadows decided to close his account, at least in part, because he

8   heard that his current broker StrikePoint was engaging in improper trading.  Further, the loss of a

9   client clearly results in pecuniary harm to a brokerage firm.  As a result, Plaintiff has at least

10  raised a genuine issue of material fact regarding pecuniary harm and causation.

11  **D.      Computer Fraud and Abuse Act[4]**

12          The first cause of action in the amended complaint is by StrikePoint against Defendant

13  Sabolyk for violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.

14  StrikePoint does not indicate under what provision of the act it brings its claim.  However, as the

15  Court interprets the statute, under any private right of action as provided for in 18 U.S.C. §

16  1030(g), the Plaintiff must prove "damage" caused by the defendant.  18 U.S.C. § 1030(3)(8).

17          The statute defines "damage" as follows: "any impairment to the integrity or availability

18  of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8).  Under this definition of

19  damage, the Court finds that Sabolyk did not violated the CFAA by creating an Excel

20  spreadsheet with protected client information.  Even assuming she was able to access her

21  personal email address by circumventing the internet firewall and consequently sent the

22

23

24  _____

25          [4]The Court notes that since this action was commenced, the CFAA has been
    amended effective September 26, 2008, a point unacknowledged by either party's
26  briefing.  However, the Court's determination of this issue turns on the definition of
    "damage" in the statute, and that definition has not changed post-amendment and is
27  included in any relevant private right of action.  Thus, the Court need not engage in a
28  lengthy analysis regarding which version of the statute properly applies to this case.

1    spreadsheet to herself or GAA,[5] the Court still does not find that this activity constitutes damage

2    under the relevant definition.

3        In reaching this conclusion, the Court is persuaded by the reasoning in *Garelli Wong &*

4    *Associates, Inc. v. Nichols*, 551 F. Supp. 2d 704 (N.D. Ill. 2008).  In that case, a departing

5    employee, prior to his resignation, allegedly "compiled signification amounts of [plaintiff's]

6    confidential and proprietary client and candidate information by entering the [company database]

7    without authority."  *Id*. at 707.  The employee then allegedly sent the information to his personal

8    email account and otherwise copied it.  *Id*.

9        The court found that the "unauthorized copying and emailing of files from a computer is

10   not enough to form the basis of a civil action under the CFAA."  *Id*. at 709.  The court reasoned

11   that the *availability* of the information was not impaired, as the employee did not delete, erase,

12   or otherwise destroy the information after he copied it.  Further, the court found that the *integrity*

13   of the information also was not impaired.  The court reasoned that in order to show impairment

14   of integrity, the Plaintiff would need to demonstrate "diminution in the completeness or

15   useability of...information," a showing that is not possible where information is merely copied or

16   sent from a protected computer.  *Id*. at 709-10 (*quoting Resdev v. Lot Builders*, 2005 WL

17   1924743, *1, *5 (M.D. Fla. Aug. 10, 2005).  Similar to *Nichols*, the facts of the instant matter do

18   not suggest that StrikePoint lost the client information or that the information was rendered less

19   complete or useless as a result of Sabolyk's alleged copying and emailing.

20       As the Court agrees with the *Nichols* Court's understanding of "impairment of integrity,"

21   the Court declines to follow *Shurgard Storage Centers, Inc. v. Safeguard Self Storage Inc.*, 119

22   F. Supp. 2d 1121 (W.D. Wash 2000), which found damage under the CFAA due to mere

23   emailing of protected material.

24       Because the facts of the instant matter so closely track *Nichols*, the Court proceeds to

25   ─────────────

26       [5]StrikePoint only provides direct evidence that Sabolyk circumvented the internet
     firewall to access her personal email. Pitre Dec. ¶¶ 3-4.  However, they do not provide
27   any direct or documentary evidence that Sabolyk in fact sent the Excel spreadsheet from
     her personal account, despite producing Sabolyk's personal email records.

28

1    grant summary judgment in favor of Defendants as to the first cause of action.

2        **E.   Preemption**

3        Defendants also argue that California's Uniform Trade Secret Act preempts Plaintiffs'

4    claims for unfair competition and tortious interference.  As a result, they argue that StrikePoint's

5    fourth and seventh causes of action fail as a matter of law.

6        The unfair competition cause of action is by all Plaintiffs against all Defendants and deals

7    with Defendants "appropriat[ion] of Plaintiffs' proprietary information, including the customer

8    lists, client information and trading strategies."  FAC ¶ 44.  The tortious interference with

9    contractual relationship claim is only by StrikePoint against GAA and implicates the following

10   facts: "Defendant GAA, with knowledge that Sabolyk, and Mondragon were bound by written

11   non-disclosure agreements with StrikePoint, encouraged and induced Sabolyk and Mondragon to

12   breach their agreements with StrikePoint so that GAA could profit by using StrikePoint's

13   proprietary client list, client account information and Optioneer's proprietary trading strategies."

14   FAC ¶ 58.

15       The UTSA indicates that it does not affect "(1) contractual remedies, whether or not

16   based upon misappropriation of trade secret, (2) other civil remedies that are not based upon

17   misappropriation of trade secret, or (3) criminal remedies, whether or not based upon

18   misappropriation of trade secret."  Cal. Civ. Code s. 3426.7(b).  Considering the limited

19   California case law addressing this issue, one federal district court has interpreted this statutory

20   language as follows: this section "suggests, therefore, that there would be no need for inclusion

21   of this provision in California's statutory scheme unless the UTSA preempted other claims based

22   on misappropriation."  *Digital Envoy, Inc. v. Google, Inc.*, 370 F. Supp. 2d 1025 (N.D. Cal.

23   2005).  The test identified by the Northern District for preemption is whether these additional

24   common law claims involve the "same operative facts" as the trade secret claim.  *Id*. at 1033,

25   1035 (holding preemption of unfair competition and unjust enrichment claims where "those

26   claims are based on the same nucleus of facts as the misappropriation of trade secrets claim for

27   relief"); *see also First Advantage Background Serv. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d

28   929, 935-6 (N.D. Cal. 2008) (finding preemption under UTSA of intentional interference with

prospective economic advantage claim where claim involved same facts as trade secret claim).

The Court finds the Northern District analysis of section 3426.7(b) and preemption persuasive.  Here, the unfair competition and tortious interference facts allege the same facts constituting liability as the UTSA misappropriation cause of action.  As a result, section 3426.7(b) would appear to preempt those claims.

Plaintiffs do not present any evidence that the common law claims involve additional or different factual allegations than the UTSA misappropriation claim.  Instead, they rely on a Ninth Circuit case that did not even address the preemption issue.  *City Solutions, Inc. v. Clear Channel Comms.*, Inc., 363 F.3d 835 (9th Cir. 2004).  As a result, Defendants' motion for summary judgment is GRANTED as to the fourth and seventh cause of action.

**IV.   DISPOSITION**

For the foregoing reasons, Defendants' Motion is GRANTED as to the First, Fourth, and

///

///

///

///


Seventh Causes of Action.  Defendants' Motion is DENIED as to the Second, Third, Fifth, Sixth, and Eighth Causes of Action.


IT IS SO ORDERED.

DATED: December 22, 2008



                                        David O. Carter
                                        DAVID O. CARTER
                                        United States District Judge