1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

3        HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE

4                     – – – –

5

6  STRIKEPOINT TRADING, LLC a          )
   California limited liability        )
7  company; and OPTIONEER, LLC, a      )
   Nevada limited liability company,   )
8                                      )
                    Plaintiffs,        )
9                                      )
           vs.                         ) No. SACV07–1073 DOC (MLGx)
10                                     )
   AIMEE ELIZABETH SABOLYK, an         )
11 individual dba INNOVATIVE OPTION     )
   STRATEGIES, and GLOBAL ASSET        )
12 ADVISORS, LLC, an Illinois limited )
   liability company, and JOHN         )
13 MATTHEW MONDRAGON, an individual     )
                                       )
14                  Defendants.        )
   _____)

15

16

17      REPORTER'S REAL TIME TRANSCRIPT OF HEARING

18             SANTA ANA, CALIFORNIA

19           TUESDAY, MARCH 10, 2009

20               DAY 1, VOLUME 1

21      _____

22        DONALD A. HILLAND, CSR NO. 11909
             U.S. Contract Court Reporter
23              312 N. Spring Street
           Los Angeles, California 90012
24            courtreporter@ureach.com

25

```
 1    APPEARANCES:

 2    For the Plaintiffs:

 3         HEWITT AND O'NEIL
           BY:  LAWRENCE HILTON
 4              JENNIFER SUN
                WILLIAM HALLE
 5         19900 MacArthur Blvd., Suite 1050
           Irvine, CA  92612
 6
      For the Defendant Mondragon:
 7
           LAW OFFICES OF TIMOTHY B. McCAFFREY
 8         BY:  TIMOTHY B. McCAFFREY
           One Wilshire Blvd., Suite 2200
 9         Los Angeles, CA 90017

10    For the Defendants Sabolyk, Global Asset:

11         LAW OFFICES OF JEFFREY A. SKLAR
           BY:  JEFFREY A. SKLAR
12         11845 W. Olympic Blvd., Suite 905
           Los Angeles, CA  90064
13

14         LAW OFFICES OF DOUGLAS L. THORPE
           BY:  DOUGLAS L. THORPE
15         1508 Old Oak Road
           Los Angeles, CA  90049
16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIIFORNIA

I N D E X

PAGE

VOIR DIRE EXAMINATION

BY THE COURT            12, 41, 47, 54, 63, 68
BY MR. HILTON          25, 43, 49, 56, 65, 69
BY MR. SKLAR           35, 45, 51, 58, 67, 71
BY MR. McCAFFERTY      38, 46, 52, 59, 67


OPENING STATEMENT

BY MR. HILTON                                    74
BY MR. McCAFFERTY                               102
BY MR. SKLAR                                    111

E X H I B I T S

|  | IN | IN |  |
| JOINT: | IDENTIFICATION | EVIDENCE | VOL. |

(NO EXHIBITS RECEIVED)

```
 1          TUESDAY, MARCH 10, 2009, 8:20 A.M. SANTA ANA, CALIFORNIA

 2                            MORNING SESSION

 3        (The following proceedings were had in open court

 4          outside the presence of the jury)

 5              THE COURT:  All right.  We're on the record, and all

 6    counsel are present.  Counsel, would you be kind enough to

 7    identify yourself?  And, first of all, good morning.

 8              MR. HILTON:  Good morning, Your Honor.  Larry Hilton,

 9    appearing on behalf of StrikePoint Trading, with Bill Halle and

10    Jennifer Sun.

11              THE COURT:  And the gentlemen seated at the end of the

12    table?

13              MR. HILTON:  This is Alex Alonso, our IT guru.

14              THE COURT:  And the rest of the people you have with

15    us, why don't you be kind enough to introduce me to them?

16              MR. HILTON:  Erik Gebhard, the CEO of StrikePoint.

17              THE COURT:  Nice meeting you, sir.

18              MR. HILTON:  Mike Armbruster, the CFO of StrikePoint.

19              THE COURT:  A pleasure.  How are you today?

20              MR. HILTON:  And this is our legal assistant, Sandra

21    Skahen.

22              THE COURT:  Then on the other side of the table?

23              MR. SKLAR:  Good morning, Your Honor.  Jeffrey Sklar,

24    representing Defendants Aimee Sabolyk and Global Asset Advisors.

25    And I have with me today, Mr. Thorpe, Douglas Thorpe, also
```

1    representing Global Asset Advisors and Aimee Sabolyk.

2              THE COURT:  Okay.

3              MR. THORPE:  Good morning, Your Honor.

4              MR. McCAFFREY:  Good morning, Your Honor.  Tim

5    McCaffrey, on behalf of John Mondragon.

6              THE COURT:  Good morning.  How are you today?

7              Now, let's do this.  One of you can start carrying

8    those out.  I'll let you use the room off to the side.

9              Now, there is a couple things Kristee told me

10   informally.  And that is that you thought your experts will not

11   be available until next Tuesday?  No.  Wrong.  Case will conclude

12   next Tuesday morning.

13             MR. SKLAR:  Correct, Your Honor.

14             THE COURT:  So if you don't have your experts

15   available, they're not testifying.

16             MR. THORPE:  Your Honor, I --

17             THE COURT:  No, I'm sorry.  You didn't year me.  Your

18   experts will be testifying this week.

19             MR. SKLAR:  Yes, Your Honor.

20             THE COURT:  And therefore, if you don't have them

21   available, you won't be calling the expert.  Simple as that.  And

22   the reason for that is we just finished a four-month trial, and

23   we're starting another six-month trial.  And frankly I'm not

24   waiting for the convenience of your experts.

25             Now sit down, Counsel.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIIFORNIA

1          The next thing is what am I going to tell the jury in a

2   few moments about this case?  What's this case about?  Do you

3   want to write out a brief paragraph so I basically say that this

4   is a dispute involving a wrongful termination?  Otherwise, I'm

5   going to tell them nothing.

6          MR. SKLAR:  Your Honor?

7          THE COURT:  Why don't the two of you get together as I

8   call up the jury.  Just a simple three lines.  That's all we

9   need.  We'll get the jury this morning.  And then we'll discuss

10  some of your in limine motions right after we select the jury.

11  You can expect that -- well, I'll get to those in a moment.

12          Kristee, call for the jury, please.

13          Off the record.

14     (Discussion off the record Re:  Other case)

15          THE COURT:  Counsel, you have three peremptories.

16  You're welcome to pass.  If you pass on a peremptory, though,

17  that's a used peremptory.

18          MR. McCAFFREY:  Your Honor, is that three per party?

19          THE COURT:  No, three total.

20          MR. THORPE:  Three total on the defense side, Your

21  Honor?

22          THE COURT:  Three total on the defense side.  Three

23  total on the plaintiff's side.

24          MR. THORPE:  Just wanted to be clear.

25          THE COURT:  Yep.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIIFORNIA

 1          MR. McCAFFREY:  Your Honor, if I may?

 2          THE COURT:  Sure.

 3          MR. McCAFFREY:  There was an instruction submitted by

 4  both parties, I believe 1.2 will sort of describe the case.

 5  Would you like to see it?

 6          THE COURT:  Want to give it to me?  As long as you both

 7  agree.

 8          MR. THORPE:  Your Honor, may I make another inquiry?

 9          THE COURT:  Sure.

10          MR. THORPE:  We're aware that you have a busy day every

11  day with criminal proceedings.  Do you have any thoughts about

12  when we will end each day?

13          THE COURT:  Well, you probably won't be leaving until

14  8:00 or 9:00 tonight.

15          MR. THORPE:  8:00 or 9:00 tonight.  And is that true on

16  every night?

17          THE COURT:  I don't know.  We're going to start on jury

18  instructions this evening.  And we'll probably complete them by

19  tomorrow night.

20          MR. THORPE:  Oh, we'll work on jury instructions

21  tonight.  When will the jury be excused?

22          THE COURT:  5:00.  Then you can go out to dinner if you

23  like.  Then we'll meet back here at 5:45.  So every item of

24  evidence will be laid out.  In other words, no surprise.  But I

25  think you have a right to know what counsel is presenting on the

1    plaintiff's side, which exhibit is coming in, which exhibit is

2    not.  Because there are no Sidebars.  When the jury comes in,

3    these are hard working folks.  They'll willing to sacrifice.

4    These are hard times.  You're going to find out that these jurors

5    are having a tough time serving now.  So we're not having a

6    Sidebar.

7              MR. SKLAR:  One other housekeeping matter, Your Honor.

8    We had thought, not in the interests of the jury, that we would

9    put the experts, both at the end of the case.  Is that a problem?

10             THE COURT:  Doesn't matter as long as it's this week.

11             MR. SKLAR:  Right.  I understand.

12             THE COURT:  You'll have ten hours per side.

13             Remember, Gentlemen, I want to get your case in.  So if

14   you feel a little weary, that's because I mean to get your case

15   tried.  Otherwise, your case would have gone over for nine

16   months.  And that's expensive for your clients.

17             Counsel, while we're waiting for the jury, then, there

18   was an in limine motion to exclude recently produced NFA and CFI

19   reports.  During pretrial conference, plaintiffs indicated they

20   intended to bring a motion in limine to exclude reference to

21   Optioneer CFTC order that addressed fraudulent misrepresentations

22   made by Optioneer to its customers regarding the Optioneer

23   Trading strategy.  I indicated at that time that I would deny

24   such a motion so plaintiffs ultimately did not bring it.

25             However, Defendants have now brought a similar motion

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIIFORNIA

1    regarding a 2007 NFA report that indicates that they engaged in

2    certain material misrepresentations to customers regarding their

3    reading or their trading programs.  Defendants argue to this

4    Court that such a report is either irrelevant under Federal Rule

5    of Evidence 401 or 402, or that if such a report is relevant it

6    is unfairly prejudicial under Rule 403.

7           I disagree.  If defendants want to argue that

8    plaintiff's fraudulent conduct caused its clients to leave

9    StrikePoint and Optioneer, then plaintiffs should likewise be

10   allowed to point out that defendant GAA has been accused of

11   engaging in misleading misrepresentations and representations.

12   Such evidence is relevant because it goes to the credibility of

13   GAA and suggests that they may have engaged in improper conduct

14   in soliciting customers.  And, here, plaintiffs are claiming that

15   GAA improperly solicited plaintiff's clients.

16          Concerning the first two in limine motions, I simply

17   reiterate that concerning the motion in limine to exclude

18   reference to CFTC investigations and consent decrees entered

19   against Optioneer, that's denied.  I previously ruled that there

20   is a nexus to Optioneer and StrikePoint at Optioneer's request.

21   So this is relevant to show the motivation for the clients to

22   leave an entity that they held in disrepute.

23          The motion in limine to exclude reference of disputed

24   allegations that Jaime Burgess made suggestive comments to

25   Sabolyk and Jaime Burgess punched Mondragon at a party.  I

1    previously said to you that if Mondragon was in fact the

2    boyfriend of Sabolyk, he probably was motivated to leave

3    StrikePoint or may be motivated if Jaime Burgess has a management

4    position or if it's an uncomfortable workplace situation.

5         So that should cover all three of your in limine

6    motions.  We can discuss those further after we get the jury.

7         Counsel, sit down.

8         MR. THORPE:  If the Court please, Your Honor?

9         THE COURT:  Sit down.

10        Good morning.  How are you?  Are you jurors?

11        THE CLERK:  They're jury clerks.

12        THE COURT:  Good enough.  Is the jury out there?

13        THE CLERK:  Yes.

14        THE COURT:  Nice to see you.  Nice to see you both.

15   Thanks for doing a wonderful job for us.  We're a little bit

16   behind today.

17        Counsel, do I have that statement to read?

18        MR. SKLAR:  We do have a statement.

19        THE COURT:  Thank you.  Appreciate it.  Thank you very

20   much.

21      (Jury panel in)

22        THE COURT:  Take either side of the courtroom that you

23   would like and you can spread out anyplace you would like to

24   sit.

25        Sir, anyplace you would like to sit would be fine.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIIFORNIA

1    Thank you.

2                   VOIR DIRE EXAMINATION BY THE COURT

3               First of all, good morning.  How are all of you today?

4    Hope you're doing well.  This case is entitled StrikePoint

5    Trading, LLC, et al. versus Aimee Elizabeth Sabolyk, et al.  It's

6    properly entitled StrikePoint Trading, LLC, and Optioneer, LLC,

7    Plaintiffs, versus Aimee Elizabeth Sabolyk, Innovative Option

8    Strategies, Global Asset Advisors, John Matthew Mondragon.

9               MR. SKLAR:  Your Honor, it is Sabolyk.

10              THE COURT:  Thank you very much.  Sabolyk.  And,

11   Counsel, would you be kind enough to introduce yourself to the

12   prospective jurors?  Let me start with plaintiff's counsel for

13   just a moment.

14              MR. HILTON:  Good morning, Ladies and Gentlemen.  I'm

15   Larry Hilton.  I'm here representing the Plaintiff StrikePoint

16   Trading.  This is my colleague, Bill Halle, and Jennifer Sun.

17              THE COURT:  And would you introduce your clients please

18   who are present?

19              MR. HILTON:  This is Michael Armbruster.  He's CFO for

20   StrikePoint Trading.  And this is Erik Gebhard, who is the CEO of

21   StrikePoint Trading.

22              THE COURT:  Thank you.  Counsel, on behalf of the

23   defense, would you be kind enough to introduce your --

24              MR. SKLAR:  Good morning, Ladies and Gentlemen.  My

25   name is Jeffrey Sklar.  And I represent Global Asset Advisors,

1    which will also be called Daniels Trading.  I also represent

2    Aimee Sabolyk.  Aimee Sabolyk is sitting here at the table.

3            Glen Swanson, president of Global Assets, is flying in

4    from Chicago.  He will be here, and you will see him in the

5    courtroom within perhaps the next half hour.

6            With me seated at table is Douglas Thorpe, my

7    co-counsel.

8            MR. McCAFFREY:  Good morning, Ladies and Gentlemen.

9    I'm Tim McCaffrey.  I represent another individual defendant,

10   John Matthew Mondragon.  Mr. Mondragon is on his from Chicago.

11   He will be here.  He will be in and out during the trial.

12           THE COURT:  Counsel, thank you very much.

13           Ladies and Gentlemen of the Jury, if you would stand

14   with me, please.  Kristee is going to administer an oath to

15   you.

16       (Jury panel duly sworn)

17           THE COURT:  We're going to call eight prospective

18   jurors.  And if you're the first name called, I'll simply direct

19   you to your seat.

20           THE CLERK:  Matthew McGrath.

21           THE COURT:  Mr. McGrath, if you would come forward,

22   sir.  You're the last person in the last row.  Come up, all the

23   way to the double doors, come around then count four seats into

24   jury box.  If I get you seated correctly, everything will flow

25   from there.

1          THE CLERK:  Betty Phan.

2          THE COURT:  Ms. Phan, if you'll be seated next to

3   Mr. McGrath in the top row.

4          THE CLERK:  Huy Nguyen.

5          THE COURT:  If you will be seated in the top row, third

6   seat down, please.

7          THE CLERK:  Kriss Larson.

8          THE COURT:  Mr. Larson, if you would go up to the top

9   row, first seat.

10          THE CLERK:  Vickie Robinson.  If you go to the bottom

11   row, four seats in.

12          THE CLERK:  Benjamin Keenan.

13          THE COURT:  Mr. Keenan, how are you?  If you would be

14   seated in the bottom row, just count three seats in.

15          THE CLERK:  Linda Fryling.

16          THE COURT:  Ms. Fryling.  Thank you.  You'll be seated

17   in the bottom row, just two seats in.  Thank you.

18          THE CLERK:  Daniel Peterson.

19          THE COURT:  Mr. Peterson, if you'll be seated in the

20   last row, the last seat in the bottom row.

21          Now, let me talk with the perspective jurors.  We're

22   going to ask a number of questions for a few minutes.  And

23   instead of repeating all of those questions, we're probably going

24   to have a jury within an hour, maybe an hour 15 minutes at the

25   latest.  If you're not selected, I'm going to ask you to check

1    with the jury commissioner and that jury commissioner will send

2    you on your way in all likelihood.

3            If you are selected, I want to inform you that this

4    case will take five days.  It will actually take four days of

5    evidence.  Each side has ten hours.  So this is not a non ending

6    case.  At the end of ten hours, that party rests, wherever they

7    are.  So you can literally count the time as a juror.  You know

8    exactly how long you're going to be here.  This is an indefinite

9    case, where it's two or three weeks.

10           Now, let me tell you how happy I am to see all of you.

11   The reason for that is I just finished a four and a half month

12   case.  Having you here for five days is a real blessing, believe

13   me.  Let me tell you a little bit about the case, as much as I

14   know.  And Plaintiff, StrikePoint Trading, LLC, seated at this

15   table, plaintiff's table, makes the following claims against the

16   following Defendants.  And plaintiff has the burden of proving

17   all these claims.  Plaintiff makes a breach of contract claim

18   against Defendant Aimee --

19           MR. THORPE:  Sabolyk.

20           THE COURT:  Sabolyk.  Thank you.  And John Mondragon

21   for their alleged breach of non disclosure agreement.  In

22   particular, plaintiff claims that Ms. Sabolyk and Mr. Mondragon

23   misappropriated trade secret information, specifically

24   StrikePoint's alleged client names and contact information, which

25   will also be referred to as a client list.

1          Plaintiff alleges that Ms. Sabolyk and Mr. Mondragon

2     used that information for their own personal benefit and that of

3     their new employer, Defendant Global Asset Advisors, Inc.

4          Plaintiff also brings claims for violation of

5     California Uniform Trade Secrets Act, based on essentially the

6     same contention.  And that Defendants deny all these claims and

7     also contend that the alleged non disclosure agreement is invalid

8     and unenforceable under California law, that plaintiff's client

9     list is not a trade secret, and that the clients identities were

10    available through other proper means, that plaintiff has

11    insufficient evidence of misappropriation, and no evidence that

12    any of its claimed damages were caused by any of Defendants's

13    wrongdoing.

14          I'm going to ask you just a couple questions, then turn

15    you over to counsel.  They'll have no more than 10 minutes with

16    all of you.  A couple things occur during a trial.  And it's

17    because judges just aren't clear.

18          First of all, you would like any of these attorneys if

19    you had a chance to talk to them.  Pretend that they're

20    invisible.  Don't ask them any question, including what time

21    court is starting or anything else.  Come to the court clerk or

22    the marshall or whoever is in the court.  The reason for that is

23    not only the eventual decision that you reach that will be just,

24    it's also along the way that the parties have the confidence that

25    along the way there is no inappropriate communication.  And one

1   of the parties if they see you talking to the other party, they

2   have no idea what you're talking about.  So please don't discuss

3   anything with counsel.  They're under the strictest admonitions

4   to say nothing to you.  Even if they get on the same elevator

5   with you.

6           The second thing is do no independent investigation.

7   This case hasn't gotten any national or local notoriety, nor do I

8   expect it to.  But do no independent investigation about the

9   companies, et cetera.  Don't Google these companies or parties

10  involved.

11          Third, any independent investigation causes a new

12  trial.  So all of the evidence we're going to hear will come from

13  witnesses who testify right from the witness box under oath that

14  we can see in here.  And that's the evidence we're going to

15  receive in this trial.  Nothing else outside the trial.

16          Finally, eventually part of the parties will trust

17  eight of you to decide this matter.  And they will choose these

18  eight of you over an hour, hour and a half, at most.  When that

19  occurs there shouldn't be input from somebody at home.  First of

20  all, they'll ask you how you got trapped in federal court for

21  five days.  Second of all, they're going to ask you what the case

22  is all about.  Just tell them they can't talk about the case

23  because then we get the other person's opinion.  And they're not

24  a juror.  And they haven't heard anything about the case.

25          Now, I expect you to follow that because it's your

1    taxpayer money, quite frankly.  I'm a workaholic.  I'm eventually

2    going to try to talk you into starting at 8:00 in the morning,

3    and I am going to try to talk to you to stay until 5:00.  America

4    works those hours, why can't the Court?  Counsel will be here at

5    7:30.  And I had promise you they won't leave until 9:00 every

6    evening.

7         Every piece of evidence should be discussed before

8    you're here each day.  There should be no breaks.  There should

9    be no Sidebars.  When you come here, you should be working the

10   whole time.  And if not, that's my mistake.  I just didn't keep

11   them long enough at night.  Kristee, how long have we been on the

12   record with counsel?

13        THE CLERK:  1:00 a.m.

14        THE COURT:  1:00 a.m.  So I promise you, when you come

15   in here, this is a hard working Court.  Your time will not be

16   wasted.  Do I excuse?  No, I don't.  You're American citizens.

17   It's your duty to serve.  I was in the Marine Corps.  We're not

18   sending to you Iraq or Vietnam or any other place.  You're

19   serving.  Unless it's such a severe financial hardship that

20   you're sole support of your family, you have a planned vacation

21   and you can show me the tickets.  I'm not going to dispute that

22   you're on your way.  I'm not going to disturb your family.  And

23   finally these are tough times.  Jury service is at a premium.  I

24   think we recognize that we need to get down to business.

25        Now, if I can talk you into it, I'll start at 7:30, and

1    I will keep you until 6:00 if you can pay attention and we can

2    get the case done even faster.  So that's up to the eight of you.

3    Some of you may have child care.  Sometimes I get in a situation

4    where you need to take the child to school.  That's fine.  We'll

5    talk to the eight of you, work out a schedule.

6           Also this hour and a half for lunch is nonsense.  I

7    like to cut that down to 45 minutes to an hour and finish this

8    case maybe even by Friday.

9           Okay.  So let's see how we can do it.  Couple questions

10   I have are the following.  Have any of you ever had jury service

11   in the past at any time in your life?  And if you have, would you

12   be kind enough just to raise your hand?  What type of jury

13   service did you have jury?

14          THE PROSPECTIVE JUROR 5:  It was a criminal trial.

15          THE PROSPECTIVE JUROR 3:  I don't actually recall

16   whether it was criminal or not.  I did serve as foreman.

17          THE PROSPECTIVE JUROR 4:  I actually never served on a

18   jury.

19          THE COURT:  But you got in?

20          THE PROSPECTIVE JUROR 4:  State court.

21          THE COURT:  State court.

22          THE PROSPECTIVE JUROR 4:  But I never served on a jury.

23          THE COURT:  Without indicating to all of you or caring

24   what type of case you sat on, the federal courts are a little

25   different.  I spent 17 years across the street in state courts.

1    In the state court, if you sat on a criminal matter, which this

2    is not, you had twelve jurors, just like you have in federal

3    court.  Nothing is changed.  And the standard was beyond a

4    reasonable doubt.  It was our highest legal standard.  So if you

5    sat on a criminal case, that was the standard you operated

6    under.

7         In a civil case, though, things are substantially

8    different than the superior court.  First of all, in the superior

9    court, twelve jurors if you're in a state court proceeding across

10   the street are chosen.  But the jury can actually disagree.  You

11   can have nine jurors and three of them might dissent from the

12   nine, but as long as there are nine jurors that's the verdict.

13   Doesn't have to be unanimous.  And the burden of proof is by

14   preponderance of the evidence.  It's a lower standard.  But the

15   plaintiff has that burden.

16        In the federal courts, we choose eight of you, not

17   twelve.  And we could actually choose as little as six if we

18   choose to.  Amongst the eight of you, it has to be unanimous.  In

19   other words, if you reach a verdict, it's not six to two and

20   that's a verdict.  It's a unanimous verdict, that you all agree

21   on, either for liability or nonliability.  And we operate on the

22   same standard here, by a preponderance of the evidence.

23        Now, I'm not going to read you a packet of instructions

24   now.  I'll read that to you at the end of the case.  But trust me

25   in this regard.  All the law that you need will be in that packet

```
 1    of instructions.  And I will ask you not to do any independent
 2    research.  Don't go to a Webster's Dictionary because the way we
 3    use words legally may be used differently if we went for
 4    Webster's dictionary compared to Blacks Law Dictionary.  So I'll
 5    normally give you the law.  I'll give you my pamphlet of
 6    instructions when you go back to deliberate.
 7             I absolutely love litigation.  Enjoy the counsel
 8    immensely.  They've been anxious to have this case brought to
 9    trial.  And I have tried to get this case in this week for one
10    reason.  I'm starting another six-month case involving alleged
11    terrorist allegations.  So if we don't try this case now, it goes
12    over for six more months.  And I would like them to get into
13    court.  They're civil parties on both sides.  They need to have
14    it resolved as quickly as possible so they know where they
15    stand.
16             I would be impressed -- I don't know about you -- if
17    the president of the United States, either past President Bush,
18    present President Obama.  So we don't leave anybody out, Clinton,
19    Bush One, Reagan, Carter, if they came into this courtroom and
20    testified, I would be pretty impressed, wouldn't you?  Until they
21    opened their mouth.  And by that, I don't mean that facetiously.
22    By that, there is absolutely no difference between somebody with
23    the highest calling in life and the most common person amongst
24    us.  And over the years, I'm amazed at the American public.
25    Station in life has absolutely nothing to do with ethics and
```

1    credibility.  So therefore the humblest of positions, the

2    Americans who go to work every day of their life, and you never

3    hear about them, are the back bone of this country.

4           So when someone takes this stand, do not be impressed

5    by some title in front of their name.  Judge their credibility

6    just like you would any other witness who comes into this court.

7    You may give them great credibility, you may give them no

8    credibility.  But everyone is equal.

9           Now, I'm going to pretend for a moment that this is the

10   I-5 freeway.  You drove in, and you've got a bunch of speeding

11   cars along this highway.  And you have a witness that comes into

12   Court and tells us the following:  That one evening about 9:00 at

13   night, when it was dark that, he or she is the witness, saw a

14   green 1992 Honda, speeding down the highway at a high rate of

15   speed, estimated to be 80 miles per hour.

16          And this witness tells us that that Honda hit the back

17   of a white pickup truck.  Both cars spun around.  Thank goodness

18   nobody was harmed.  No one was hurt.  But the driver of that

19   green Honda looked at the driver of the pickup truck and drove

20   away.

21          Now, if we were over in state court, that's called a

22   hit and run.  It's commonly called 2002 a of the California

23   Vehicle Code.  And what the law requires as a policy is that we

24   stop at the scene of an accident, we give our insurance, our name

25   we wait for the police to take a report.  We don't leave the

1    scene.  And also hopefully if somebody is hurt, we can give aid.

2         It turns out, though, when that person comes into

3    court, we find out the following:  That person was telling us the

4    truth, but they were mistaken.  It wasn't a green 1992 Honda.  It

5    turned out to be a red Honda.  Because it was dark that night,

6    the witness just misperceived the color.  And it wasn't a 1992

7    Honda.  It was a 1993.  You see the body styles didn't change

8    between 1992 and 1993.  I know because I own one.

9         And, third, it wasn't 80 miles per hour.  The

10   California Highway Patrol did an accident reconstruction and the

11   skidmarks indicate that it was in excess of 100 miles per hour.

12        That silly example tells us that this person was

13   telling you the truth.  They came in, and they were people just

14   like you who said, "This is what I believe happened."  You may

15   decide that that different is insignificant, or that it is

16   significant.  But there you've got a truthful witness doing their

17   best to recollect.

18        Then you've got the other witness.  You've got somebody

19   who just lies to you.  They tell you the truth all the way up to

20   the moment of truth, but at that critical part, I don't care what

21   his oath is, they just get up on the stand and lie to you.

22        Now, I don't know what's going to happen during this

23   trial at all.  I haven't heard this case before.  But as jurors

24   nobody takes the common sense and life experience of the eight of

25   you in terms of just who you are, your life experience, who's

1    telling the truth.

2            And I will give you a set of instructions that tell us

3    that you can judge demeanor and those other factors concerning

4    credibility and anything concerning credibility in deciding who's

5    telling you the truth or who's misperceived.

6            Now, finally a couple more things.  The counsel know

7    the following rule.  When we call for the next witness, that

8    witness appears at that moment or they've rested their case.

9            Counsel, you know that.

10           I don't care what time of the day it is.  Those

11   witnesses can stack up in the hallway and be inconvenienced and

12   come back tomorrow if they need to, but you're not

13   inconvenienced.  And when we call for that next witness, they

14   appear in that doorway.  And if they don't, that case is done on

15   that side.

16           So, knowing that, there is no wasted time.  We don't

17   wait for doctors and lawyers and other, quote, unquote,

18   professionals who can't find their way to court.  That's up to

19   counsel to get them here in a timely manner.  And that's the end

20   of the discussion.

21           Now, Counsel, I think that the only other question I'm

22   going to raise with you is this.  I'm really fortunate to go

23   around the world.  They take a couple federal judges to go into

24   place like Afghanistan, Armenia.  I just came back from Georgia,

25   last week, teaching rule of law to judges across the world.  Our

1    system is amazing.  It took us 230 some years to figure out, but

2    it is incredible.

3          The only thing you read about the paper is when it goes

4    haywire.  Thousands of cases that flow through never make the

5    news.  I'm absolutely convinced and share this with you as an

6    American that what's such a blessing about our system is the jury

7    system.  You see, no other country trusts it's people come no in

8    and judgment.  No other country.  Professional judges do that.

9    And frankly, I'll put this on the record, in many countries

10   they're bought off.  What keeps the system absolutely honest, and

11   I think the ethics, are the jurors who serve.

12         So therefore I have high expectations of you.  How you

13   conduct yourself.  And I think that without the jury service

14   hopefully we would be a little bit, but I'm not too certain of

15   that.  I'm not saying judges would be bought off in this country,

16   but I just don't like a system without common jurors

17   participating.

18         All right.  Counsel, you have 10 minutes.  Questions.

19   You'll conclude at 10 minutes to.

20         MR. HILTON:  Good morning, Ladies and Gentlemen.

21         THE COURT:  Stand up and use the lectern, sir.

22              VOIR DIRE EXAMINATION BY MR. HILTON

23         MR. HILTON:  I introduced myself I'm a minute ago, but

24   again I'm Larry Hilton, here representing the Plaintiff,

25   StrikePoint Trading.  And I just want to ask you a few questions.

 1   I'm not trying to be nosey or pry, but I do want to test some of

 2   your experience and some of your thoughts so that I can evaluate

 3   whether or not this case would be something that would be a good

 4   jury to serve for.

 5           Has anyone on the panel ever traded options?

 6           That would be Ms. Robinson?

 7           THE PROSPECTIVE JUROR 5:  Yes.

 8           THE COURT:  Talk a little bit about your experience

 9   trading options.  What kind of options did you trade?

10           THE COURT:  I want the jurors to hear you.  Okay?

11           THE PROSPECTIVE JUROR 5:  The corporation I work for

12   went public.  So they gave us tons of options when they went

13   public and they were handing them out like candy.

14           MR. HILTON:  And so at some point did you sell those

15   options?

16           THE PROSPECTIVE JUROR 5:  You bet.

17           MR. HILTON:  So you're a little familiar with those

18   would have been stock options?

19           THE PROSPECTIVE JUROR 5:  They were.

20           MR. HILTON:  Has anyone ever heard of something called

21   index options?

22           Anyone ever work in the financial industry?

23           Okay.  Mr. McGrath?

24           THE PROSPECTIVE JUROR 1:  Right.

25           MR. HILTON:  What position did you have in the

1    financial industry?

2            THE PROSPECTIVE JUROR 1:  I was a licensed financial

3    planner for Prudential.

4            MR. HILTON:  And what types of financial products did

5    you or did you recommend financial products?

6            THE PROSPECTIVE JUROR 1:  Yes, I did.

7            MR. HILTON:  What kind of products did you recommend.

8            THE PROSPECTIVE JUROR 1:  Anything from common shares

9    to mutual funds, bonds.

10           MR. HILTON:  Did you ever deal with any kind of option

11   at all or foreign exchange, any kind of that type of a product?

12           THE PROSPECTIVE JUROR 1:  No, not in that position.

13   Where I work now, I do have stock options just like the lady in

14   front of me.  But I never traded them anybody else.

15           Have any experience, Ms. Fryling?

16           THE PROSPECTIVE JUROR 7:  I worked for international --

17   international trading group in San Mateo, California.

18           MR. HILTON:  What do they do?

19           THE PROSPECTIVE JUROR 7:  Options trading.

20           MR. HILTON:  What kind of options do they trade?

21           THE PROSPECTIVE JUROR 7:  Commodities, other things.

22   And I worked in the legal department as a secretary.

23           MR. HILTON:  So are you familiar at least generally

24   with the kind of product that they do?

25           THE PROSPECTIVE JUROR 7:  Uh-huh.

1          MR. HILTON:  Has your employer ever been involved in

2     any kind of a dispute with traders, option people, traded

3     options?

4          THE PROSPECTIVE JUROR 7:  The legal department.  That's

5     all they handle.

6          MR. HILTON:  So you've got clients who are unhappy.

7          THE PROSPECTIVE JUROR 7:  Sure.  The ones that lose

8     money.

9          MR. HILTON:  And does your employer have brokers?

10         THE PROSPECTIVE JUROR 7:  I don't work for them any

11     more.  Yeah, they had brokers.  I'm not sure now.

12         MR. HILTON:  And do you know if those brokers had any

13     sort of nondisclosure agreement that they signed?

14         THE PROSPECTIVE JUROR 7:  Uh-huh.

15         MR. HILTON:  Did your employer ever have disputes or

16     problems?

17         THE PROSPECTIVE JUROR 7:  All the time.

18         MR. HILTON:  What kind of problems did you see when you

19     were there?

20         THE PROSPECTIVE JUROR 7:  When people lost money, they

21     claimed there was a breach of some sort.  So the company had

22     inhouse counsel that addressed all those claims.

23         MR. HILTON:  With your employer, do you know if they

24     record phone conversations if a customer called in?

25         THE PROSPECTIVE JUROR 7:  I think so, yeah.

 1          MR. HILTON:  Mr. Nguyen?

 2          THE PROSPECTIVE JUROR 3:  Yes.  I don't have

 3    experience brokering stocks, but I am the president of a small

 4    business.  And we're actually in the middle of an equity

 5    agreement with a small company.  And I have experience with NE

 6    NEA and the like.  And actually I was -- I don't mean to

 7    interrupt your question, but I did bring documents stating that

 8    this will be a financial burden if I am to serve this month

 9    because it's a very critical month to serve on this trial.

10          MR. HILTON:  Okay.  That is probably something that

11    Judge Carter will take up.  But other than Mr. McGrath and Ms.

12    Fryling, anyone else have any experience or did you ever work for

13    a company that was involved in trading any kind of options or

14    commodities?

15          THE PROSPECTIVE JUROR 5:  You know, our company there

16    was some investigation with the SEC there for a while.  Some

17    question.  I believe they were cleared of everything.  But there

18    was some questioning there on who they gave some of the options

19    to.

20          MR. HILTON:  Okay.  Ultimately they were cleared on

21    that?

22          THE PROSPECTIVE JUROR:  You know, I'm not sure if it's

23    still pending.

24          MR. HILTON:  Does anyone on the panel ever owned a

25    business?  Mr. Nguyen you own a business.

1          THE PROSPECTIVE JUROR 5:  Yes.

2          MR. HILTON:  Anyone else on the panel ever owned a

3     business?  Mr. Keenan?

4          THE PROSPECTIVE JUROR 6:  Yes, sir.

5          MR. HILTON:  What kind of business?

6          THE PROSPECTIVE JUROR 6:  It was a whole sale grocery.

7          MR. HILTON:  And did you build that business up or did

8     you buy that business?

9          THE PROSPECTIVE JUROR 6:  I bought it existing.

10          MR. HILTON:  Okay.  And did that -- did that business

11     have clients when you bought it?

12          THE PROSPECTIVE JUROR 6:  Yes, it did.

13          MR. HILTON:  Okay.  So you basically bought --

14          THE PROSPECTIVE JUROR 6:  I bought the client list.

15          MR. HILTON:  Okay.  So you'll understand that?  You're

16     familiar with client lists?

17          THE PROSPECTIVE JUROR 6:  Yes, sir.

18          MR. HILTON:  And how long did you own the business?

19          THE PROSPECTIVE JUROR 6:  Three years.

20          MR. HILTON:  And then did you sell the business?

21          THE PROSPECTIVE JUROR 6:  Yes.

22          MR. HILTON:  And did you sell the client list with the

23     business?

24          THE PROSPECTIVE JUROR 6:  Lock, stock, and barrel.

25          MR. HILTON:  Okay.  Has anyone on the panel ever had to

1    sign a nondisclosure confidentiality agreement?

2            All right.  Let me start with you, Mr. McGrath.  What

3    type just was that when you were working for the financial

4    planner?

5            THE PROSPECTIVE JUROR 1:  That was one of the

6    occasions.  Then it was a couple other employers also.

7            MR. HILTON:  Now, I want to ask follow-up but does

8    everyone understand the distinction between a non disclosure

9    agreement and a noncompete agreement?

10           Okay.  You understand noncompete agreement says you

11   can't go to work in a competing business?  Nondisclosure

12   agreement deals with information.  You have access to

13   information.  It's what you do with the information.  Does anyone

14   have any confusion on that issue?

15           Okay.  Does anyone have a problem with a non disclosure

16   agreement?  Do you think it's wrong for an employer to ask an

17   employee to keep information confidential?  Anyone have trouble

18   with that?

19           THE PROSPECTIVE JUROR 5:  Well, I know with our company

20   I mean, our company they have bought blackout periods where you

21   can't trade those options, but I mean, we know information.  You

22   know, I mean, we know how the company is doing.  So to ask us not

23   to trade our options when we know that the business isn't going

24   to be doing good next month, that doesn't make any sense because

25   that's when you market the you are going to cash in your options

 1   if you know that next month -- I work for trade and technical

 2   school.

 3        So I know when enrollments aren't doing good and sure

 4   I'm going to try to get rid of everything I can before the

 5   enrollments go down.  For me that's just part of the business.

 6   I'm going to know that information.

 7        MR. HILTON:  Okay.  Thank you.  Anyone else have a

 8   conceptual problem with a business having its employees sign a

 9   non disclosure agreement that protects certain information?

10   Would you have trouble enforcing that agreement if the judge told

11   you that the agreement was legally enforceable would you have

12   trouble finding in favor of an employer who asked its employees

13   to sign that kind of medium?

14        THE PROSPECTIVE JUROR 5:  Well, yeah.

15        MR. HILTON:  An agreement.  Mr. Larson, are you

16   employed now?

17        THE PROSPECTIVE JUROR 4:  Me?  I'm a licensed land

18   surveyor.

19        MR. HILTON:  And who do you work for?

20        THE PROSPECTIVE JUROR 4:  Surveyor company called Tal,

21   Inc.

22        MR. HILTON:  And, Mr. Nguyen, you are a business owner?

23        THE PROSPECTIVE JUROR 3:  Yes.  My information has

24   changed since I last filled the questionnaire, but yes, that's

25   correct.

1          MR. HILTON:  What's the name of your business?

2          THE PROSPECTIVE JUROR 3:  It's calmed Metronome

3   Software, LLC.  The business started operations May, October.  So

4   we're in our first six months of operation.

5          MR. HILTON:  Ms. Phan?

6          THE PROSPECTIVE JUROR 2:  Yes.

7          MR. HILTON:  Hi.  Are you currently employed?

8          THE PROSPECTIVE JUROR 2:  Yes.  I work for software

9   company.

10         MR. HILTON:  Okay.  What do you do for that company?

11         THE PROSPECTIVE JUROR 2:  I am the programmer for that

12  company.

13         MR. HILTON:  You work with computers?

14         THE PROSPECTIVE JUROR 2:  Yes.

15         MR. HILTON:  And, Mr. McGrath, you said you were a

16  financial planner.  Are you still in that business?

17         THE PROSPECTIVE JUROR 1:  No.  I got out.

18         MR. HILTON:  What do you do now?

19         THE PROSPECTIVE JUROR 1:  I'm a construction manager

20  for a wireless carrier.

21         MR. HILTON:  And who is that?

22         THE PROSPECTIVE JUROR 1:  Metro PCS.

23         MR. HILTON:  Mr. Peterson, who are you currently

24  employed with?

25         THE PROSPECTIVE JUROR 8:  I'm employed with National

 1    Basketball Association.

 2              MR. HILTON:  What do you do for NBA?

 3              THE PROSPECTIVE JUROR 8:  Media and public relations.

 4              MR. HILTON:  And you're based out here on the West

 5    Coast?

 6              THE PROSPECTIVE JUROR 8:  Yeah.  We operate for minor

 7    league team out in Anaheim.

 8              THE COURT:  Couple more questions, Counsel.

 9              MR. HILTON:  All right.

10              Mr. Keenan, who do you work for now that --

11              THE PROSPECTIVE JUROR 6:  Saddle Back Valley Community

12    Church.

13              MR. HILTON:  What do you do for them?

14              THE PROSPECTIVE JUROR 6:  I'm a pastor.  I feed the

15    homeless in Costa Mesa and preach to them every Sunday.

16              MR. HILTON:  We work pretty hard here, but I don't

17    think we're going to work on Sunday.  Then, Ms. Robinson, who are

18    you currently employed by.

19              THE PROSPECTIVE JUROR 6:  Printing colleges.

20              THE COURT:  Counsel, believe it or not, yes, you are.

21              MR. HILTON:  Thank you, Ladies and Gentlemen.  I

22    appreciate your time.

23              THE COURT:  Counsel, you have ten minutes.

24              MR. SKLAR:  Good afternoon, Ladies and Gentlemen.  I

25    have a question.

1          VOIR DIRE EXAMINATION BY MR. SKLAR

2          MR. SKLAR:  Does anybody on the jury own a patent?

3  Anybody?

4          THE PROSPECTIVE JUROR 3:  Our company has filed

5  provisional Patents.  And we're in the process of filing for

6  it.

7          MR. SKLAR:  Thank you, sir.  Does your company have

8  employees?

9          THE PROSPECTIVE JUROR 3:  Yes.  Myself and four other

10  folks.

11          MR. SKLAR:  And do you have any type of confidentiality

12  agreements with those employees.

13          THE PROSPECTIVE JUROR 3:  Yes, we do.  And we have

14  confidential agreements with previous employers as well.

15          MR. SKLAR:  Do you have any kind of non compete.

16          THE PROSPECTIVE JUROR 3:  Myself and two other

17  individuals have noncompete clauses.

18          MR. SKLAR:  Has anybody on the jury ever traded in the

19  commodity futures markets?

20          Nobody has traded cattle or pork bellies or anything

21  like that?

22          Mr. Keenan, when you bought the grocery store, did the

23  seller have restrictions on what they could do with that client

24  list.

25          THE PROSPECTIVE JUROR 3:  Yes.  They couldn't use it to

 1   compete against me.

 2              MR. SKLAR:  Was there a time period on that?

 3              THE PROSPECTIVE JUROR 3:  Two years.

 4              MR. SKLAR:  And in that was there an actual piece of

 5   paper that delineated the client list when you bought that

 6   business.

 7              THE WITNESS:  Yes.

 8              MR. SKLAR:  So it was actually laid out as a subscribed

 9   list of clients, correct?

10              THE PROSPECTIVE JUROR 3:  It was.

11              MR. SKLAR:  Do you think you can be subjective in a

12   case where we're looking at issues such as allegations of

13   soliciting a protected client.

14              THE PROSPECTIVE JUROR 3:  Yes, I can.

15              MR. SKLAR:  Is it Ms. Robinson?

16              THE PROSPECTIVE JUROR 5:  Yes.

17              MR. SKLAR:  And do you think you can be fair in a case

18   where we're looking at competing allegations if you will of

19   performance and options do you have any bias regarding the

20   options market.

21              THE PROSPECTIVE JUROR 5:   Well, I do to a certain

22   extent.  I mean, I think that if an individual feels that there

23   is going to be a change based on information they know from

24   they're working just by knowing the business that that

25   shouldn't --

1          MR. SKLAR:  So in a sense are you talking about the

2    person that has options in a company that they work at?  And do

3    you think if you were talking about stock options generally or

4    even options are you familiar with options in the stock markets

5    generally where people buy and sell them on the exchanges?

6          THE PROSPECTIVE JUROR 5:  Not too much.

7          MR. SKLAR:  You don't have any opinions on those

8    exchanges one way or the other?  For example, is anybody on the

9    jury familiar with the Chicago Mercantile Exchange.

10          Mr. McGrath, in your days as a financial planner, did

11    you have occasion to use any options to hedge any of your will

12    clients investments.

13          THE PROSPECTIVE JUROR 1:  No, I didn't.

14          MR. SKLAR:  And did you utilize any certified trading

15    advisors, what are commonly refers to as CTA's, in your business

16    at all?

17          THE PROSPECTIVE JUROR 5:  There was a couple in the

18    company, yes.

19          MR. SKLAR:  Okay.  And you're obviously -- you're not

20    familiar with any of the parties in this litigation, Daniels

21    Trading, StrikePoint, Dominion, Optioneer?

22          THE PROSPECTIVE JUROR 5:  No.

23          MR. SKLAR:  And do you think, sir, you can be fair in

24    weighing competing claims in the financial?  Do you have -- do

25    you think you have any bias in the financial industries and the

1    employment practices therein?

2            THE PROSPECTIVE JUROR 5:  No.  With the one exception

3    that I think my understanding is non compete clause is really --

4    doesn't hold up in California.  A man has a right to employment.

5            MR. SKLAR:  Thank you.

6            THE PROSPECTIVE JUROR 5:  That's my understanding.  My

7    belief.

8            MR. SKLAR:  And does that bias your position at all?

9            THE PROSPECTIVE JUROR 5:  Well, if it's going to stop a

10   person from being employed, yeah.

11           MR. SKLAR:  So you have an understanding in California

12   that noncompetes in your understanding are not valid, correct?

13           THE PROSPECTIVE JUROR 5:  Correct.

14           THE COURT:  Counsel, the other juror has his hands

15   up.

16           MR. SKLAR:  Yes, please.

17           THE PROSPECTIVE JUROR 3:  That's what I have been told

18   as well in regard to my own company.

19           MR. SKLAR:  I have no other questions.

20           MR. McCAFFREY:  Your Honor, may I have a few?

21           THE COURT:  You may.

22              VOIR DIRE EXAMINATION BY MR. McCAFFREY

23           MR. McCAFFREY:  Just real quick, Ladies and Gentlemen,

24   again I'm Tim McCaffrey.  I represent John Mondragon.  Has

25   anybody ever used the Internet to look up or locate someone that

```
 1   they've lost contact with?  By a show of hands?  Is that
 2   everyone?  Ms. Phan, have you done that?
 3              THE PROSPECTIVE JUROR 2:  No.
 4              MR. McCAFFREY:  Do you believe that you can do it?
 5              THE PROSPECTIVE JUROR 2:  Of course.  I could search
 6   and I can Google, but I'm not looking for anyone I lost.
 7              MR. McCAFFREY:  But if you were, you can Google someone
 8   and fine them, right?
 9              THE PROSPECTIVE JUROR 2:  Yes.
10              MR. McCAFFREY:  And other members of the panel have
11   done that before?
12              JURY PANEL:  Yes.
13              MR. McCAFFREY:  And have any members of the panel
14   actually serviced as clients themselves been in sales?
15              Start with you, Mr. Peterson.
16              THE PROSPECTIVE THE PROSPECTIVE JUROR 8:  Because I
17   work in minor league sports a lot of the stuff is my title and
18   sales so we do a lot of cold calling researching clients off the
19   Internet.
20              MR. McCAFFREY:  And that's what you're doing now for
21   the NBA?
22              THE PROSPECTIVE THE PROSPECTIVE JUROR 8:  To some
23   extent, yes.
24              MR. McCAFFREY:  And when and if you leave the NBA do
25   you have any expectation as to whether or not you can still call
```

1    on those contacts that you learned about during your employment?

2              THE PROSPECTIVE THE PROSPECTIVE JUROR 8:  There is a

3    some that you establish a good relationship with.  I would say

4    overall, it's not that successful of a technique.  But in two

5    years or so, we probably keep in touch with 10, 15 percent of

6    them.

7              MR. McCAFFREY:  And those that you keep in touch with,

8    do you have an expectation that you can continue to keep in touch

9    with them following your employment at the NBA?

10             THE PROSPECTIVE THE PROSPECTIVE JUROR 8:  If I was in

11   the same type of career path, yes.

12             MR. McCAFFREY:  And was it Mr. McGrath who also raised

13   his hand?  Servicing clients?

14             THE PROSPECTIVE THE PROSPECTIVE JUROR 1:  Yes.

15             MR. McCAFFREY:  Thank you.  Same basic question.  You

16   serviced clients when you were financial planner.

17             THE PROSPECTIVE JUROR 1:  No, not as financial planner.

18   I was working sales for mechanical, on-site service companies and

19   they actually were competitors.  And I left one and went to the

20   other.  And I did call on other clients and I actually got them

21   to come over to the new company.

22             MR. McCAFFREY:  And did the former employer when you

23   made the switch, have any beef with your calling on their

24   clients?

25             THE PROSPECTIVE JUROR 1:  Well, they didn't send me

```
 1    candy, but no, no formal beef.

 2              MR. McCAFFREY:  They didn't file a lawsuit trying

 3    to stop --

 4              THE PROSPECTIVE JUROR 1:  No, nothing like that

 5              MR. McCAFFREY:  Anyone else have similar experience as

 6    Mr. McGrath in terms of changing employment calling on clients

 7    that they knew from the previous job?

 8              MR. McCAFFREY:  Okay.  I have nothing further.

 9              THE COURT:  Okay.  Counsel, the first peremptory pass

10    is to the plaintiff.

11              MR. HILTON:  Your Honor, the plaintiff will thank and

12    excuse juror number five.

13              THE COURT:  Number five.  By name, that is?

14              MR. HILTON:  Ms. Robinson.

15              THE COURT:  Ms. Robinson.  Thank you.  Go back to the

16    jury room.  Check with the jury commissioner.  There may be

17    another case for you.  Thank you very much.

18              THE COURT:  Kristee, call the next juror, please.

19              THE CLERK:  Donald Sanderson.

20              THE COURT:  Mr. Sanderson, if you would come forward,

21    sir?  Would you please and have a seat?

22                 FURTHER VOIR DIRE EXAMINATION BY THE COURT

23              THE COURT:  Tell me your occupation, sir.

24              THE PROSPECTIVE JUROR 5:  I'm self-employed.

25              THE COURT:  What are you reading today?  What book?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIIFORNIA

 1              THE PROSPECTIVE JUROR 5:  Chronicle.

 2              THE COURT:  Have you ever been a juror before, sir?

 3              THE PROSPECTIVE JUROR 5:  Yes.

 4              THE COURT:  And was that a criminal or civil case?

 5              THE PROSPECTIVE JUROR 5:  Criminal.

 6              THE COURT:  Criminal.  Okay.  You heard that the

 7    criminal doesn't change from state to federal, most of the jury

 8    service takes place in the state courts.  About 95 percent of all

 9    the nation's work take place in the state courts.  About five

10    percent in the federal courts.

11              THE PROSPECTIVE JUROR 5:  Yes.

12              THE COURT:  But you have heard that there is a

13    substantial difference on the civil side.  On the civil side, we

14    have smaller juries, but it requires unanimity if you're going to

15    reach a verdict.  You heard my silly example about the car on the

16    freeway.  It's a silly example, but it demonstrates that

17    sometimes people tell us the truth, but they're just

18    misperceived.

19              THE PROSPECTIVE JUROR 5:  I understand.

20              THE COURT:  May not make a difference.  May have had

21    the right person in the hit and run.  Other times they just lie

22    to us shocking as it seems regardless of the truth you understand

23    that.

24              THE PROSPECTIVE JUROR 5:  Yes.

25              THE COURT:  Nobody takes your place in terms of judging

1    credibility along with your fellow jurors.  You heard my

2    admonitions about not using any outside resources outside the

3    courtroom and the highest things that I expect from all the

4    jurors in our system.

5           THE PROSPECTIVE JUROR 5:  Yes, I heard.

6           THE COURT:  You heard a little bit about the dispute.

7    There is no evidence before us at the present time.  Do you have

8    any questions of me, sir?

9           THE PROSPECTIVE JUROR 5:  No.

10          THE COURT:  Do you think you could be fair and

11   impartial to both sides with whatever you know about this case so

12   far?

13          THE PROSPECTIVE JUROR 5:  Yes, I do.

14          THE COURT:  Will you follow the law that I instruct you

15   at the end of the case?

16          THE PROSPECTIVE JUROR 5:  Yes.

17          THE COURT:  Counsel, couple minutes.  This is not 10

18   minutes now, Counsel.

19          MR. HILTON:  Your Honor, yes, I'll be very, very brief.

20            FURTHER VOIR DIRE EXAMINATION BY MR. HILTON

21          MR. HILTON:  Mr. Sanderson, thank you.  Did you say

22   you're self-employed?

23          THE PROSPECTIVE JUROR 5:  I beg your pardon?

24          MR. HILTON:  You're self-employed?

25          THE PROSPECTIVE JUROR 5:  Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIIFORNIA

1          MR. HILTON:  What business are you in?

2          THE PROSPECTIVE JUROR 5:  I have a few clients who I

3    work with in doing profitability analysis and so forth.  Cash

4    flow.  Accounts receivable.

5          MR. HILTON:  And you heard some of the questions

6    earlier.  I won't repeat all of them.  But are you generally

7    familiar with a non disclosure agreement?

8          THE PROSPECTIVE JUROR 5:  Yes, I am.

9          MR. HILTON:  And would you have any problem enforcing

10   it if the facts supported it enforcing an employer an employer's

11   contract to keep certain of its information secret?  Would you

12   have any problem with that?

13         THE PROSPECTIVE JUROR 5:  None at all if the facts

14   support it as you say.

15         MR. HILTON:  But in concept you don't think there is

16   anything conceptually wrong with an employer asking an employee

17   to sign an --

18         THE PROSPECTIVE JUROR 5:  No.

19         MR. HILTON:  Have you been involved in a business that

20   had a client list?  A client list?

21         THE PROSPECTIVE JUROR 5:  Yes.

22         MR. HILTON:  And was that a client list that you

23   developed on your on or was it a client list that was pre

24   developed?

25         THE PROSPECTIVE JUROR 5:  Developed over the years.

 1          MR. HILTON:  Okay.  And you did that through your own

 2  efforts and your own labor?

 3          THE PROSPECTIVE JUROR 5:  No, I didn't do it myself.

 4  It was done it was a combined act.

 5          MR. HILTON:  Okay.  But that was while the you were

 6  with the company?

 7          THE PROSPECTIVE JUROR 5:  I beg your pardon?

 8          MR. HILTON:  Bad question.  I'm just going to ask you

 9  one more question.  Talking about a client list, would you see

10  the distinction between a client list compiled by an employee who

11  did the work themselves who went out and Googled and cold called

12  and did the effort versus a client list that's just handed to an

13  employee when they come in, would you see a distinction between

14  those two lists in terms of whether that employee would have

15  that?

16          THE COURT:  I think that prejudges the evidence,

17  Counsel.  Thank you.

18          MR. HILTON:  All right.  That's all I have.

19          THE COURT:  Thank you.  Next.

20           FURTHER VOIR DIRE EXAMINATION BY MR. SKLAR

21          MR. SKLAR:  Hello, sir, thank you.  Equally, would you

22  have a problem if the facts supported find ago contract invalid

23  if it's true purpose was to prevent someone from competing in a

24  business?

25          THE COURT:  Counsel, these questions don't --

1           MR. SKLAR:  I'll strike that.

2           MR. SKLAR:  What kind of business did you say you had

3     that had a client list?

4           THE PROSPECTIVE JUROR 5:  Right now I just do

5     profitability analysis and accounts receivable cash flow.

6           MR. SKLAR:  And are you trained as an accountant, sir?

7           THE PROSPECTIVE JUROR 5:  No.

8           MR. SKLAR:  What is your educational background?  Your

9     background.

10           THE PROSPECTIVE JUROR 5:  I was general management and

11     distribution companies.

12           MR. SKLAR:  Thank you.  And is there any reason you

13     don't think you could be fair in weighing varying claims about

14     whether or not there is actually a true trade secret list or a

15     true solicitation or true noncompete?

16           THE PROSPECTIVE JUROR 5:  No, I have no doubt.

17           MR. SKLAR:  Thank you, Your Honor.  Nothing further.

18           THE COURT:  Counsel?

19           MR. McCAFFREY:  Thank you, Your Honor.  Just briefly.

20           FURTHER VOIR DIRE EXAMINATION BY MR. McCAFFREY

21           MR. McCAFFREY:  The clients you now service how did you

22     get them?  The clients you now service, how did you get them?

23           THE PROSPECTIVE JUROR 5:  They were former employees or

24     business associates before I retired from corporate.

25           MR. McCAFFREY:  People that you knew in the past?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIIFORNIA

1          THE PROSPECTIVE JUROR 5:  Yes.

2          MR. McCAFFREY:  People you've worked with in the past?

3          THE PROSPECTIVE JUROR 5:  Yes.

4          MR. McCAFFREYUU:  And they decided to continue to work

5   with you when you opened up your new operations.

6          THE PROSPECTIVE JUROR 5:  Right.

7          MR. McCAFFREY:  Thank you.

8          THE COURT:  Counsel if one of your clients just arrive

9   would you like to introduce him.

10          MR. SKLAR:  Yes.  Glenn Swanson, this is the president

11   of GAA.  He's the president of Global Assets.

12          THE COURT:  Thank you very much.  The peremptory now

13   passes to defense.

14          MR. THORPE:  Thank you, Your Honor.  Defendants would

15   thank and excuse Mr. Keenan.

16          THE COURT:  Mr. Keenan, if you go back and just check

17   with the jury commissioner.  They may send you out on another

18   case.

19          THE CLERK:  William Hollister.

20            FURTHER VOIR DIRE EXAMINATION BY THE COURT

21          THE COURT:  Mr. Hollister.  Mr. Hollister, you heard

22   all the prior questions?

23          THE PROSPECTIVE JUROR 6:  Yes, sir.

24          THE COURT:  Then I won't reask them.  Would you be fair

25   and impartial to both sides in this matter?

1                    THE PROSPECTIVE JUROR 6:  Yes.

2                    THE COURT:  Would you follow the law?

3                    THE PROSPECTIVE JUROR 6:  Yes.

4                    THE COURT:  Could I ask your profession?

5                    THE PROSPECTIVE JUROR 6:  I work for a publishing

6      company.

7                    THE COURT:  Have you ever served on a jury before?

8                    THE PROSPECTIVE JUROR 6:  No.

9                    THE COURT:  You heard that silly example I gave about

10     the freeway system?

11                   THE PROSPECTIVE JUROR 6:  Correct.

12                   THE COURT:  It's the easiest way to demonstrate the

13     difference between someone telling us a truth and that they might

14     not be off compared to the person who just lies to us.

15                   If you're married, could I ask your spouse's

16     occupation?

17                   THE PROSPECTIVE JUROR 6:  She works with me.

18                   THE COURT:  Okay.  Do you have any experience in

19     commodities or trading markets?

20                   THE PROSPECTIVE JUROR 6:  No.

21                   THE COURT:  Do you believe once again you would be fair

22     and impartial to both sides?

23                   THE PROSPECTIVE JUROR 6:  Correct.

24                   THE COURT:  Follow the law?

25                   THE PROSPECTIVE JUROR 6:  Yes.

1          THE COURT:  If this was a criminal matter, we used to

2    get cases like child molesting and a lot of jurors would say, "I

3    just couldn't sit on a case like that.  And I've had a lot of

4    dealt penalty cases, some people would say, "I could never find

5    for death" or "I could always find for death."  But this

6    certainly is not a death case.  Counsel?

7              FURTHER VOIR DIRE EXAMINATION BY MR. HILTON

8          MR. HILTON:  Mr. Hollister, I'm not going for repeat

9    all the questions.  You probably heard most of them, but have you

10   ever signed a non disclosure agreement with an employer?

11         THE PROSPECTIVE JUROR 6:  No, but we do have a

12   noncompete with our company.

13         MR. HILTON:  Now, it wasn't clear for me.  You're owner

14   of your company now.

15         THE PROSPECTIVE JUROR 6:  Well, it's family owned,

16   yeah.

17         MR. HILTON:  Have you ever asked other people to sign a

18   noncompete?

19         THE PROSPECTIVE JUROR 6:  No.

20         MR. HILTON:  But yourself had to sign a noncompete?

21         THE PROSPECTIVE JUROR 6:  Right.  I can't go out and

22   sell the same product to the same customers that we already have.

23   I could sell something else.

24         MR. HILTON:  I will ask the question before, but I will

25   ask directly to you.  You understand the distinction between a

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIIFORNIA

1    noncompete and a nondisclosure?

2              THE PROSPECTIVE JUROR 6:  Right.  I think so.

3              MR. HILTON:  Noncompete that you signed keeps you from

4    competing, and non disclosure deals with certain information that

5    can't be used.  You understand that distinction?

6              THE PROSPECTIVE JUROR 6:  Okay.  Yeah.

7              MR. HILTON:  Have you ever had a dispute with -- strike

8    that.  It's a family business?

9              THE PROSPECTIVE JUROR 6:  Right.

10             MR. HILTON:  Do you employ people?  Do you have any

11   employees?

12             THE PROSPECTIVE JUROR 6:  Yes, we do.

13             MR. HILTON:  Have you ever had disputes with employees?

14             THE PROSPECTIVE JUROR 6:  No.

15             MR. HILTON:  Any employees ever leave?

16             THE PROSPECTIVE JUROR 6:  Yeah.

17             MR. HILTON:  Ever have any problem after they leave?

18   Any disputes with them?

19             THE PROSPECTIVE JUROR 6:  No.

20             MR. HILTON:  Okay.  All right.  And have you ever had

21   any problems with a stockbroker or a provider of a financial

22   services?

23             THE PROSPECTIVE JUROR 6:  No.

24             MR. HILTON:  Do you trade stocks or any kind of equity

25   mutual funds anything like that?

```
 1                THE PROSPECTIVE JUROR 6:  No.

 2                THE COURT:  Thank you, Counsel.

 3                MR. HILTON:  Thank you, Mr. Hollister.

 4                 FURTHER VOIR DIRE EXAMINATION BY MR. SKLAR

 5                MR. SKLAR:  Hello, sir.  Thank you for coming.  Do you

 6      have any more biases that you can identify regarding solicitation

 7      of clients or anything like that?

 8                THE PROSPECTIVE JUROR 6:  What do you mean?

 9                MR. SKLAR:  Preconceived ideas about people going after

10      your clients or something anything like that?

11                THE PROSPECTIVE JUROR 6:  If they worked for me I would

12      probably have a problem like that.  Because I've created a lot of

13      our lists and stuff.

14                MR. SKLAR:  So do you have your employees sign any kind

15      of non disclosure agreements?

16                THE PROSPECTIVE JUROR 6:  No.

17                MR. SKLAR:  And do you own any patents, sir?

18                THE PROSPECTIVE JUROR 6:  No.

19                MR. SKLAR:  Does your company?  That you're aware of?

20                THE PROSPECTIVE JUROR 6:  I don't think so.

21                MR. SKLAR:   You've heard a lot of the questions I

22      don't want to repeat them.  Is there anything you would like to

23      add that you've heard that you think you might want to respond to

24      that you weren't asked directly?

25                THE PROSPECTIVE JUROR 6:  I don't think so.
```

1          MR. SKLAR:  Thank you very much.

2              FURTHER VOIR DIRE BY MR. McCAFFREY

3          MR. McCAFFREY:  Hi, Mr. Hollister.

4          THE PROSPECTIVE JUROR 6:  Hi.

5          MR. McCAFFREY:  Just a couple quick things.  You said

6    you created your own list?

7          THE PROSPECTIVE JUROR 6:  Correct.

8          MR. McCAFFREY:  How did you do that?

9          THE PROSPECTIVE JUROR 6:  Cold calls.

10         MR. McCAFFREY:  And this is for the company that you

11   own?

12         THE PROSPECTIVE JUROR 6:  Correct.  We own.

13         MR. McCAFFREY:  And how many years did you take to

14   create your company list?

15         THE PROSPECTIVE JUROR 6:  About 18.  Well, we've been

16   in business almost thirty years.  So it's taken a while.

17         MR. McCAFFREY:  I'm sorry?

18         THE PROSPECTIVE JUROR 6:  It started from an idea.  My

19   dad actually started the company.  And we just kind of grew and a

20   lot of cold calling and trying to get into some dealers.

21         MR. McCAFFREY:  I'm sorry.  I might have missed it, but

22   what's the business you're in?

23         THE PROSPECTIVE JUROR 6:  Publishing.

24         MR. McCAFFREY:  I'm sorry to be obtuse, but what is

25   that in terms of publishing?  What document?

1              THE PROSPECTIVE JUROR 6:  We publish books for law

2    enforcement, college textbooks.

3              MR. McCAFFREY:  So your clients are?

4              THE PROSPECTIVE JUROR 6:  Primarily law enforcement.

5              MR. McCAFFREY:  Law enforcement agencies?

6              THE PROSPECTIVE JUROR 6:  Yeah.  Officers, departments,

7    colleges, criminal law.  Homeland Security.

8              MR. McCAFFREY:  Do you have the list of your clients in

9    some secret database or confidential database?

10             THE PROSPECTIVE JUROR 6:  I don't know how secret it

11   is, but yeah, I have it.

12             MR. McCAFFREY:  And you have a good idea of who your

13   clients are, correct?

14             THE PROSPECTIVE JUROR 6:  Correct, yes.

15             MR. McCAFREY:  And approximately how long clients are

16   on that list?

17             THE PROSPECTIVE JUROR 6:  Over 300.

18             MR. McCAFFREY:  And I think you heard you mention you

19   signed a non compete with the entity that your father founded?

20             THE PROSPECTIVE JUROR 6:  Right.

21             MR. McCAFFREY:  And that noncompete or non solicit

22   agreement would prohibit you from calling on these clients to set

23   the same product?

24             THE PROSPECTIVE JUROR 6:  To sell the same product,

25   right.

```
 1            MR. McCAFFREY:  But you think you could call on them to

 2   sell a different product?

 3            THE PROSPECTIVE JUROR 6:  Yeah.

 4            MR. McCAFFREY:  Thank you.

 5            THE COURT:  Peremptory now passes back to the

 6   plaintiff.  This will be the second.  Plaintiff?

 7            MR. HILTON:  Your Honor, the plaintiff will accept the

 8   panel as presently constituted.

 9            THE COURT:  The peremptory now passes to Defendants.

10   This will be your second peremptory.

11            MR. THORPE:  One moment, Your Honor.  May I consult

12   with my co-counsel?

13            THE COURT:  Please do.

14            MR. THORPE:  Your Honor, thank you very much.

15   Defendants would thank and excuse Mr. Sanderson, please.

16            THE COURT:  Mr. Sanderson, thank you very much.  If you

17   go back to the jury room with thanks and appreciate.  They may

18   send you out for another proceedings today, sir.  I just don't

19   know.  But thank you for your attendance.

20            Call another juror please.

21            THE CLERK:  Diane Neilson.

22             FURTHER VOIR DIRE EXAMINATION BY THE COURT

23            THE COURT:  Ms. Neilson.  How are you today?

24            THE PROSPECTIVE JUROR 5:  Great.

25            THE COURT:  Have you heard all of the prior questions
```

1    that were asked?

2              THE PROSPECTIVE JUROR 5:  Yes.

3              THE COURT:  You do mean you could be fair and impartial

4    to both sides in this matter.

5              THE PROSPECTIVE JUROR 5:  Yes.

6              THE COURT:  Will you follow the law that I instruct you

7    on at the end of the case?

8              THE PROSPECTIVE JUROR 5:  Yes.

9              THE COURT:  Now, once again you've heard that silly

10   example that I used about perception versus somebody lied to us?

11             THE PROSPECTIVE JUROR 5:  Yes.

12             THE COURT:  Okay.  Could I ask your profession?

13             THE PROSPECTIVE JUROR 5:  Homemaker.

14             THE COURT:  And are you married?

15             THE PROSPECTIVE JUROR 5:  Yes.

16             THE COURT:  Could I ask your husband's profession?

17             THE PROSPECTIVE JUROR 5:  He just retired.

18             THE COURT:  Okay.  What did he do before?

19             THE PROSPECTIVE JUROR 5:  Worked for UPS.

20             THE COURT:  Okay.  And you understand that if you're

21   selected to be a member of the jury that a unanimous verdict is

22   required if you're going it find liability in this matter?

23             THE PROSPECTIVE JUROR 5:  Yes.

24             THE COURT:  And have you had any prior jury service at

25   all?

```
 1              THE PROSPECTIVE JUROR 5:  Yes.

 2              THE COURT:  Tell me about that.

 3              THE PROSPECTIVE JUROR 5:  I served about a year ago

 4  over in the other building on a malpractice.

 5              THE COURT:  Superior court?

 6              THE PROSPECTIVE JUROR 5:  Uh-huh.

 7              THE COURT:  You if you sat on that malpractice case it

 8  was a civil case and there were twelve jurors?

 9              THE PROSPECTIVE JUROR 5:  Right.

10              THE COURT:  And you could actually disagree as long as

11  you reached a verdict if the other three disagreed you could go

12  render a verdict here it's unanimous.  Okay.  Thank you very

13  much.

14          Counsel?

15              VOIR DIRE EXAMINATION BY MR. HILTON

16          MR. HILTON:  Hi, Ms. Neilson.

17              THE PROSPECTIVE JUROR 5:  Hi.

18          MR. HILTON:  Just can I ask you consume of the same

19  questions we've gone over.  I appreciate your patience.  Do you

20  have any kind of -- any experience at all investing generally in

21  mutual funds, anything like that?

22              THE PROSPECTIVE JUROR 5:  Personally, no.  But my

23  husband has.

24          MR. HILTON:  Okay.  What did your husband do for UPS?

25              THE PROSPECTIVE JUROR 5:  He was a human resources,
```

1   employee benefits.

2           MR. HILTON:  Okay.  And in that capacity did he ever

3   have to deal with disputes between UPS and employees?

4           THE PROSPECTIVE JUROR 5:  Yes.

5           MR. HILTON:  Did it happen very often at UPS?  --

6           THE PROSPECTIVE JUROR 5:  I don't know.

7           MR. HILTON:  Are you familiar with nondisclosure

8   agreements?  Have you ever had to sign one before?

9           THE PROSPECTIVE JUROR 5:  I'm aware of it, but I've

10  never signed one.

11          MR. HILTON:  Do you know if your husband ever had to

12  sign a non disclosure agreement?

13          THE PROSPECTIVE JUROR 5:  I don't know.

14          MR. HILTON:  I'll just ask.  You understand the

15  distinction between a noncompete agreement and a nondisclosure

16  agreement?

17          THE PROSPECTIVE JUROR 5:  Yes.

18          MR. HILTON:  Okay.  Have you or your husband ever owned

19  a business?

20          THE PROSPECTIVE JUROR 5:  No.

21          MR. HILTON:  Never bought or sold a business?

22          THE PROSPECTIVE JUROR 5:  No.

23          MR. HILTON:  Was your husband with UPS for a long time?

24          THE PROSPECTIVE JUROR 5:  36 years.

25          MR. HILTON:  Okay.  All right.  And as I recall I think

1    UPS went public about 10 years ago or something was your husband

2    working for them at the time?

3              THE PROSPECTIVE JUROR 5:  Yes.

4              MR. HILTON:  Do you know did he get any kind of stock

5    options his or anything like that?

6              THE PROSPECTIVE JUROR 5:  Yes, he did.

7              MR. HILTON:  Okay.  Do you have any familiarity at all

8    with those options?

9              THE PROSPECTIVE JUROR 5:  I don't pay much attention to

10   it.  I figured it was his responsibility.

11             MR. HILTON:  Okay.  All right.  And you're a homemaker

12   now.  Have you worked in the past?

13             THE PROSPECTIVE JUROR 5:  I haven't worked in 35 years

14   outside the home.

15             MR. HILTON:  Okay.  That's all I have, Your Honor.

16   Thank you, Ms. Neilson.

17             THE COURT:  Counsel?

18                  FURTHER VOIR DIRE BY MR. SKLAR

19             MR. SKLAR:  Hello, and thank you for coming.  You were

20   hearing testimony or not -- pardon me.  You were hearing

21   explanations about what this case is about.  And I just have a

22   couple of questions.  Did you and your husband, did he bring home

23   some of the discussions or any of the issues that presented

24   themselves to him in his workplace employee complaints anything

25   like that?

 1              THE PROSPECTIVE JUROR 5:  No.

 2         MR. SKLAR:  So you wouldn't discuss any particular

 3    allegations or concerning the workplace that he had to resolve or

 4    anything like that?

 5              THE PROSPECTIVE JUROR 5:  He said he wasn't at liberty

 6    to talk about it.

 7         MR. SKLAR:  Fair enough.  So he -- fair enough.  And

 8    you have never on considered or looked at trading in the

 9    commodities futures markets at all.

10              THE PROSPECTIVE JUROR 5:  No.

11         MR. SKLAR:  And your husband never has either?

12         THE PROSPECTIVE JUROR 5:  Not that I know of.

13         MR. SKLAR:  And do you have children?

14         THE PROSPECTIVE JUROR 5:  Six.

15         MR. SKLAR:  And do they trade at all as far as you know

16    in the commodities or futures market?

17              THE PROSPECTIVE JUROR 5:  Not that I know of.

18         MR. SKLAR:  Thank you very much.

19         THE COURT:  Counsel?

20         MR. McCAFFREY:  Thank you, Your Honor.

21           FURTHER VOIR DIRE EXAMINATION BY MR. McCAFFREY

22         MR. McCAFFREY:  Ms. Neilson, try to ask this in a way

23    that makes sense.  Sometimes I ask questions that don't make any

24    sense, which everyone will find out.  Do you believe that even if

25    someone signs a contract it still might not be enforceable?

1          THE PROSPECTIVE JUROR 5:  I don't have an opinion on

2     it.

3          MR. McCAFFREY:  Don't have an opinion on it one way or

4     another.  If someone signs a contract do you believe that they

5     have to live by whatever the contract requires they meant to

6     do.

7          THE PROSPECTIVE JUROR 5:  Usually.

8          MR. McCAFFREY:  Do you think there is any exceptions to

9     that?  Or do you think that people should have to live township

10    what they sign on to.

11         THE PROSPECTIVE JUROR 5:  I think they usually should

12    live up for what they sign on to.

13         MR. McCAFFREY:  Regardless of the circumstances?

14         THE PROSPECTIVE JUROR 5:  Well, I guess there are

15    always circumstances.  But for the most part.

16         MR. McCAFFREY:  So you're open to circumstances that

17    might explain why someone doesn't have to follow a contract?

18         THE PROSPECTIVE JUROR 5:  Sure.

19         MR. McCAFFREY:  Thank you, Your Honor.  Your Honor,

20    Mr. Nguyen made a request about this business.  And I just wanted

21    to make sure the Court heard that.

22         THE COURT:  Thank you very much.  Next peremptory will

23    pass to the plaintiff.

24         MR. HILTON:  Your Honor, plaintiff will accept the

25    panel.

```
 1              THE COURT:  Peremptory now passes to defendant.

 2              MR. THORPE:  Thank you very much, Your Honor.  The

 3    defendants will accept the panel.

 4              THE COURT:  Thank you.  Now, let me go through each of

 5    you for just a moment.  Mr. McGrath, can you sit with us for four

 6    or five days?

 7              THE PROSPECTIVE JUROR 1:  It will be tough on me.  I

 8    live by myself.  I'm the only wage earner.

 9              THE COURT:  Ms. Phan?

10              THE PROSPECTIVE JUROR 2:  I have two young kids.

11              THE COURT:  What time do you usually drop them off?

12              THE PROSPECTIVE JUROR:  I drop them at 8:00, 8:30.

13              THE COURT:  8:30?  Thank you.  Mr. Nguyen, your

14    concern?

15              THE PROSPECTIVE JUROR 3:  Your Honor, thank you.  I

16    brought documents.  As a company, we're in the middle of an

17    equity agreement with a potential investor.  And it's happening

18    essentially this week.  So this month is very critical to for us.

19    I have documents supporting it.

20              THE COURT:  Mr. Larson?

21              THE PROSPECTIVE JUROR 4:  Actually, you caught me a

22    good week.  I just finished a surveyor project.  And you know how

23    the survey industry is down.  So I probably can, no problem.

24              THE COURT:  Thank you very much.  Ms. Neilson.

25              THE PROSPECTIVE JUROR 5:  I'm okay.
```

```
 1              THE COURT:  Mr. Hollister?

 2              THE PROSPECTIVE JUROR 6:  It's tough for a small

 3   business in California.

 4              THE COURT:  I know it.  These are hard times.

 5              THE PROSPECTIVE JUROR 6:  Yeah, you're telling me.

 6              THE COURT:  Ms. Freeman?

 7              THE PROSPECTIVE JUROR 7:  Yes.

 8              THE COURT:  Mr. Peterson?

 9              THE PROSPECTIVE JUROR 8:  Our business is currently

10   being bought out, but I understand that since duty kind of

11   thing.

12              THE COURT:  Thank you very much.  Appreciate it.  Two

13   concerns that I have, counsel.  Mr. non, potentially Mr. McGrath.

14   Now, I do not excuse for any reason unless there is a death or

15   illness.  You two gentlemen will have to stipulate.  Otherwise,

16   they'll serve.  So you two gentlemen get up out of your seats

17   have an informal discussion.

18              They're talking about you for just a moment.  Counsel,

19   you don't need to leave the courtroom.  Counsel, this is a very

20   brief decision.  Make a decision.

21              Counsel?

22              MR. HILTON:  Your Honor, counsel have agreed that

23   Mr. non can be excused.

24              THE COURT:  Mr. Nguyen?  You're thanked and excused by

25   both counsel.
```

1              Call an additional juror.

2              THE CLERK:  Michael Woods.

3               FURTHER VOIR DIRE EXAMINATION BY THE COURT

4              THE COURT:  Mr. Woods, how are you, sir?

5              THE PROSPECTIVE JUROR 3:  Great.  Thank you.

6              THE COURT:  Mr. Woods, could I ask your profession,

7    sir?

8              THE PROSPECTIVE JUROR 3:  Well, at this particular

9    moment, I have no profession.

10             THE COURT:  What did you previously do?

11             THE PROSPECTIVE JUROR 3:  I was in auto parts retail.

12             THE COURT:  Okay.  Have you ever been a jury before?

13             THE PROSPECTIVE JUROR 3:  I was a juror for a moment,

14   and then I got dismissed.

15             THE COURT:  Okay.

16             THE PROSPECTIVE JUROR 3:  502.

17             THE COURT:  I don't know very much about this case.  I

18   only know what you've heard basically.  But the result is I think

19   the fundamental question is are we going to be fair and impartial

20   to both sides?

21             THE PROSPECTIVE JUROR 3:  Yes.

22             THE COURT:  And will the jurors follow the law at the

23   end of the case?  This isn't the kind of case where I expect

24   disagreements.  Sometimes I get very inflammatory cases.

25   Especially death penalty cases where the jurors are really in a

1   difficult position in terms of their own personal thoughts and

2   feelings.  Those are hard on jurors.  We just finished a nine-

3   month case involving the Aryan Brotherhood with death

4   allegations.  And those were tough on the jurors.  Would you

5   follow the law, though, at the end of the case that I instruct

6   you on?

7             THE PROSPECTIVE JUROR 3:  Absolutely.

8             THE COURT:  In fact, I'm going to give you my own

9   packet of instructions.  When you go back as jurors, I'm just

10  going to give you my packet of instructions.  You'll have the law

11  right there.  And unlike federal courts, they won't allow

12  testimony to be read back, if you've missed something or there is

13  a disagreement, I'll get the court reporter to read back that

14  portion that you need.  So you'll always have those resources

15  available to you.  And you heard my silly example about

16  perception.  It's the only way I know to simply quickly

17  demonstrate.

18            THE PROSPECTIVE JUROR 3:  Yes, I thought that was very

19  nice.

20            THE COURT:  Sometimes people are just misperceived but

21  they're telling you the truth.  And other times I'm telling you,

22  they'll get up to lie to you.  They'll just tell you straight

23  out, and don't even blink about it.  And, quite frankly, it's

24  just as apt to occur on the criminal side as it is on the civil

25  side.  And believe it or not, it's just as apt to occur over

1    money on the criminal side as it is on the civil side.

2              All right.  Do you have any questions of me, sir?

3              THE PROSPECTIVE JUROR 3:  No.

4              THE COURT:  I'll turn you over to counsel.  Counsel?

5              FURTHER VOIR DIRE EXAMINATION BY MR. HILTON

6              MR. HILTON:  Hi, Mr. Woods.  You've heard all the

7    questions.  And I am just going to ask you a couple more, and I

8    appreciate your patience.

9              THE PROSPECTIVE JUROR 3:  Yeah.

10             MR. HILTON:  I'll ask you the question I've asked

11   several people.  That is are you familiar with the distinction

12   between a non compete agreement and a nondisclosure agreement.

13             THE PROSPECTIVE JUROR 3:  Yes, I am.

14             MR. HILTON:  Okay.  Have you ever signed either one of

15   those agreements before.

16             THE PROSPECTIVE JUROR 3:  I have.  I sold a business.

17   So I signed the agreement of noncompete.

18             MR. HILTON:  Okay.  What kind of business was that?

19             THE PROSPECTIVE JUROR 3:  Auto parts.

20             MR. HILTON:  Okay.  How long ago was that?

21             THE PROSPECTIVE JUROR 3:  Oh, gee.  Probably 15 years

22   ago.

23             MR. HILTON:  And was that -- was that a business that

24   you built up on your own or was it a business had you acquired

25   earlier.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIIFORNIA

1          THE PROSPECTIVE JUROR 3:  It was a business that I

2    bought but we acquired a lot of new business also.

3          MR. HILTON:  And was that business that was acquired

4    basically due to you rolling up your shirt sleeves and getting

5    out there and bringing in business?

6          THE PROSPECTIVE JUROR 3:  Well, basically, it was

7    mostly retail.  Retail auto parts is kind of gone now it's mostly

8    wholesale.  So it's a whole new ball game but at this time it was

9    retail and I don't know how you can -- you know, this claim that

10   many I had forced upon me was that I could not put in a business

11   in that retail area.  It was like a certain area.

12         MR. HILTON:  Like a territorial radius?

13         THE PROSPECTIVE JUROR 3:  Exactly.

14         MR. HILTON:  Right.  For some period of time.

15         THE PROSPECTIVE JUROR 3:  Yes.

16         MR. HILTON:  Any familiarity at all with trading any

17   kind of options or commodities?

18         THE PROSPECTIVE JUROR 3:  No.

19         MR. HILTON:  Okay.  Have you ever had a dispute with a

20   stockbroker or anything like that?

21         THE PROSPECTIVE JUROR 3:  No.

22         MR. HILTON:  Okay.  That's all I have.  Thank you,

23   Mr. Woods.

24         THE COURT:  Counsel.

25           FURTHER VOIR DIRE EXAMINATION BY MR. SKLAR

1          MR. SKLAR:  Thank you, sir, for coming down here.

2    You've heard of what we've been talking about here today.

3    Anything that you would like to add at all?  You've indicated you

4    think you can be fair.  Any reason we should know any facts in

5    your background you would like to make us aware of.

6          THE PROSPECTIVE JUROR 3:  I don't think so.

7          MR. SKLAR:  All right.  Thank you, Your Honor.

8          THE COURT:  Counsel?

9          MR. McCAFFREY:  Thank you, Your Honor.

10         FURTHER VOIR DIRE EXAMINATION BY MR. McCAFFREY

11         MR. McCAFFREY:  Hi, Mr. Woods.

12         THE PROSPECTIVE JUROR 3:  Hi.

13         MR. McCAFFREY:  After you sold your business, did you

14   end up doing any more -- did you go into business again?

15         THE PROSPECTIVE JUROR 3:  Yes, I did.

16         MR. McCAFFREY:  Did you have any issue with the

17   restrictions that were imposed on you.

18         THE PROSPECTIVE JUROR 3:  No, I was quite a ways

19   away.

20         MR. McCAFFREY:  So where were you when you sold your

21   business.

22         THE PROSPECTIVE JUROR 3:  Well, I had several.  I had

23   one in Garden Grove.  Then I moved to Santa Ana, just down the

24   street.  Then I sold that one and I moved to La Habra.  Not close

25   in any retail sense.

```
 1              MR. McCAFFREY:  You heard my question about Googling

 2     people on the Internet if you want to find them.  Have you ever

 3     done that?

 4              THE PROSPECTIVE JUROR 3:  I've never done that, but I'm

 5     sure I could do it.

 6              MR. McCAFFREY:  Thank you.  Nothing further.

 7              THE COURT:  Counsel, if it's acceptable, then I'll give

 8     each of you one additional peremptory because you stipulated to

 9     one of the jurors.  Counsel, do you wish for exercise peremptory

10     on behalf of plaintiff?

11              MR. HILTON:  Plaintiff will pass.

12              THE COURT:  On behalf of defendant?

13              MR. THORPE:  Thank you, Your Honor.  Defendants will

14     thank and excuse Ms. Fryling.

15              THE COURT:  Ms. Fryling, thank you very much.

16              THE CLERK:  Michael Fagan.

17              THE COURT:  Mr. Fagan.

18               FURTHER VOIR DIRE EXAMINATION BY THE COURT

19              THE COURT:  Mr. Fagan, have you ever served as a

20     juror before?

21              THE PROSPECTIVE JUROR 7:  Yes, I have on three criminal

22     trials.

23              THE COURT:  Were those all at state court, sir?

24              THE PROSPECTIVE JUROR 7:  Yes.

25              THE COURT:  What you reading today?  The book?
```

1          THE PROSPECTIVE JUROR 7:  The name of the book is

2    Temple by Matthew Riley.

3          THE COURT:  And have you heard once again that silly

4    example the difference between somebody whose just miss

5    perceiving but telling you the truth and somebody who just lies

6    to you?

7          THE PROSPECTIVE JUROR 7:  Yes, sir.

8          THE COURT:  Do you think you could be fair and

9    impartial to both sides in this matter?

10          THE PROSPECTIVE JUROR 7:  Yes, sir.

11          THE COURT:  Will you follow the law?

12          THE PROSPECTIVE JUROR 7:  Right.

13          THE COURT:  I promise you we won't waste your time.

14    I'm a work alcohol so we'll get things done here.  Counsel, do

15    you have any questions?

16          FURTHER VOIR DIRE EXAMINATION BY MR. HILTON

17          MR. HILTON:  Hello, Mr. Fagan.  Again, I'm Larry

18    Hilton, representing StrikePoint.  I'll just ask you a couple of

19    the same questions.  Are you familiar with the distinction

20    between a nondisclosure agreement and noncompete agreement.

21          THE PROSPECTIVE JUROR 7:  I guess so, sure.

22          MR. HILTON:  And have you ever signed either one of

23    those.

24          THE PROSPECTIVE JUROR 7:  I have signed a nondisclosure

25    agreement.

1          MR. HILTON:  And tell me a little bit about the

2     circumstances under which you signed that agreement.

3          THE PROSPECTIVE JUROR 3:  I'm an engineer.  I work for

4     the Boeing Company.  And we've patterned on proposals to the

5     government with other government.  So we have nondisclosure on

6     any information that we might learn about their technical or

7     engineering strategy that we wouldn't reveal that type of

8     thing.

9          MR. HILTON:  Okay.  But you understand that that

10    agreement wouldn't necessarily prohibit you from going to work

11    for north are you positive.

12         THE PROSPECTIVE JUROR 7:  No.

13         MR. HILTON:  It just deals with certain information.

14         THE PROSPECTIVE JUROR 7:  Right.  I wouldn't be able to

15    use that information if I went to work for another competitor,

16    that's right.

17         MR. HILTON:  And do you have any problem with your

18    company asking you to do that?

19         THE PROSPECTIVE JUROR 7:  No.

20         MR. HILTON:  Did you ever have any dispute over that?

21         THE PROSPECTIVE JUROR 7:  No.

22         MR. HILTON:  Do you know while you were at Boeing were

23    you personally aware of any disputes with others who signed

24    nondisclosure And ended up having disagreements with Boeing?

25         THE PROSPECTIVE JUROR 7:  Boeing Company has had a few

 1    disagreements with that over the years.

 2              MR. HILTON:  Any you're particularly familiar with or

 3    just heard generally?

 4              THE PROSPECTIVE JUROR 7:  I've not been involved with

 5    any.  Our company had issues with Delta program.  One of the

 6    people bringing in from Lockheed, one of their programs.

 7    Competition and stuff.  And there has been several legal suits

 8    over that type of thing.  But I've not been involved directly.

 9    Just from what I've heard read in the paper type ever thing.

10              MR. HILTON:  How long have you been at Boeing?

11              THE PROSPECTIVE JUROR 7:  36 years.

12              MR. HILTON:  Sort of career engineer?

13              THE PROSPECTIVE JUROR 7:  Yes.  Chief engineer for most

14    of the works we do at NASA and Huntington Beach.

15              MR. HILTON:  My last question is, have you personally

16    or family ever been involved in any kind of disagreement or

17    dispute with stockbroker or financial services provider?

18              THE PROSPECTIVE JUROR 7:  No.

19              MR. HILTON:  Okay.  Thank you.

20              THE COURT:  Counsel, you have questions?

21               FURTHER VOIR DIRE EXAMINATION BY MR. SKLAR

22              MR. SKLAR:  Hello, Mr. Fagan.  Thank you for coming.

23    You were an engineer at Boeing did you say.

24              THE PROSPECTIVE JUROR 7:  Yes.

25              MR. SKLAR:  Can you tell me what it was that you did.

1          THE PROSPECTIVE JUROR 7:  Well, I'm still doing it.  I

2    work on NASA programs, primarily the space shuttle, space

3    station.

4          MR. SKLAR:  All right.  So when you did that I imagine

5    you came in contact with a lot of patented protected information?

6          THE PROSPECTIVE JUROR 7:  Sometimes, yes.

7          MR. SKLAR:  And in this case there are allegations

8    about trade secrets.  And I just want to be sure you feel you can

9    be fair in evaluating whether or not something actually is a

10    genuine trade secret or not.

11          THE PROSPECTIVE JUROR 7:  I think so.

12          MR. SKLAR:  As you're instructed you will be instructed

13    by the judge on what those parameters are but you have know

14    problems in that area at all.

15          THE PROSPECTIVE JUROR 7:  No.

16          MR. SKLAR:  So if something didn't look like a realty

17    trade secret you would have no problem finding it wasn't; is that

18    correct.

19          THE PROSPECTIVE JUROR 7:  Depends on the guidelines.

20          MR. SKLAR:  Depends on the facts definitely nothing

21    else, Your Honor.

22          THE COURT:  Counsel?

23          MR. McCAFFREY:  I'm fine, Your Honor.

24          THE COURT:  All right.  Then I believe we've exhausted

25    our peremptories at this time.  I'm trying to be courteous.  I

1    know these are tough times.  Can you stay with us these four to

2    five days?

3            THE PROSPECTIVE JUROR 7:  I believe so.  We have a

4    shuttle launch coming up Wednesday evening, but I'm not directly

5    involved.

6            THE COURT:  No, Boeing has been very Patriotic about

7    it.  In the good old days, actually we got jurors for thirty

8    days.  We required jurors to serve for thirty days in Superior

9    Court.  Then we cut it to 15 down, to 10.  Now I don't know where

10   we're at five, but these are tough times.

11           Well, then, Counsel, unless there is anything further,

12   I'm going to invite the eight of you to stand.  Ms. Hopkins is

13   going to administer an oath to you.

14      (Jury duly sworn)

15           THE JURY:  I do.

16           THE COURT:  Please be seated.  I want to thank the

17   other Ladies and Gentlemen.  If you would go back to the jury

18   room.  I'm sorry you're not serving.  If you're not serving, my

19   impression would be that this is the biggest waste of time you

20   could have participated in frankly.  It's very satisfying.  I

21   wish on behalf of the American system.

22           All right.  Ladies and Gentlemen, do you need a rest

23   room break?  Do you?  Let's take a rest room break.  Can we meet

24   back in 15 minutes.  And Kristee will take you back to the back.

25   There is soda pop.  There is coffee.  And rest rooms.  There is

```
 1   also a beautiful view.

 2          Now, you're not to discuss this matter amongst yourself

 3   nor firm or express any opinion regarding the case.  We'll come

 4   and get you in 15 minutes.

 5          JUROR 3:  Your Honor, can I ask a question?

 6          I just have a weak bladder.

 7          THE COURT:  You get up any time you want to.  Go take a

 8   rest break.

 9          Counsel, 15 minutes.

10     (Court recessed from 10:34 A.M. to 10:49 A.M.)

11     (Jury in)

12          THE COURT:  Thank you.  We're back in session.  All

13   counsel are present.  The parties are present.  And counsel on

14   behalf of the plaintiff.

15          Counsel, have you reached an agreement or not?

16          MR. HILTON:  I think we're close, Your Honor.

17          THE COURT:  No, there is no exhibits during opening,

18   then.  Counsel, your openings statement on behalf of the

19   plaintiff.

20          Counsel, your opening statement on behalf of plaintiff.

21               OPENING STATEMENT BY MR. HILTON

22          Good morning, Ladies and Gentlemen.  I want to start

23   off by thanking you for being here.  I know it's a sacrifice and

24   you all are giving up time to be here.  And I want you to know

25   that counsel appreciate it.
```

1          THE COURT:  Counsel, opening statement on behalf of

2    plaintiff.  Facts, evidence, what will you be presenting.

3          MR. HILTON:  Again, Ladies and Gentlemen, I'm Larry

4    Hilton.  I'm here representing the Plaintiff StrikePoint Trading.

5    And I am here to tell you what the evidence will show in this

6    case, the evidence that plaintiff intends to produce.  And what I

7    say is not evidence.  But if I tell you that StrikePoint is going

8    to produce evidence and we do produce the evidence, then I'm

9    going to ask you to find in favor of StrikePoint based on that

10   evidence.

11         But I don't want a free pass.  So if I tell you I'm

12   going to produce some evidence and I don't, I expect you to hold

13   that against me.  So when I go through the list of evidence that

14   I am going to tell you about, I want you to listen and hold me to

15   it.  Because at the end of the case, what's important is the

16   evidence, not what I say.

17         THE COURT:  And while counsel for both sides make their

18   opening statements, opening statements are not evidence.  You can

19   take notes if you would like to, but the only evidence you will

20   hear will come from the witness stand.  This is what counsel

21   believes the evidence will be.

22         MR. HILTON:  Briefly, the parties to this lawsuit are

23   my client StrikePoint Trading.  And StrikePoint Trading is a

24   company that engages in trading index options.  I can't tell you

25   exactly what it is.  And it's not particularly germane to the

1    case, but it's a type of option that trades on indexes like the

2    S&P 500, the Russell 2K, and things like that.

3           The Defendant, Daniels Trading, Global Asset Advisors,

4    which is also known as Daniels Trading -- and I just want to let

5    you know, sometimes you'll hear those names, both of those names

6    used.  It's the same company.  So Global Asset Advisors we might

7    say GAA or Daniels, it's all the same company.  And that is the

8    defendant.  And they are a competitor of StrikePoint.

9           And the two individual Defendants, Aimee Elizabeth

10   Sabolyk and John Matthew Mondragon were two options brokers who

11   formerly worked for StrikePoint who now work for Daniels.  Those

12   are the parties.

13          The dispute in this case is whether or not when Ms.

14   Sabolyk and Mr. Mondragon came to work for StrikePoint and

15   obtained information about clients, the question is when they

16   left and went to a competitor were they free to take that

17   information over to the competitor.

18          And the evidence in this case will show that Ms.

19   Sabolyk came to work for StrikePoint in about 2004 when it was

20   formed.  And I am going to come back to the formation of

21   StrikePoint.  When she -- actually, back up.

22          I need to tell you a little bit about StrikePoint.

23   It's an LLC, a limited liability company.  It has between

24   members.  One of the members is a company called Optioneer.  The

25   other member is a company called Altavest.  And prior to 2004,

1    aimee Sabolyk worked for Altavest.  In 2004, strikePoint was

2    formed by Altavest and Optioneer.

3         At that point, Aimee was transferred in essence to

4    StrikePoint.  Now, Optioneer is also a name that you're going to

5    need to know.  What Optioneer does is it has a computer program

6    for options trading.  And it has members, subscribers.  So for a

7    fee, you can become a subscriber to Optioneer systems.  And the

8    way it works -- again, I can't go into the details because

9    they're a little over my head.  But if you're a member, you pay a

10   fee and you can get on your computer every day and every day

11   Optioneer, the computer program, generates a list of recommended

12   trades.

13        And it's -- again, it's a little more complicated than

14   I can get into, but if the S&P 500 is traded at 700, you can

15   place a trade that in essence hopes that it will stay within a

16   certain range within a certain period of time.  So these options

17   are expiring in 60 days.  And if the and S&P 500 is about 950 and

18   650, your trade wins.  And if it gets outside of those

19   parameters, it loses.  And that's options trading in general.

20   But the Optioneer strategy is like I said a computer system that

21   generates recommended trades.

22        And the clients place the trades.  They decide on the

23   trades themselves.  So, in the morning, an Optioneer subscriber

24   can logo onto the computer, look at the trades, and decide, is

25   this a trade I want to get into or not.  And if the subscriber

1    decides to place the trade, they push a button or they can get on

2    the phone, and order is placed.  And that's where StrikePoint

3    comes in.

4          StrikePoint is what's called an introducing broker.

5    And it's registered by what's called the NFA.  And I am going to

6    talk about that a little bit.  Because this is a highly regulated

7    industry.  And one of the regulators is called the National

8    Futures Association.  And StrikePoint is registered with the NFA.

9    And so what StrikePoint does is we have Optioneer on this side.

10   The Optioneer customers place trades.  And StrikePoint executes

11   the trades.

12         So they have two different functions.  Optioneer owns

13   the program.  StrikePoint actually executes the trades.  Prior to

14   2004, Optioneer traded through Altavest.  And that was a company

15   also owned by Mr. Gebhart, who is the CEO of StrikePoint now, and

16   Mr. Armbruster, who is the CFO of StrikePoint.  They also own

17   Altavest.  And in 2004, altavest and Optioneer got together and

18   they formed StrikePoint.

19         At that time, Aimee worked for Altavest.  Aimee

20   Sabolyk.  And she began working for StrikePoint in 2004.  When

21   she went to work for Altavest, she signed the nondisclosure

22   agreement.  You'll see that.  The evidence will show, and you'll

23   see that document during trial.  And it's an agreement that

24   requires her to keep certain information confidential.

25         And when she transferred over to StrikePoint, she

1    signed another nondisclosure agreement that had similar language.

2    And some of the information that Ms. Sabolyk agreed in that

3    document to keep confidential is client names, client contact

4    information, client lists, all kinds of information about

5    clients.

6            Now, that's important to StrikePoint.  The reason it's

7    important to StrikePoint is that StrikePoint's brokers don't go

8    out and get clients.  They don't cold call.  They don't Google.

9    They don't do anything.  They walk in the door, and they're

10   handed a list of clients that has already been generated by

11   Optioneer and StrikePoint at their cost and expense.  And you

12   will see that they spend a lot of money and a lot of time

13   developing these clients.

14           And you heard in the voir dire where we talked about

15   has anybody ever traded these kinds of options, it's pretty

16   unusual.  It's an unusual financial product.  There is not a lot

17   of people that do it.  And so finding appropriate investors for

18   that product takes a lot of time, effort, and expense.  And

19   Optioneer and StrikePoint spent a lot of time, effort, and

20   expense developing their client.  So when a broker comes in,

21   you'll see from the evidence they have procedures in place to

22   protect that information.

23           And that includes nondisclosure agreements.  And you

24   will see employee policies and procedures manuals that have

25   language, all kinds of language in there, about protecting trade

1   secrets, including client names, client contact information, all

2   kinds of client information.  And that's because that is very

3   valuable to them.  And the evidence will show that that client

4   list, which is developed at great expense, has a lot of value to

5   StrikePoint.

6           Now, Mr. Mondragon joined StrikePoint in 2005.  And he

7   signed the identical agreement, a nondisclosure agreement that

8   required him to maintain the confidentiality of StrikePoint's

9   client information, client list, and a host of information

10  related to clients.  And, again, that's because it's important to

11  StrikePoint.

12          And Mr. Mondragon also received the policy and

13  procedures manual and acknowledged receiving those manuals.  And

14  Mr. Mondragon also was handed a client list that he did not

15  develop on his own.  He was just given that client list.  And in

16  that agreement, he agreed to maintain the confidentiality of that

17  list.

18          Now, the evidence will show that in 2007, June of 2007,

19  Aimee Sabolyk quit StrikePoint.  And a few weeks later she went

20  to work for Daniels Trading.  And shortly thereafter some of her

21  clients, some of the StrikePoint clients that she serviced,

22  because the brokers at StrikePoint, they didn't just have a bunch

23  of brokers who sat there and took calls.  Each broker was

24  assigned certain clients.  And the clients that had been assigned

25  to Ms. Sabolyk, some of them started leaving shortly after she

1    left.

2          And StrikePoint did an investigation.  And they

3    determined that they had sufficient evidence to believe that Ms.

4    Sabolyk was initiating contact, using confidential information to

5    initiate contact with the clients that she had served at

6    StrikePoint.  And that's what led to this lawsuit.

7          Now, about six months later, Mr. Mondragon left

8    StrikePoint.  He didn't -- technically, he resigned, but I'll

9    give you more details on that.  Then about two weeks later,

10   Mr. Mondragon ended up at Daniels Trading.  In fact, all told,

11   four of StrikePoints brokers over time have left StrikePoint and

12   moved from Mission Viejo to Chicago to go to work for Daniels.

13         Now, the first two brokers who left, there weren't any

14   problems.  And they're not here.  This lawsuit has never been

15   about those two brokers.  The facts of different.  But when

16   Mr. Mondragon left in January of 2008, a couple weeks later he's

17   over at Daniels, and within a week, two weeks, three weeks, the

18   clients that he served, StrikePoint clients that he served when

19   he was at StrikePoint, some of them started leaving.

20         And StrikePoint did an investigation.  And they felt

21   they had sufficient evidence, which you will see, to bring

22   Mr. Mondragon into this lawsuit.

23         Now, that's a brief overview.  And I am going to talk

24   to you specifically about some of the specific evidence you'll

25   see.  And it's things like personal emails that were acquired

1    through subpoenas and cell phone records.  You won't -- most

2    people are smart enough not to use their office computer to do

3    this kind of thing, but you'll see some very informative

4    information in the form of personal emails and personal cell

5    phone records.

6         Now, I want to go back and talk about the formation of

7    StrikePoint, 2004.  Prior to 2004, Optioneer was a company that

8    started in Australia and apparently had a lot of success in

9    Australia.  And in 2001 or 2002, Optioneer came over to the

10   United States and started operating here.  And I told you, all

11   you will see that the options industry in the United States is

12   heavily regulated.  And there are two primary regulators.  There

13   is the Commodities Futures Trading Commission, CFTC, and then

14   National Futures Association, called the NFA.  And they have very

15   strict compliance rules.

16        And you will see the evidence in this case is that

17   participants in the industry sometimes stub their toe, and they

18   have regulatory problems.  And you will see the evidence.  I'll

19   talk a little bit about some of it.  But I'll tell you right up

20   front, of all the entities involved in this case being

21   StrikePoint, Optioneer, and Daniels Trading, there is only one

22   that's never had a regulatory problem, and that's StrikePoint

23   Trading.

24        Now, you'll have to decide whether the regulatory

25   problems that Optioneer had and the regulatory problems that

1    Daniels had, you'll have to decide whether they have anything to

2    do with this case.  That's really up to you.  That's for you to

3    determine.  But you're going to see evidence about that.

4            And StrikePoint's role with Optioneer, in order to

5    understand it you have to understand what happened to Optioneer

6    several years ago, about five years ago in 2004.  2004, Optioneer

7    had a serious problem with the CFTC over claims that it made on

8    website and promotional materials.  It made claims about

9    performance, client performance, returns, the kind of returns

10   people could get.  And they weren't true.  And Optioneer got in a

11   lot of trouble for that.  And you will hear about that.  In fact,

12   they paid a big fine.  Paid a big fine to the CFTC.  And they

13   entered into a settlement with the CFTC.  And they admitted that

14   they had made false and misleading statements in promotional

15   materials and committed what the CFTC calls fraud.  And that was

16   in -- goes back to 2004, July and before.

17           Now, enter StrikePoint, because this is -- in 2004 is

18   when right at the same time Optioneer and Altavest are forming

19   StrikePoint.  And one of the things that Optioneer agreed to do

20   with the CFTC is basically fix the problem, but they didn't have

21   the expertise.  So what you'll see is when StrikePoint was

22   formed, Mr. Armbruster and Mr. Gebhart, who have been in the

23   business a long time, and who are with Altavest -- and also

24   Altavest never had any problems at all.  Both Altavest and

25   StrikePoint have a complete clean by him of health.

1        And StrikePoint needed regulatory expertise.  They

2   didn't have it.  They had a computer program.  People were doing

3   well.  People were making a lot of money trading their strategy.

4   But they weren't making as much money as Optioneer said they were

5   making.  And that's a big problem for the CFTC.  So you'll see

6   that one of the fundamental -- one of the fundamental roles that

7   StrikePoint played in this relationship is it has 100 percent

8   complete control over all marketing materials so that they never

9   have the problem again.

10        And StrikePoint actually went and hired a

11   regulator from the NFA who's with them today, their compliance

12   officer.  And they have since that time have made sure that

13   Optioneer has had no problems at all.  Since July of 2004, when

14   the prior marketing materials were pulled off, Optioneer has had

15   no regulatory compliance issues.

16        And StrikePoint has a complete clean bill of health.

17   And you will see that.  You'll see the correspondence from the

18   NFA, where they do routine audits of all of their registered

19   members.  And you will see a letter from Mr. DeCarlo, a regulator

20   at the NFA, talking about the audit that they did of StrikePoint.

21   And StrikePoint got a complete bill of health.

22        You'll also see a letter from Mr. DeCarlo that just

23   happens to be the same guy to Daniels Trading, and it looks a

24   little bit defendant.  But I'm not going to talk about that right

25   now.  I'm going to talk about the specific evidence that you will

1    see that we believe will show that the reason these people

2    left -- and it's undisputed that there are twenty customers that

3    were StrikePoint customers that moved over to Daniels.  There is

4    twenty.  The parties agree to that.

5         And I'm going to tell you a little bit about the

6    specific evidence that you're going to see that will establish

7    that the reason those people left is because Ms. Sabolyk and

8    Mr. Mondragon violated their nondisclosure agreements and

9    misappropriated StrikePoint's trade secret client list in

10   violation of the California Uniform Trade Secrets Act.

11        Now, I'm going to tell you about Ms. Sabolyk's

12   resignation.  She resigned on June 1st of 2007.  And the day that

13   she resigned, she walked into Mr. Armbruster's office and said

14   I'm quitting.  She had an exit interview.  Mr. Gebhart was there

15   as well.  And they said, "oh, okay.  Well, what are you going to

16   do?"

17        And she said, "I don't know.  I haven't really made up

18   my mind yet.  I just don't want to work here.  I'm tired of

19   California.  And I am going to go back to New Orleans and figure

20   things out."

21        And you'll hear the evidence, not only from

22   Mr. Armbruster and Mr. Gebhart, but actually from Ms. Sabolyk

23   herself that what they said to her at that time was we take our

24   nondisclosure agreements seriously.  And if you go after our

25   clients, we'll pursue you aggressively.  But as long as you leave

86

1    our clients alone, we wish you well.  That was the conversation

2    they had.

3            Well, it turns out that when Ms. Sabolyk said on June

4    1st of 2007, that she said she didn't really know what she was

5    going to do, the evidence will show that that statement wasn't

6    true.  And I'll tell you what the specific evidence will be.

7    Again, it's personal emails.  There was nothing in her

8    StrikePoint Trading emails.  But through this lawsuit we got her

9    personal Google emails.

10           And what those records will show is that on May 17, two

11   weeks before she quit, two weeks before she told Mr. Armbruster

12   and Mr. Gebhart that she didn't know what she was going to do,

13   she e-mailed a StrikePoint client by the name of Mike Kessler on

14   her personal Google email and she sent him an email saying, "Hey,

15   Mike, I'm going to another firm.  Here's the name."  And it had

16   Daniels Trading website on it.  That's on May 17, two weeks

17   before she leaves.

18           Well, that is significant for a number of reasons.

19   Mr. Kessler is not a party to this lawsuit, but he's a very

20   important person.  And you're going to hear his name a lot.

21   Because he was a customer that was assigned to Ms. Sabolyk.  But

22   it turns out that she developed a personal relationship with

23   Mr. Kessler.  I'll call it a romantic relationship.  And I will

24   leave it at that.  But you'll see from the evidence that no

25   sooner than Ms. Sabolyk sends that email to Mr. Kessler notifying

1    him of where she was going, he then turns around and starts

2    sending it to other StrikePoint clients.

3              Now, Mr. Kessler was a pilot for American Airlines.

4    And you will see from the evidence that StrikePoint had a huge

5    base of clients that were airline pilots, particularly American

6    Airlines pilots.  And that was a target audience for StrikePoint.

7    They spent a lot of time and effort cultivating their client base

8    in the pilot world.  Mr. Kessler was a pilot.  And he had access

9    to a pilot proprietary sort of private pilot web board where

10   pilots could chat and talk to each other.

11             And the evidence will show that Ms. Sabolyk and

12   Mr. Kessler combined to divert StrikePoint's client secret

13   confidential information to Mr. Kessler, who then used that

14   information to induce clients to persuade StrikePoint clients,

15   primarily airline pilots, to move their accounts over to Daniels

16   Trading with Aimee Sabolyk.

17             And you will see an email from May 18, again about two

18   weeks before Ms. Sabolyk quit.  And she's copied on it, but it's

19   an email from Mr. Kessler to another StrikePoint client.  And it

20   says, "Hey, I have it on good authority, Roger, who's our client,

21   Aimee Sabolyk is going to be leaving.  Don't call her at work,

22   though, because they monitor those things.  And don't write to

23   her because they monitor those things.  But for obvious

24   reasons" -- and I am going to quote.  And look for this language

25   quote.  "For obvious reasons, she's interested in taking some

1    clients with her."

2            And we don't necessarily agree with everything that Ms.

3    Sabolyk said, but that turned out to be true.  She certainly was

4    interested in taking some clients with her.  And the evidence

5    will show that she did that.

6            Now, about ten days later, on May 29 of 2007, two days

7    before Ms. Sabolyk quits, this is before -- she didn't give any

8    notice.  We didn't know she was going to quit.  StrikePoint had

9    no idea.  On May 29 of 2007 -- and we found this later.  After

10   she left, we inspected her work computer and found a file in

11   there on the desktop.

12           For non computer people, desktop really is not sitting

13   on a desk, it's on the screen in a certain location on the

14   computer.  But there was a file on the desktop that was created

15   by Aimee Sabolyk on May 29th of 2007.  And it was a download of

16   all 65 of her clients.  Their names, their address, their emails,

17   their phone numbers.

18           And when you bring up a file on the computer, you can

19   look at something that's called Properties.  And it tells you

20   when the file was created, when it was modified, and when it was

21   printed.  And you'll see that on that same day that file was 65

22   client names, addresses, phone numbers, emails, was printed by

23   Aimee Sabolyk.  That was two days before she quit and told

24   Mr. Armbruster and Mr. Gebhart that she was going to go back to

25   New Orleans and figure things out.

1          It doesn't get much better after she left.  She left on

2     June 1st.  And three days later, on June 4th, Mr. Kessler went on

3     to the American Airlines pilot chat board and made a posting on

4     the chat board about Aimee Sabolyk.

5          Now, you'll see from the evidence that Mr. Kessler and

6     Ms. Sabolyk knew that StrikePoint had friends in the pilot

7     community that would see it.  And I am not going to tell you much

8     about it except that when you look at it -- and you read it.

9     You'll have to ask yourself whether or not Mr. Kessler was trying

10    to be deceptive about what he said.

11         The one quote I will give you from it -- and this will

12    come right out of the document.  It opens up with just a general

13    thing, "Oh, I just learned from StrikePoint that my broker, Aimee

14    Sabolyk, had quit.  Well, of course, he knew that already because

15    she told him two weeks before.  And in light of their

16    relationship, I don't think there is much question that he knew

17    that.

18         But one thing that he says in the posting is I asked

19    her where she was going.  She wouldn't tell me.  All she would

20    say is that she was going to Chicago and she would let me know

21    when she get there.  Again, this is about two weeks after she

22    e-mailed him, telling him specifically, "Here's where I'm going,

23    Daniels Trading," and giving him a link to the website.

24         Now, the evidence will show that pilot chat board where

25    a lot of StrikePoint's clients were active participants paid some

1     pretty dividends for them.  In fact, the very next day, on June

2     5, 2007, another StrikePoint client, a pilot, named Stephen

3     Spencer, responds, and says, "Hey, that's interesting.  Aimee

4     Sabolyk is leaving.  Let me know.  I want to know where she's

5     going."

6            Mr. Kessler says, "Yeah, as soon as I find out, I'll

7     let you know."  And you might be not surprised to hear that not

8     long after that Mr. Spencer closed his account at StrikePoint,

9     moved it to Daniels Trading, and took two family members who were

10    also StrikePoint clients with him.  That's on June 5th.

11           On June 6th, Ms. Sabolyk sends Mr. Kessler an email

12    thanking him for all of his efforts and telling him, "I couldn't

13    have done this without you.  And your efforts clearly are helping

14    me generate the business I need at my new firm."  So we think the

15    evidence will show that Ms. Sabolyk knew exactly what Mr. Kessler

16    was doing.

17           Now, you'll see a lot of that evidence.  And virtually

18    ten of Ms. Sabolyk's clients would move their accounts, ten of

19    the clients that she was assigned to at StrikePoint, would move

20    their accounts over to Daniels Trading.

21           Now, a little bit about Mr. Mondragon.  Mr. Mondragon

22    of course, knew Ms. Sabolyk from StrikePoint.  And his departure

23    was a little different because he didn't know in advance that he

24    was going to be leaving.  He wasn't terminated, but he was called

25    in by Mr. Armbruster, Mr. Gebhart and basically told that he

1    wasn't really performing as a broker the way they needed him to

2    and they offered him another position, which he viewed as a

3    demotion.  And again the timing and the dates are important.  And

4    you don't need to write these down because you'll see them from

5    the evidence that we will produce.  But that's happened on

6    January 4th of 2008.  That was a Friday.

7         And at that time Mr. Mondragon didn't know if he wanted

8    to take the demotion or not.  So he told Mr. Armbruster and

9    Mr. Gebhart that he needed to think about it over the weekend.

10   That was the 4th.

11        On Monday morning, the 7th, he called StrikePoint and

12   said, "No, no, thanks, I'm not going to take the other position

13   I'm going to quit."  And so he resigned.  That was January 7th.

14        He started working for Daniels on January 22.  And

15   within a week or two, clients that he had served, StrikePoint

16   clients that he had searched, started closing their accounts and

17   moving them over to Daniels Trading.

18        Now, StrikePoint did an investigation.  And

19   Mr. Mondragon was brought into this case.  And initially he

20   denied that had he initiated any contact with any of the clients

21   that he had served at StrikePoint.  And he signed these sworn

22   statement saying that he didn't take any client information with

23   him when he left.

24        But just recently we got his cell phone records, And

25   you will see those during the trial.  And they tell a different

1    story.

2           Now, I'm just going to tell you about a couple of

3    customers.  One was a guy named John McDonald.  Turns out that

4    the day before he called in and quit on a Monday, he called John

5    McDonald on his cell phone.  Now, John McDonald didn't call him,

6    he called John McDonald.  That was the day before he quit.  And

7    then a few weeks later, he called John McDonald again.  And then

8    he started sending emails to John McDonald from Daniels.  And

9    eventually John McDonald closed his StrikePoint account and moved

10   over to Daniels.

11          Now, what is significant about that of course is what

12   I've told you, but I want to put that into context.  Because

13   there is another document that you will see.  You'll see a lot of

14   these.  And it's a very important document.  It's a document

15   that's -- has a title called a declaration.  And it is something

16   that Daniels required all of the StrikePoint clients to sign.

17   When they moved their account over.  And it's an identical

18   document.  So it's a cut and paste.  The exact same document with

19   a blank, you fill in your name.  The only difference is for the

20   clients that Ms. Sabolyk brought over, it says Aimee Sabolyk.

21   And then for the ones John Mondragon brought over, it says John

22   Mondragon.

23          But what it says is something to the effect of John

24   Mondragon never initiated contact with me to bring my account

25   over to Daniels.  And John McDonald signed that.  And it says,

1    "To the contrary, it was me that initiated contact with John

2    Mondragon."

3         Well, you'll see from the evidence that it was John

4    Mondragon who called John McDonald.  Cell phone records.  They'll

5    say whether it was outgoing or incoming.  These were outgoing

6    calls.  These were emails that Mr. Mondragon sent to Mr.

7    McDonald.  So the significance of that is that you're going to

8    see a lot of those declarations.  And you're going to have to

9    decide whether or not they're believable.

10        Now, I'm going to tell but one more client of

11   Mr. Mondragon.  A guy by the name of Dennis Anderson.

12   Mr. Anderson was a client, a StrikePoint client, that

13   Mr. Mondragon had served.  And like all those clients, he was

14   simply given to Mr. Mondragon.  Mr. Mondragon didn't develop him,

15   he didn't cold call him.  He was just handed to him.

16        Well, Mr. Mondragon resigned on January 7th of 2008.

17   And you will see from his cell records that that same day, he

18   called Dennis Anderson.  And then he had more calls with Dennis

19   Anderson.  Now, you're also going to hear from another

20   StrikePoint person, a guy by the name of Nick Fazio.  Nick Fazio

21   is a broker at StrikePoint and was a broker at StrikePoint who

22   knew John Mondragon.  And they were friendly.  And Mr. Fazio is

23   going to tell that you a few weeks after Mr. Mondragon quit

24   StrikePoint, he was in town getting stuff to move to Chicago.

25   And he stopped over at Nick Fazio's house.  Because they were

1    friends.  And they had a conversation.

2            And what happens at StrikePoint, when a broker leaves,

3    that broker's clients are assigned to other brokers.  And so

4    Mr. Mondragon asked Nick Fazio, "Hey, did you get any of my

5    clients when I left?"

6            And Nick Fazio said, "Yeah, I got Dennis Anderson."

7            And Mr. Mondragon said, "Oh, don't worry about him.

8    He's coming with me."

9            And this was just a couple weeks after Mr. Mondragon

10   left.  And again we don't always agree with what Mr. Mondragon

11   said, but he certainly was telling the truth when he said that.

12   Because in fact Mr. Anderson did move his account.  And he did

13   move over to Daniels.  And he also signed that declaration that

14   said that it was him who initiated contact with John Mondragon.

15           And you'll see the cell phone records.  And you will

16   see that the day that Mr. Mondragon resigned, he called

17   Mr. Anderson.  And he called him again.  And he e-mailed him half

18   a dozen times.  And finally Mr. Anderson moved his accounts and

19   signed the declaration.

20           And you will have to decide.  You will see a

21   declaration for just about every one of those clients.  And you

22   will have to decide whether they're believable or not.  That's

23   really for you to decide.

24           Now, you've heard about Mr. Mondragon.  You've heard

25   about Ms. Sabolyk.  What about Daniels?  Well, Daniels was a

1   little different in the way they did business.  See, at Daniels,

2   you didn't get a client list handed to you.  You had to go

3   develop it on your own.  So that was one of the things that

4   Mr. Mondragon and Ms. Sabolyk had to do when they went to

5   Daniels.  They didn't get any clients.  They had to go get them.

6          And the evidence will show that the place they went to

7   go get them was from the client information that they took.  With

8   Ms. Sabolyk, it was the XO file with the 65 names.

9          With Mr. Mondragon, although he had testified in a

10  sworn statement under penalty of perjury that he never took any

11  client information, he later admitted in a deposition that

12  actually he had client contact information on his cell phone and

13  he took that with him.  And you'll see from the cell phone

14  records that that's fairly -- they'll validate that point.

15         But one of their duties at Daniels was to develop

16  clients.  And at the end of the case, the judge will instruct you

17  on something called agency.  And that is under some certain

18  circumstances the principal, which would be Daniels, can be

19  liable for the acts of its agents, which would be Ms. Sabolyk and

20  Mr. Mondragon.  And ultimately you'll get instructed.  You'll

21  have to decide on the facts.  But we think that the evidence will

22  show that Ms. Sabolyk and Mr. Mondragon were acting in the course

23  and scope of their duties.  In fact, that was part of their job

24  was client development.

25         The other thing that you'll see from the evidence is

1    that almost all of their clients came from StrikePoint.

2    Initially, Mr. Mondragon had ten clients.  Ever one of them was

3    from StrikePoint.  After about a year, he had about twelve

4    clients.  Maybe twelve or thirteen, ten of which were from

5    StrikePoint.

6          Now, same thing for Ms. Sabolyk.  She got about --

7    after a year, year and a half at Daniels, she had brought in a

8    total of maybe two or three clients on her own.  She had twelve

9    or thirteen clients.  And ten of them were from StrikePoint.

10         The evidence will show that that client information,

11   that client contact information, was extremely valuable because

12   it's not easy to go out and cold call and bring in this kind of

13   client.  And you will see that from the evidence that we'll

14   produce in this case.

15         Now, there is one more issue with Daniels.  There is

16   the agency issue.  You'll get instruction from the judge.  But we

17   also believe the evidence will show that Daniels directly

18   misappropriated StrikePoint's client list, confidential trade

19   secret client list, and trade information.  And you will get

20   instruction on the law, but you will see from the evidence that

21   that information was given or provided to Daniels under

22   circumstances where Daniels knew or should have known that it was

23   provided in breach of a confidentiality agreement that Ms.

24   Sabolyk and Mr. Mondragon owed to StrikePoint.  And when you make

25   that finding based on the instruction from the judge, we believe

1    you'll find that Daniels Trading is directly liable under the

2    Uniform Trade Secrets Act.

3           Now, you think twenty clients, well, gee, what's the

4    big deal?  Well, this kind of trading is -- it's high risk, but

5    it's high return.  And the kinds of trades that are executed in

6    the options industry, there is a lot of transaction costs in

7    order to hedge.  To hedge against market movement, you've got to

8    buy and sell combinations of puts and calls.  And I can't tell

9    you the specifics, but I can tell you and there is really no

10   dispute about this, that the commissions that get generated from

11   the this kind of trading are substantial.  And these 20 clients

12   represent millions of dollars of revenue for the parties involved

13   here.

14          And you're going to hear testimony about the damages

15   that StrikePoint has suffered by losing these twenty clients.

16   You'll hear from Chris Money.  It's not a joke.  Chris Money will

17   come and testify on behalf of StrikePoint Trading.  And he will

18   tell you that based on his analysis and based on the evidence

19   StrikePoint has incurred damages in the range of $2.6 million to

20   $4.1 million for these clients.  And you will hear conflicting

21   evidence, and you will have to decide.

22          But you will also hear that just in terms of pure

23   commissions have already been generated by Daniels for these

24   customers, just in the short period of time that these customers

25   have been over at Daniels, and some of them only a period of six

 1   months, they've already generated over a half million dollars in

 2   gross commissions to Daniels.  And that is at a period of time

 3   when the options market is, to put it bluntly, horrible.  You

 4   know, you will hear testimony that the last year and a half has

 5   been devastatingly bad for options traders.

 6          And you will see that everyone in the industry has been

 7   hit really hard.  Through either losses where customers have lost

 8   money, or withdrawals.  Because this is a certain type of

 9   investment.  It's called risk capital.  It's not recommended that

10   you put your nest egg in this investment.  It's for a certain

11   type of investor.  It's generally a high net worth investor who

12   has a significant amount of money that they can risk.

13          But you don't put your whole investment in it.  But

14   when times get tough -- and we know right now we're in tough

15   times -- that's the first money that comes out.  You don't go

16   borrow against your 401K.  You take the money out of your options

17   trading account.  And you'll see a lot of people have pulled

18   money out.  They've pulled money off the table.  StrikePoint has

19   had lots of money go out.

20          And you will see from the evidence that so has Daniels.

21   In fact, if you look at the percentage of the decline in the

22   invested equity at StrikePoint -- and the only information we

23   have on Daniels is Mr. Mondragon's clients -- is virtually

24   identical in terms of the reduction.

25          But what's important is that even after the worst

1    period in recent history -- and when I say recent, I mean that

2    loosely -- a period that's been absolutely devastating to the

3    options industry, you will see that the clients that moved their

4    accounts over to Daniels all lost a lot of money over at Daniels.

5    And I say that not to suggest that Daniels did a bad job.

6    Everybody lost money.  StrikePoint clients lost money.  Daniels

7    clients lost money.

8            The important thing is of those twenty clients who left

9    17 of them are still trading.  That's because they are the core

10   client that StrikePoint spent so much time and effort to develop.

11   Option trading is a core part of their investment strategy.  And

12   yeah, they lost a lot of money.  The market dropped.  But you'll

13   hear from some of those clients who testified, and from

14   Mr. Mondragon himself, that they're still in the game.  Because

15   it's not what happened last year that matters.

16           You hear the old adage, past performance is no

17   guarantee of future results.  That's true when the markets is

18   going up, and it's true when the it's going down.  So what's

19   important is not that these people lost money, but that they

20   think the market is going to come back.  And you will hear them

21   say that in testimony.  And that's what makes these clients so

22   valuable.  Because they're still trading.  And you should infer

23   that if they had stayed at StrikePoint, they may have lost a lot

24   of money at StrikePoint, too, but they would still be trading.

25   And that's why losing these clients is so costly.  And that's why

1      the damages are so high.

2              Now, just to briefly summarize the people you're going

3      to hear from on our side.  The first person you're going to hear

4      from is James Burgess.  And he is the CEO of Optioneer.  He's

5      going to tell you about the Optioneer strategy, what it is, and

6      so on.  And he is going to tell you about the CFTC investigation.

7      What you'll hear from Mr. Burgess is they made a mistake.  It was

8      a big mistake.  They accepted responsibility and moved on.  And

9      one of the ways that they moved on was that they got StrikePoint

10     to come in and provide compliance oversight.  And StrikePoint

11     hired a regulator.  And since then, since July of 2004, Optioneer

12     has had no compliance problems.

13             The next person you'll hear from is Mr. Armbruster, the

14     CFO.  And he will tell you about StrikePoint and background and

15     some of the events that happened with Aimee Sabolyk and Mr.

16     Mondragon while they were employed at StrikePoint.  Mr. Gebhart

17     will tell you a little bit more about StrikePoint and about the

18     exit interview with Ms. Sabolyk.

19             And you will hear from a guy by the name of Dan Pitre.

20     Pan Pitre is the IT guy, the information technology, guy at

21     StrikePoint.  He's the guy that went in and found that Excel file

22     on the desktop.  He's going to come in and tell you about that.

23             And you're going to hear from Nick Fazio.  Nick Fazio

24     will tell you about his conversation with John Mondragon when he

25     said Dennis Anderson is coming from me.

1          And then you're going to hear from Mr. Money, who is a

2    damages expert.  And he is going to tell you about his analysis

3    of the damages.  And when the case is over, I want you to hold me

4    to what I said, the evidence I told you that we would produce.

5          Again, as the judge said, what I told you doesn't

6    matter.  I have to come forward with it.  And I am confident that

7    when this case is over, you will believe that StrikePoint has

8    lived up to what I've just told you they would do.  And you'll

9    find that you did see all the evidence that I told you that you

10   were going to see.

11         And when the case is over, I'm going to ask you on

12   behalf of StrikePoint to find that Aimee Sabolyk violated her

13   nondisclosure agreement with StrikePoint, that John Mondragon

14   violated his nondisclosure agreement with StrikePoint, that

15   Daniels Trading is liable for the acts of Mr. Mondragon and Ms.

16   Sabolyk because they were acting in the course and scope of their

17   duties as brokers at Daniels.  And that Daniels is directly

18   liable for misappropriating the trade secrets because they

19   acquired that information under circumstances where they knew or

20   should have known that it was being provided in breach of

21   nondisclosure agreements.

22         And at the conclusion of the case, I'm going to ask you

23   to award damages in the amount that you believe to be

24   appropriate.  And I thank you for your time.

25         THE COURT:  Counsel, your opening?

 1          MR. McCAFFREY:  Thank you, Your Honor.

 2          THE COURT:  And, Counsel, as you rise, Counsel, would

 3    you once again state to the jury the clients you represent.  I

 4    well know them, but I want the jury to hear them once again.

 5          MR. HILTON:  Thank you.  Again, Larry Hilton, and I

 6    represent the Plaintiff, StrikePoint Trading.

 7          THE COURT:  Thank you.  And, Counsel, would you

 8    reintroduce yourself and your client also?

 9          MR. McCAFFREY:  Thank you, Your Honor.

10              OPENING STATEMENT BY MR. McCAFFREY

11          I'm Tim McCaffrey, and I represent one of the

12    Defendants, John Mondragon.  Mr. Mondragon is being sued by Mr.

13    Hilton's client, StrikePoint.

14          StrikePoint is also suing Mr. Sklar's clients, Ms.

15    Sabolyk and GAA.

16          I'm going to start off, and I am sure Mr. Sklar will

17    tell you some things, too, but I thought it appropriate just to

18    run over really what the central issue in this case is.  Because

19    well all due respect to Mr. Hilton, I'm not quite sure we got

20    there.  But the central issue in this case is whether or not

21    StrikePoint's alleged clients are a trade secret.  And that is a

22    difficult question legally.

23          Factually, when you hear the evidence, you'll see, I

24    believe, that there is no evidence to support their contention,

25    that this client list, this is amorphous client list, that has

1   more than two thousand names on it through a three-year period is

2   actually a trade secret.

3           So you're going to be instructed at the end of the case

4   about what is a trade secret.  And the instructions are basically

5   going to ask you to look at that and think to yourself, is this a

6   secret?  Is it generally known to the public?  Did StrikePoint

7   actually treat it as a secret?  Did StrikePoint spend time and

8   money generating this customer list?  This client list?  And did

9   they keep it a secret and make reasonable efforts to keep it a

10  secret?  So that it had value?

11          So in the context of a customer list case like this,

12  what you're looking at is that type of development of a list over

13  years by StrikePoint.  Efforts by StrikePoint to keep it

14  confidential.  Efforts by StrikePoint to keep other people from

15  having access to it.

16          What you'll see, though, what the evidence will show,

17  is that it was Optioneer, not StrikePoint, not the plaintiff,

18  that developed these clients.  It was Optioneer that went out and

19  spent the money on marketing campaigns, marketing this

20  computerized strategy that Mr. Hilton told you about.  It was

21  Optioneer that promised tremendous returns that it could not

22  deliver on, that Mr. Hilton described as a, quote, unquote, big

23  problem.

24          Optioneer went out and told people they would make 60

25  to 70 percent a year in returns if they used their strategy.  Mr.

 1    Hilton is right, that's a big problem.  Because you can't deliver

 2    on that.  And eventually people are going to realize, you can't

 3    deliver.  And I am going to try it somewhere else.

 4         You also know or will learn that it was only Optioneer

 5    that signed a contract with these customers.  StrikePoint, the

 6    plaintiff, who's claiming these customers are so important, never

 7    signed a contract with them.

 8         Further, you will see evidence that shows that

 9    Optioneer actually publishes the names of certain clients on the

10    Internet, has done so since 2005, and continues to do so today.

11    Some of these clients include American Airlines pilots, that Mr.

12    Hilton talked about as being so important to StrikePoint.

13         Well, if they're so important to StrikePoint and

14    keeping their identity a secret is so important, why does

15    StrikePoint let Optioneer publish their names on the Internet?

16    Anyone could go look them up.  Anyone could track them down using

17    Google or any other source.  Anyone could know that they're

18    trading options.  And if you wanted to sell them on trading

19    options, you could do so.

20         You will also see that in the marketing materials that

21    promise 60 to 70 percent returns, Optioneer listed at least

22    twenty clients on the back with their names, phone numbers, and

23    email addresses.  Again, StrikePoint didn't do anything to stop

24    this.  Those marketing materials were widely disseminated.

25    Again, if you wanted to go out and talk to someone who was

1    trading the Optioneer strategy, you could.  It was publicly

2    known.

3           Why is this important?  Because it goes to whether or

4    not the client list that StrikePoint is now claiming as a trade

5    secret is truly a trade secret.  It's not a secret.  They didn't

6    do what they needed to do to keep it a secret.  And the evidence

7    will show that.

8           And why is this important?  Because ultimately the

9    nondisclosure agreement that Mr. Hilton talked about and the

10   other claim brought for violation of Uniform Trade Secret Act all

11   hinges on whether or not there is a client list trade secret.

12   That's the first fundamental question.

13          The second fundamental question, if you decide there is

14   a trade secret -- if you decide there is no trade secret, the

15   case is over.  They lose.

16          But if you about you decide there is a trade secret,

17   you then get to the next question.  And that is do we have

18   evidence of solicitation.  And I submit to you when this is done

19   there won't be any evidence of solicitation as that term is used

20   under the law.

21          What Mr. Hilton didn't tell you is that it's okay to

22   call people, even if the client list is a trade secret, and tell

23   them where you are.  It's okay to announce that you've left.

24   It's okay to announce that you're working somewhere else.  The

25   law draws a distinction between announcement and solicitation.

1           Yes, Mr. Mondragon may have called people and said,

2    "I'm leaving" or "I've left," or "Here's where I am," but that's

3    okay.  Same for Ms. Sabolyk.

4           And then if a client is interested, they can contact

5    them back.  And nothing prohibits Mr. Mondragon or Ms. Sabolyk or

6    GAA from accepting business from any client that's interested.

7    Because ultimately it's the client's choice.  It's the client

8    who's making the investment.  It's the client who has to deal

9    with the broker.

10          So once the client knows where they are, the client

11   picks up the phone and wants to go there, they can go there.  And

12   nothing can stop that.  Even if this client list which is not a

13   secret, which they did not develop over years, is a trade secret,

14   you still can take the business.  You still can accept the

15   business.

16          The evidence will also show that even if you find that

17   there is a trade secret and even if you believe that there is

18   solicitation, that there is no causal link between the

19   solicitation and these handful of clients deciding to move.

20          Mr. Hilton mentioned it briefly.  We're talking about

21   twenty or so clients.  StrikePoint at its peak, which was

22   December 2005 to December 2006, serviced between 1,500 to 2,000

23   clients at the time.  They had Mr. Mondragon and Ms. Sabolyk

24   service about 60 or 70 of those.  We're talking about only ten

25   each.

1          And Mr. Hilton went through a list of people who are

2     going to testify.  But what's absent from that list is any single

3     client who is still at StrikePoint.  The other 50 or 60 that

4     Mr. Mondragon serviced or that Mr. Sabolyk serviced that will

5     come forward and say, "I was solicited by Mr. Mondragon" or "I

6     was solicited by Ms. Sabolyk."  You will not hear that.

7          The only clients you're going to hear from or see

8     statements written by are the clients that actually moved.  And

9     they did so of their own volition.

10         And what you will also learn is that they weren't

11    unusual in the sense that a lot of people left StrikePoint.

12    You'll see that StrikePoint's total business in December 2006,

13    the total amount of its account equity if you add it all together

14    was 280 million in 2006.  In December 2007, it goes to 140

15    million.  In December 2008, 40 million.

16         Now, Mr. Hilton talked about the clients at issue being

17    worth millions, but under any stretch of the imagination, even

18    Mr. Money's fanciful report, which you'll hear plenty about and

19    why it's so fanciful, these clients at best one, two, three, at

20    best, so this giant decline in StrikePoint business is exactly

21    consistent with a handful people leaving on their own volition

22    because they're losing money.

23         Now, that's why they invested.  I don't understand

24    options investing either, but I do know you invest in markets to

25    make money.  And I do know the point of risking capital isn't to

1   lose it.  It's to make money.  I mean, it may be more risky than

2   other things, but you still wanted to make money.

3           And when you're told you're going to make 60 or 70

4   percent a year and that doesn't happen and you see yourself

5   losing money in 2007, as you'll see from the clients statements

6   was happening, of course you might try something else.  Because

7   what's going on here with the Optioneer and StrikePoint dynamic

8   is the clients are only placing trades using the Optioneer

9   computerized system.  And what you'll hear about with respect to

10  why Mr. Mondragon left was because he actually was looking at the

11  recommendation of the computerized trading recommendation from

12  Optioneer system and saying, "I don't think that's a good play.

13  I think we should maybe try something else."  Some clients like

14  that, some clients didn't.  So he was deviating from the model.

15          StrikePoint didn't like that.  Because StrikePoint's

16  charge, all it does, is take orders from the Optioneer system.  I

17  say all it does, it's a slight overstatement.  You'll hear

18  testimony from Mr. Armbruster.  95 percent of its trade are

19  simply using the Optioneer system.  What Optioneer recommends.

20          When Mr. Mondragon did something a little different,

21  that didn't go over so well.  So they stripped him of his ability

22  to be a broker, and he left.  And Mr. Hilton makes a big deal

23  about the timing of when he left.  He says he was demoted on a

24  Friday and quit on a Monday.  And he called I believe he said

25  Mr. Anderson or Mr. McDonald or both of them on Sunday.

1          Actually, what happened was he was demoted on Friday,

2    called on Sunday to StrikePoint and said I'm leaving and then

3    told a couple people that he was not going to be there.  But

4    that's perfectly lawful.  And all you're going to see on his cell

5    phone bill is a one minute call on that date.  Nothing was talked

6    about.  No solicitation was engaged in.  There was no selling.

7    All it was was a mere announcement.  "I'm not going to be there.

8    It seems to me when you go to execute a trade."

9          And Mr. Mondragon will eventually get here from

10   Chicago.  And he will be able to tell you that when he's called

11   to the stand.

12         You also -- Mr. Hilton talked about Mr. Anderson.

13   Well, Mr. Anderson is an interesting case because Mr. Anderson

14   actually was deposed.  He lives in Illinois, but during discovery

15   his deposition was taken.  And he confirmed everything in the

16   statement that he signed to be true and accurate.  He wasn't

17   solicited away.  He liked what Mr. Mondragon was doing in terms

18   of not following the Optioneer system.  He recognized that with

19   the changing in the market conditions in '07 and '08, the

20   Optioneer system wasn't going to work.  And it hasn't worked.  So

21   he picked up his chips and moved them somewhere else.  But that

22   was his decision.  That's not because of solicitation.  That's

23   not because of anything that's unlawful.  It's because he just

24   decided he wanted to do it.  And that's his prerogative.  The

25   same can be said for the other clients.

110

1      Mr. Hilton thinks that the statements that they signed

2  are unbelievable?  Not to me.  The one thing I know is

3  StrikePoint has the burden of proof.  StrikePoint has to prove to

4  you that they have a trade secret, that there has been

5  solicitation, and that there has been damages because of that

6  solicitation.  They have the burden of proof.  Not the

7  defendants.

8      So all you're going to see is statements from a handful

9  of clients saying I wasn't solicited and not hear a single client

10  from another client saying I was.

11      At the end of the day, I submit to you when you hear

12  the evidence, you'll make the proper determination.  This is not

13  StrikePoint's trade secret.  They didn't spend years building it

14  up.  There is publicly available information on the website.

15  There is publicly available information on the back of their

16  marketing materials about how to contact these customers,

17  including some of the precious American Airlines pilots.

18      If you find there is a trade secret there is no

19  solicitation.  At most there was announcement and then accepting

20  the business when it came back.  And there is no causation.

21  Because just like the hundred million dollar decline in business,

22  these clients took off as well.  They made a decision to move.

23  It wasn't because of solicitation.

24      So I'll return to you after the evidence -- and

25  hopefully this will be a relatively quick trial -- and I will ask

```
 1   you to do what's right and come to the only conclusion that is

 2   fair based on the evidence that's presented.  And that is that

 3   StrikePoint is entitled to nothing.  They're not entitled to a

 4   penny from Ms. Sabolyk.  Not entitled to a penny from

 5   Mr. Mondragon.  And not entitled to a penny from GAA.

 6            Thank you very much.

 7            THE COURT:  Counsel, opening statement, please.

 8                OPENING STATEMENT BY MR. SKLAR

 9            Hello, Ladies and Gentlemen of the Jury.  And thank you

10   very much for coming down here and spending a week with us to

11   hear about our case.

12            As I said before, I represent Aimee Sabolyk and Global

13   Asset Advisors, also known as Daniels Trading.  And Mr. Glenn

14   Swanson is the president of that company.  And I am here to tell

15   that you they have done nothing wrong.  And there is no proof

16   that they have done anything wrong, and that is what the evidence

17   will show.

18            Now, I was taking some notes during Mr. Hilton's

19   opening.  And as these things go, things change.  And one of the

20   notes that I was taking, I wanted to share with you.  He started

21   to talk about all the evidence he will have of solicitation.  And

22   I made some bullet points on the page.  You can see them here.

23   And I expected him -- because I don't know of any evidence

24   frankly --

25            THE COURT:  Counsel, I'm sorry.  Your evidence.
```

1    Facts.

2              MR. SKLAR:  Fair enough, Your Honor --

3              THE COURT:  The only evidence that will be offered that

4    there was any solicitation will be some personal emails.

5    Personal emails that he defined.  Personal emails between Aimee

6    Sabolyk and her boyfriend, Michael Kessler.  And their good

7    friend Chris Wood.

8              Now, there are three essential issues in this case.

9    Did StrikePoint Trading indeed have a legitimate trade secret?

10   Mr. McCaffrey has outlined what they need to prove to you to

11   establish that.  I will submit to you the evidence is

12   overwhelming that they do not have a trade secret.

13             They've identified what they call lead sources.  It's

14   one of the terms in their contract.  Now, I had asked

15   Mr. Armbruster, and he had testified what a lead source is is

16   actually the pilots.  And in fact these American Airlines pilots.

17   And so it is StrikePoint's contention -- and they have testified,

18   and you will hear testimony -- that because Aimee Sabolyk learned

19   that American Airlines pilots liked to trade options while she

20   was working at StrikePoint, that knowledge is the property of

21   StrikePoint.

22             And that is not the law.  In fact, as you will see, in

23   bold color, Optioneer has a website, including testimonials.  And

24   there are approximately 15 testimonials on that website.  And out

25   of those 15 testimonials, I believe eleven or twelve are airline

1   related.  And the reason you know they're airline related is

2   right under their name, it lists their occupation and employer.

3   And I suggest to you that ten of those list American Airlines

4   pilot.

5           Now, any broker who is looking for business may look at

6   that website, see that, and garner that perhaps as StrikePoint

7   alleges -- and I don't eastbound know if this is true -- American

8   Airlines pilots like to trade options.  Well, that's irrelevant.

9   Because it's no secret.  And they've published it.

10          And you will see no agreements between Optioneer and

11  StrikePoint relating to how they're going to protect those trade

12  secrets.  You will see no information at all concerning how

13  StrikePoint Trading is going to reimburse Optioneer for garnering

14  all these clients.  And for the years 2004 to 2007, the end of

15  2006, it is StrikePoint's testimony that they spent zero dollars

16  in 2004, it will be their testimony that they spent zero dollars

17  in 2005 and zero dollars in 2006.

18          Now, they have tried to clean that up a little, but

19  subsequently with what they call the ballpark figure.  But there

20  is no documentation to support that at all.

21          Now, Aimee Sabolyk, this Excel spreadsheet that they're

22  so fond of referring to a list of clients, I don't know what

23  their client list that they're actually suing on is.  We've asked

24  them to actually give us that, quote, client list.  The only list

25  that they have that they are suing on is the one we gave them in

1    response to answers about which clients are trading.

2           On that list for Aimee Sabolyk are really seven

3    clients.  Seven out of 65 or 70.  Mike Kessler, who was referred

4    to her through a client named Chris Wood, Mike Kessler was not a

5    random assignment by StrikePoint to Aimee Sabolyk, but rather was

6    referred to her directly from an existing client, Chris Wood, who

7    in fact was assigned to her.

8           You'll see testimony from Chris Wood -- he lives in St.

9    Louis.  He's a pilot, an airline pilot.  And Mike Kessler also

10   airlines pilot.  They're best friends.  And they've been best

11   friends for 25 years.  And you will see their testimony.  Because

12   I went to St. Louis to ask them their story.  I went to St. Louis

13   to ask them, "Were you asked to engage in a procedure to help

14   take clients away and help get Aimee business?"

15          And you will judge their veracity for yourself.  I

16   believe their testimony is compelling.  You can't solicit

17   somebody who's your boyfriend and is encouraging you to leave a

18   workplace.  And that's the testimony of Mike Kessler.  Mike

19   Kessler met Aimee Sabolyk, and they became close friends and that

20   developed into a romantic relationship.  And they're still close

21   friends today.  The romantic relationship is not still ongoing,

22   but Mike Kessler and Chris Wood are close personal friends.  And

23   they will deny that any type of solicitation took place

24          Mike Kessler was told by Aimee Sabolyk -- and you will

25   hear testimony about some uncomfortable things that were

1   occurring for her while she was working at StrikePoint, things

2   like deductions from her paycheck, things like inappropriate

3   comments.  As recently as a month before she left.  And in fact

4   she was docked $3,800 in the month before she left.

5          The other clients that she has, John Kendall, a retired

6   aircraft maintenance supervisor, I took his testimony, too.  John

7   Kendall actually accounts for about 60 percent of all the

8   commissions that Aimee generated at GAA and likely at StrikePoint

9   as well.  And John Kendall had no idea that Aimee was leaving.

10  And you will see his testimony, that he gave the broker at

11  StrikePoint a chance, he was not satisfied with how the account

12  was being handled, expressed some concern to his friends saying,

13  "Hey, I can't find my broker.  What's happened?"

14         And the friend suggested he Google her.  And

15  Mr. Kendall said, "What's Google?"  And he found out, and he

16  found her.  I believe his testimony is straightforward and

17  compelling.

18         The other clients that Aimee Sabolyk had, the Spencers

19  and the Lohmanns.  The Lohmanns sent an email saying they had

20  seen the announcement.  The announcement Mr. McCaffrey tells you

21  is in fact legal.

22         Now, one of the battles in this case has been, well,

23  what is the extent of the protection that the plaintiffs are

24  claiming?  And plaintiffs have -- Mr. Armbruster, the

25  representative of StrikePoint, has over and over and over and

116

```
 1    over again said that the mere fact that these people opened an

 2    account is evidence of solicitation.  All she knows is what she

 3    learned at StrikePoint.  And the evidence that they were

 4    solicited is because they signed these statements.

 5            Now, I'm perplexed how individuals at arms length can

 6    be coerced into signing a statement.  And no evidence has been

 7    offered as to what that motivation might be.  Because in fact

 8    commissions charges at StrikePoint and Global are not so much

 9    different at all.

10            So what you're going to be asked to do is speculate.

11    You're going to be asked to speculate from some emails because

12    Aimee was telling people where she was going that in fact the

13    solicitation occurred.  There is no connection between

14    Mr. Kessler and any of the other clients other than Mr. Wood.

15    And there is no testimony that there is.

16            And the Defendants submit to you that every single

17    client that Aimee Sabolyk opened was garnered through legitimate

18    means.  Now, the plaintiffs want you to believe that because she

19    said she was interested in opening accounts that that is evidence

20    of solicitation.  I suggest to you that's evidence that she

21    wanted to continue making a living.  And because it is up to the

22    client where they go, she had faith that out of the 60 or 70 some

23    might want to continue to do business with her.  And she did know

24    she had one.  Her boyfriend.

25            Now, Chris Wood in fact didn't move until seven months
```

1    later.  And he will testify and you can hear his story as to why.

2    There is an email where he is ribbing her about how Mike was

3    hounding him.  He was kidding.  And you can read it, and you can

4    judge for yourself.

5           But as to these other clients, the Spencers, Scott --

6    Steve Spencer -- pardon me -- and James Spencer.  The Lohmanns,

7    Virginia and her sons Frederick and James, there is no evidence

8    that they were solicited.  In fact, out of the 60 or 70 clients

9    on the Excel spreadsheet that they say Aimee solicited off of

10   that she printed a few days before she left, which in fact is not

11   illegal because under the law announcements to trade secret

12   protected clients -- and that's mailed announcements, identifying

13   your new affiliation, the judge will instruct you that that is

14   legal as a matter of law, that an announcement is legal.  And

15   that is what the evidence will show.

16          And other than the fact that these people opened

17   accounts with clients they claim that are their exclusive

18   property there will be no other evidence.  None.  And I submit to

19   you that if there was this solicitation going on, this continual

20   program to try to get clients, StrikePoint would produce one.

21   Just one.  Give us a client that said they were solicited.

22   Brokers solicit people all the time.  Some people are receptive.

23   Some are not.  And some people hang up on them.  Many people have

24   different views to brokers.

25          Now, StrikePoint Trading actually records all of its

1    conversations.  Every single one of them.  Most brokerage houses

2    do so that if there is a despite about what happened on an order

3    it's right there on the tape.

4            When asked if they had looked at these tapes or

5    listened to them, StrikePoint said no.  When asked if they had

6    done any investigation at all to corroborate their feelings about

7    solicitation and appropriation, the answer was no.  No

8    investigation.  We never listened to any of the tapes.  We never

9    asked anyone to say, "Hey, see, why Ms. Lohmann is moving her

10   account."

11           In fact, Ms. Lohmann an account at StrikePoint while

12   the account was opened at GAA.  So how they're claiming damages

13   there, I have no idea.  But that's not really the issue here.

14   The issue is that StrikePoint had available to it means to

15   investigate and corroborate these claims, and they came up with

16   no evidence at all.

17           Moreover, they have a system that brokers take notes

18   from the interviews and their talks with their clients called the

19   CRM.  When I asked Mr. Armbruster, "Do you have any notes where a

20   broker took a note that somebody was solicited?"  Because that's

21   not hearsay.  It's a business record.  Nothing was produced.  Not

22   a one.  When I asked if there was a conversation evidencing

23   solicitation -- you're going to hear his testimony -- he said it

24   might be out there.

25           Now, StrikePoint Trading is not a full service

 1   brokerage house.  They work in a limited area.  And they are

 2   licensed in commodity futures and options.  What they work in are

 3   risk, speculation markets.  They're very familiar with

 4   speculation.  And you're going to see a lot of that in this case.

 5           StrikePoint Trading was formed for one purpose and one

 6   purpose only.  To service the clients of Optioneer.  If you're

 7   not a client of Optioneer, you can't open an account at

 8   StrikePoint.  And all of Optioneer's clients must open an account

 9   at StrikePoint.

10           And this brokerage house as Mr. Hilton told you the

11   evidence will show was formed by Altavest, the prior employer of

12   Aimee Sabolyk and Optioneer.  They each owned fifty percent of

13   this brokerage house.  And it was formed in 2004.

14           And the regulatory problems that Mr. Hilton likes to

15   equate equally are not at all equal.  You're going to hear

16   evidence that during the period of time that Optioneer garnered

17   and put out seminars getting these clients during that same

18   period in time, the CFTC, the Commodities Futures Trading that

19   regulates commodities in this country, much the same way that the

20   FTC does, found that they had made false and misleading

21   statements to their clients.  And they consented to a fine of

22   $130,000.  And it was at that time during that investigation that

23   StrikePoint Trading was formed.

24           And initially Mr. Burgess, Mr. James Burgess, was also

25   found to be personally responsible for those misrepresentations.

 1    And Mr. Burgess was initially the president of StrikePoint.  But

 2    then he was no longer.  And I say this because it is our

 3    contention that this evidence demonstrates that these leads,

 4    these clients that were closed during the period that these

 5    material misrepresentations were made cannot be trade secrets.

 6    Because they were gotten by ill-conceived and fraudulent methods.

 7    And that will be a decision for you to make.

 8            Prior to the filing of this lawsuit, you will hear

 9    testimony that a representative from StrikePoint, a fellow by the

10    name of Robert Burgess, James Burgess's father, spoke with the

11    owner of Daniels Trading, Andrew Daniels.  And you will hear

12    testimony that Mr. Burgess told Mr. Daniels to fire Aimee and

13    everything would be fine.  And he was alleging at that time that

14    Aimee had stolen this, quote, proprietary secret strategy.

15            And I am going to digress a little bit and tell you a

16    little bit about it, try not to make it too complicated.

17    Optioneer is not available at Daniels.  Optioneer is not

18    available anywhere.  And it is a variation of an old, old

19    strategy that dates back to the origins of the options market.

20    It's called the iron condor.  And without getting too technical,

21    as Mr. Hilton said, an iron condor, instead of having one option

22    where you have basically an option call is a gamble bell that the

23    market is going to rise and an option put is a gamble that the

24    market is going to go down.  And there are gamblers that buy

25    those.  And they're doing what we call buying volatility.  Buying

1   a very wild market.  And any time those markets move, those

2   buyers of volatility make a lot of money.

3           Now, a lot of times the market isn't volatile.  And you

4   will hear testimony that from 2004 to 2006 the Dow Jones

5   Industrials and the S&P 500, which are you'll hear, are simply

6   measures of the broader market traded in a very narrow range.

7   And it is that strategy that the iron condor was originally

8   conceived to take advantage of.  It's called selling volatility.

9           And over time this strategy, this selling volatility

10  strategy, began to work less and less for Optioneer.  And you

11  will hear testimony from Mr. Mondragon who actually conceived how

12  to get this thing off the ground, and from Aimee Sabolyk who

13  contrary to what they claim, she learned everything she knew

14  there, she's a very intelligent person, and realized that this

15  Optioneer strategy, developed by a man named Andrew Evans, was

16  ill-equipped to handle a rapidly changing market.

17          So what Optioneer did is they started including more

18  and more recommendations for trades, which included more and more

19  commissions.  And it was for these reasons, among the others that

20  we've already cited, that Aimee Sabolyk decided to leave.

21          And when she left she told Global Asset Advisors about

22  the conversation she had with him Mike Armbruster, who was really

23  telling her don't think about opening an account with any of our

24  clients.  He wasn't telling letter not to solicit them.  He was

25  telling her not to open it.

1          And when I asked Mr. Armbruster her at deposition, what

2    if a client Googled her and found her and just wanted to open

3    account, it was his view that it would be improper for her to

4    accept that business.

5          And I submit to you that's the crux of their case.  And

6    they're going to try to dance around that, but that's really what

7    they believe.  And it's not true.  Because she can announce.  And

8    John can announced where they went.  And there is not anything

9    they can do about it.

10          Now, as I said Global Asset Advisors Glenn Swanson and

11    Andy Daniels, were very well aware of what was going to happen.

12    They stood by Ms. Sabolyk because they thought this was wrong.

13    They thought this was wrong.  It would have been a lot easier to

14    fire her, but they didn't.  But they wanted to make sure that no

15    one was solicited.  Because after they instructed her not to

16    solicit, we all know, no ones knows.

17          So what they did was they told Aimee, and John, who was

18    hired some five months later, six months later, to have all their

19    clients sign a statement, confirming that they were not

20    solicited.

21          Now, Mr. Hilton wants to make a lot of the fact the

22    statements are the same format.  Well, of course, they're the

23    same format.  But that doesn't mean that the clients were coerced

24    into signing them.  That doesn't mean that every single client

25    would lie.  In fact, it means just the opposite.  It means they

1    weren't solicited.  And there are no damages here.

2          Now, you're going to hear a report from Christopher

3    Money.  Actually, he filed two.  The first one asking for $7

4    million in damages.  And the second one, two to four million

5    dollars.  We have an expert of our own, a man named William

6    Ackerman.  And he is going to talk about the assumptions of

7    Mr. Money's report and why we think it was speculation and why we

8    think Mr. Armbruster's testimony about solicitation is

9    speculation.  And why we think that the causation for these

10   clients moving is complete speculation.  Because this is

11   something --

12         MR. HILTON:  Your Honor, I apologize for interrupting,

13   but this is argument.

14         THE COURT:  Counsel, this is argument.

15         MR. SKLAR:  -- that they're familiar with.

16         And I'll finish it up.  And this is what the evidence

17   will show, that there is no evidence at all that anyone was

18   solicited whatsoever.  Thank you.

19         THE COURT:  Okay, sir.  I want you to go to lunch.  Why

20   don't we meet at -- how long would you like for lunch?  Do you

21   want to try an hour today?  Think you can do it an hour?  Let's

22   start off with an hour.  You're admonished not to discuss this

23   matter amongst yourselves, nor form or express any opinion

24   amongst yourselves.  We'll see you in an hour, about twenty after

25   1:00, okay?

```
 1        (Jury out)

 2            THE COURT:  All right, then, Counsel, 1:20, please.

 3   Thank you very much.  Have a nice lunch.

 4        (Court recessed at 12:19 P.M.)

 5

 6                       CERTIFICATION

 7

 8      I hereby certify that pursuant to Section 753, Title 28,

 9   United States Code, the foregoing is a true and correct

10   transcript of the stenographically reported proceedings held in

11   the above-entitled matter and that the transcript page format is

12   in conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   Date:  MARCH 10, 2009

16

17                          _____

18                          DONALD A. HILLAND, CSR No. 11909

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIIFORNIA